**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:16CR329 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| EDWARD R. HILLS, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

The indictment, returned October 19, 2016, charges defendants with a variety of federal crimes involving federal fraud, bribery, and conspiracy relating to their dental practices. (Doc. No. 1 ["Ind."].) Defendants have filed a series of pre-trial motions. The Court conducted a hearing on these motions on December 14, 2017, at the conclusion of which it took the motions under advisement. The Court is now prepared to issue its rulings.

## I. DEFENDANTS' DISCOVERY MOTIONS

Various defendants have sought early disclosure of *Brady*, *Giglio*, and/or Jencks Act material. (Doc. Nos. 130, 131, 132, 137, 138, 165, 205, 208 ["Disc. Mot."].) The motions cite the complexity of the case, the importance of testing/impeaching government witnesses (especially those who have received promises in exchange for their testimony), and the potential for delays if such material is not produced in advance of trial. The government filed a consolidated response to these discovery motions. (Doc. No. 215 ["Disc. Mot. Opp'n"].)

In opposition to these motions, the government represents that it has and will continue to

honor its affirmative obligation to provide discovery. It notes that it produced the bulk of discovery in December 2016 and January 2017. Each defendant was provided with a four-terabyte hard drive that included "a sub-set of documents identified by the government as most relevant within the realm of discoverable materials." (Disc. Mot. Opp'n at 1636[1].) It also provided copies of defendants' statements, grand jury subpoenas, and executed search warrants and affidavits. Also included was an index of other documents available for inspection and copying by defense counsel upon request. The government further discloses that it has no knowledge of exculpatory evidence material, and that its efforts to supplement discovery are ongoing. It also notes that it intends to comply with the Court's trial court order that provides that, "[u]nless there is a well-founded concern for the safety of the witness, the parties are strongly encouraged to provide Jencks and reciprocal Jencks material no later than the close of proceedings the day before the witness is expected to testify." (Doc. No. 17 ["Tr. Order"] at 145.) In some cases, the government plans to produce Jencks Act material weeks before a witness testifies. (Disc. Mot. Opp'n at 1641.) At the hearing, the government also confirmed that it has made no promises, nor offered any deals, to any anticipated witnesses in exchange for their testimony.

Under Rule 26.2, which incorporates the Jencks Act in the Federal Rules of Criminal Procedure, after a witness has testified on direct examination, the government or the defendant may discover the witness' pretrial statements if the statements are in the possession of the party calling the witness and relate to the subject matter of the witness' testimony. *See also* 18 U.S.C. § 3500. While it is true that early disclosure of Jencks material "avoids the inevitable delay of the

---

[1] All page numbers are to the page identification number generated by the Court's electronic docketing system.

trial when the material is withheld until the witness concludes his direct examination[,]" *United States v. Minksy*, 963 F.2d 870, 876 (6th Cir. 1992), the government has the right under the Jencks Act to withhold such material until the witness has testified on direct. *See id.; United States v. Brazil*, 395 F. App'x 205, 215 (6th Cir. 2010); 18 U.S.C. § 3500(b); *see also United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988) ("The clear and consistent rule of this circuit is that the intent of Congress expressed in the Act must be adhered to and, thus, the government may not be compelled to disclose Jencks Act material before trial.") (citations omitted). As for *Brady,* the government is only required to provide exculpatory and impeachment evidence in time for effective use at trial. *See United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004) (citation omitted). Further, "[w]hen *Brady* material sought by a defendant is covered by the Jencks Act . . . the terms of that Act govern the timing of the government's disclosure." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (quotation marks and citation omitted).

At the hearing, counsel for the moving defendants conceded that they had no evidence that the government has failed to meet its discovery obligations to date. Instead, they merely underscored the importance of receiving potential witness statements as early as possible as they may be useful at trial.[2] The government has assured the Court and defense counsel that it intends to provide all Jencks Act material well in advance of trial. Therefore, defendants' discovery

---

[2] At the hearing, defense counsel also expressed concern that the terms of defendants' conditions of pretrial release would interfere with the ability to interview certain employees of MetroHealth Hospital Systems who might be called at trial. The government clarified that these terms did not extend to defense counsel or their investigators.

motions are **DENIED**. The government is encouraged to provide all required discovery materials as early as possible so as to avoid any unnecessary delays at trial.

## II. DEFENDANT HILLS' MOTION TO SEVER

Defendant Edward Hills ("Hills") has filed a motion for an order severing the proceedings against him from the trial of his co-defendants. (Doc. No. 206 ["Mot. Sever"].) The government opposes the motion. (Doc. No. 214 ["Mot. Sever Opp'n"].) Hills does not suggest that he has been misjoined with his co-defendants in violation of Fed. R. Crim. P. 8. Instead, he claims that discretionary severance is warranted under Rule 14 because one of his co-defendants, Sari Alqsous ("Alqsous"), made incriminating statements about Hills to the FBI in an interview on September 8, 2016.

In his motion, Hills maintains that he may suffer substantial prejudice if he is not severed from Alqsous because the introduction of his co-defendant's statement, without the benefit of cross-examination, would violate the Sixth Amendment as set forth in *Bruton v. United States*, 391 U.S. 123, 132, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). The government concedes that the "use at a joint trial of a confession made by a defendant which also implicates a co-defendant violates due process." (Mot. Sever Opp'n at 1627, citing *Bruton, supra*). Still, the government insists that severance is not necessary because it does not intend to, and cannot by the terms of the proffer agreement entered into with Alqsous, use this evidence in its case-in-chief. (*Id*.) While it envisions that it could use the statement if Alqsous elects to testify and testifies in manner that contradicts his proffer, the government notes that Hills would have the right to cross-examine, rendering the argument under *Bruton* moot. (*Id*. at 1628.) Further, the government posits that potential *Bruton* violations can be avoided through redaction "by

replacing the co-defendant's name with a neutral pronoun or other generalized phrase." *United States v. Winston*, 55 F. App'x 289, 294 (6th Cir. 2003) (citing, among authority, *Gray v. Maryland*, 523 U.S. 185, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998)).

At the hearing, counsel for Hills agreed that, based upon the government's representations, any possible prejudice to her client from the unlikely introduction of Alqsous' proffer statement can be ameliorated through proper redaction Accordingly, the Court shall **DENY WITHOUT PREJUDICE** Hills' motion and shall revisit the issue if, and when, the government introduces Alqsous' statement at trial. Prior to such introduction, the government shall advise the Court and opposing counsel so that the Court may make the appropriate ruling at that time.

### III. DEFENDANT ALQSOUS' MOTION TO SUPPRESS EVIDENCE FROM RESIDENTIAL SEARCH

Alqsous seeks to suppress all evidence seized during a search of his home and cellular phone, owing to what he perceives as insufficiencies in the warrant and Master Affidavit offered in support of the warrant. (Doc. No. 207 ["Mot. Supp."].) Specifically, Alqsous argues that: (1) the Master Affidavit lacked the requisite nexus between the places to be searched and the evidence to be seized, and (2) the warrant was based on stale evidence. The government rejects each attack upon the warrant and supporting affidavit. (Doc. No. 213 ["Mot. Supp. Opp'n"].) In the event that the Court finds probable cause lacking, the government also argues that the searches should be upheld under the good faith exception to the exclusionary rule.[3]

On September 16, 2015, a warrant application was submitted for the search of several

---

[3] Because the Court may not look beyond the four corners of the affidavit in evaluating Alqsous' motion to suppress, *see United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010), the parties agreed at the hearing that live testimony from the affiant was unnecessary. Additionally, defense counsel advised that Alqsous was not seeking a *Franks* hearing.

businesses and private residences, in connection with an ongoing investigation into healthcare fraud. Among the locations to be searched were Alqsous' residence at 1422 E. 15th Street, Cleveland, Ohio, and the business address for his clinic, Nobel Dental Clinic, at 2140 Noble Road, East Cleveland, Ohio. The application was supported by a Master Affidavit prepared by FBI Special Agent (SA) Kirk Spielmaker and totaling 70 pages. (Doc. No. 207-2 (Master Affidavit ["Master Aff."]).) The Master Affidavit provided that it sought to search and seize records in both hard copy and digital formats, including any found in a computer or smartphone. The Master Affidavit contained information derived from the special agent's investigation, including information from individuals with first-hand information, confidential informants, and contributions from various federal and state law enforcement agencies. In swearing out the affidavit, SA Spielmaker also drew from his years of experience investigating "public corruption and government fraud matters" in presenting the information to the neutral magistrate. (Master Aff. at 1351-52.) The warrant signed by the magistrate judge authorized federal agents to recover from Alqsous' residence various documents and records, including: accounting, tax, and financial records; government contracts involving MetroHealth and others healthcare providers; documentation of things of value given or received; and communications, written and electronic, with co-conspirators. (*Id*., Attach. B3; Doc. No. 207-2 (Warrant), beginning at 1471, Attach. B3.)

The Fourth Amendment mandates that there must be probable cause for any search and seizure. U.S. Const. amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995) (quoting *United States v. Bennett*, 905 F.2d 931, 934

(6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quotation marks and citation omitted). "Probable cause is based on the totality of the circumstances; it is a 'practical, non-technical conception that deals with the factual and practical considerations of everyday life.'" *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *Frazier,* 423 F.3d at 531); *see United States v. Lazar*, 604 F.3d 230, 241-42 (6th Cir. 2010) (trial judge properly found probable cause in common-sense manner where affidavit was based on two-year involvement in the case, personal visits to locations, review of bills, and extensive interviews).

*Stale Evidence*

Alqsous first challenges the warrant on the ground that it was based on stale evidence. The probable cause requirement for a search warrant "is concerned with facts relating to a presently existing condition." *Abboud*, 438 F.3d at 572 (quotation marks and citations omitted). "Thus the critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at [the location of the search]." *Id*. (quotation marks and citations omitted).

"The staleness inquiry is tailored to the specific circumstances in each case." *Abboud*, 438 F.3d at 572 (citation omitted). Accordingly, in considering the issue of staleness, the Sixth Circuit has outlined several factors, in addition to the length of time between the events described in the affidavit and the application for the warrant, to consider: the character of the crime, the criminal (nomadic or entrenched), the thing to be seized, and the place to be searched.

7

*Id.; see United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010). Evidence of ongoing criminal activity will generally defeat a claim of staleness. *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) (citation omitted).

Relevant to the staleness inquiry, the Master Affidavit provides that applicants for the MetroHealth Dental Residency Program were either solicited by Alqsous and defendant Tariq Sayegh ("Sayegh") for bribes or provided said bribes to Alqsous and others from approximately 2009 through as recently as 2014. (Master Aff., Sec. III, A, at 1364-76.) The Master Affidavit further states that Hills solicited and accepted bribes and things of value from Alqsous, defendant Yazan Al-Madani ("Al-Madani"), and others from at least 2012 through Hills' departure from MetroHealth in late 2014. (*Id.*, Sec. III, B, at 1376-84.) These things of value included payments provided in June 2014 by Alqsous to Hills for a hotel room for Hills' mistress (*id.* at 1382) and numerous cash payments through the preceding years. (*Id.* at 1379-80, 1382-83.) Alqsous also used a personal check bearing his home address to pay for a television for Hills as recently as December 31, 2013. (*Id.* at 1379.) The Master Affidavit further describes an ongoing scheme to divert Medicaid eligible payments from MetroHealth to one of Alqsous' clinics, Buckeye Family Dental, in return for kickback payments made to Hills. (*Id.*, Sec. IV, at 1384-92.) These kickbacks included payments made directly to Hills by checks bearing Alqsous' residence address as recently as March 2014. (*See id.* at 1384.)

In support of his staleness argument, Alqsous observes that the most recent evidence relied upon in the Master Affidavit to justify the search of his residence was a check dated May 1, 2014—"more than 16 months before" the search. (Mot. Supp. at 1336.) He also makes several arguments that are better left to the issue of a sufficient nexus to his residence. He believes that

the only other possible *temporal* nexus the affidavit tries to establish is SA Spiekmaker's contention that "[t]he courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, and that where there was an ongoing criminal business or where the evidence is of a nature that would be kept long after the criminal activity ceased, the passage of long periods of time will not make the evidence supporting the issuance of a warrant stale." (Master Aff. at 1354.) Alqsous argues that this "broad-based assertion is a far-cry from demonstrating 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" (Mot. Supp. at 1342, quoting *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006)).

Alqsous relies heavily upon *Hython*, but in that case the accompanying affidavit was supported by only one controlled drug transaction that was not even dated. The court found that one sale did not constitute ongoing activity, and "more importantly, the affidavit offer[ed] no clue as to when this single controlled buy took place." *Hython*, 443 F.3d at 486. Under these circumstances, the court found that the warrant was invalid for staleness. This case, however, is more analogous to circumstances presented in *Abboud*. There, agents were investigating a bank fraud case involving check kiting, and the warrant was based on evidence from 1999, even though the search was conducted in 2002. In concluding that the warrant was not based on stale evidence, the Court relied on the fact that the character of the crime was such that it involved "numerous" incidents of bank fraud such that it was ongoing, that the defendant was entrenched in the area-owning multiple business and a residence in the area, that the business records sought were likely to be found at the defendant's home or business long after the fraud was concluded, and that such records were likely to be kept at a home or business. *Abboud*, 438 F.3d at 574.

These same relevant factors defeat Alqsous' staleness argument. The affidavit outlines an ongoing bribery and kickback scheme occurring over several years. Also, Alqsous owned a home and several businesses in the area so he was "entrenched" at the places to be searched. *See United States v. Gardiner,* 463 F.3d 445, 472 (6th Cir. 2006) (evidence of ongoing criminal bribery conspiracy, over several years, defeated staleness argument);[4] *United States v. Greene,* 250 F.3d 471, 481 (6th Cir. 2001) (citing *United States v. Yates*, 132 F. Supp. 2d 559, 565 (E.D. Mich. 2001) ("The place to be searched was the defendant's home, suggesting that there was some permanence to the defendant's base of operation.")). The things sought to be seized (mostly business records) were the type that would be kept for an extended period of time (as opposed to drugs). *See Abboud*, 438 F.3d at 574 ("This Court has found that business records are a type of evidence that defy claims of staleness.") (collecting cases). Finally, the place to be searched—Alqsous' residence—was the type of place that such records would be kept. *See Gardiner*, 463 F.3d at 472. Thus, the Court finds that the Warrant was not based on stale evidence.

*Nexus with the Location Searched*

Alqsous also challenges the sufficiency of the Master Affidavit because it allegedly failed to establish the necessary nexus between the place to be searched (his residence) and the items to be seized. "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.

---

[4] In *Gardiner*, "even more crucial[]" than the ongoing nature of the criminal enterprise, was the fact that affidavit noted that a co-conspirator had lied to police "a mere three months before the warrant was issued." *Id*. Here, the affidavit claims that in February 2015, less than 7 months before the warrant issued, Alqsous told a confidential informant that he and other clinic employees removed files from the clinic. (Master Aff. at 1390.)

2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)); *see Fraizer*, 423 F.3d at 531 (internal quotation marks and citation omitted) ("To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search.") (quotation marks and citations omitted).

Again, the Master Affidavit alleged a bribery and kickback scheme whereby individuals, including Alqsous, provided bribes to Hills. Specifically, the Master Affidavit provided that Alqsous made cash payments to Hills in June 2014 for a hotel room for Hill's mistress, and numerous cash payments throughout the year. Included in these payments was a personal check, dated December 31, 2013, written by Alqsous bearing his home address to pay for a television for Hills. (Master Aff. at 1379.) The affidavit further represented that Alqsous used his phone to divert Medicaid patients from MetroHealth Hospital to one of his private clinics. (*Id.* at 1388-89.) Additionally, the Master Affidavit identified evidence that Alqsous and other employees of his clinic, Noble Clinic, began removing patient files and records from the clinic in response to the ongoing federal criminal investigation, and that Medicaid providers are required by law to keep such records for at least seven years. (*Id.* at 1390-91.) Finally, the Master Affidavit discussed evidence showing that Alqsous used his residential address on his personal and business checks and incorporation documents for one or more of his clinics. (*Id.* at 1379, 1385, 1387.)

Alqsous argues that there is no evidence in the Master Affidavit to suggest that he treated his residence as a home office (such as a home office tax deduction), and the government cannot point to any criminal activity that took place at his residence. (Mot. at 1337 ["Common sense . . .

must prevail here, since, simply put, dentists work in dental offices and do not work at home."].)

He complains that the only evidence connected to his residence is two checks from 2013 and 2014 and some incorporation documents for Alqsous' clinic. (*Id*. at 1341.)

According to the government, the Master Affidavit establishes a "fair probability" that evidence of criminal activity would be found at Alqsous' residence. It underscores the fact that an affiant need not offer direct proof of illicit activity in a location to establish a nexus to search it. *Graham*, 275 F.3d at 503. "Instead, as the search concerned records that were likely to be kept and maintained in a residence, and were likely to remain as they were not susceptible to dissipation or degradation, the affidavit established a sufficient nexus to the location." (Opp'n at 1573-74.) The Master Affidavit described evidence that the residence was used as the return address for checks written to further the conspiracy, and that business records of financial transactions supporting the conspiracy are likely to be kept at a residence. *See Abboud*, 438 F.3d at 572 ("One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home."); *see, e.g., United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011) (evidence of Medicaid fraud likely to be found at defendant's residence, and no need for the crimes to have taken place at defendant's residence to establish nexus); *United States v. Linares*, No. 13-20368, 2015 WL 3870959, at *7-8 (E.D. Mich. May 4, 2015) (sufficient nexus to search defendant physician's residence for business records establishing Medicaid fraud) (relying on cases, such as *Abboud*, that business records likely to be kept at a defendant's residence).

Given the nature of the criminal enterprise and the evidence sought by the warrant, not to mention the fact that Alqsous and his employees were alleged to have removed files from the

only other likely place where such evidence might be kept, the Master Affidavit demonstrated more than a "fair probability" that evidence of the conspiracy would be found at Alqsous' residence. Accordingly, based upon the "totality of the circumstances," the Court finds that the Master Affidavit supplied the necessary nexus between Alqsous' residence and the evidence sought by law enforcement.

*Cell Phone*

Alqsous also claims that his iPhone (and its contents) were improperly seized. In support, he notes that at least one of the text messages seized was a text between himself and his fiancé, Dr. Jennifer DePiero. He claims that the search warrant only permitted the seizure of communications between co-defendants. (Mot. Supp. at 1343, citing Warrant, Attach. B2, B3.) It is the government's position that the face of the warrant (and the nature of how digital evidence searches are conducted) permitted such seizure, and, in any event, suppression of the entirety of the records form the phones would not be the appropriate remedy. *See United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985) ("Unlawful seizure of items outside a warrant does not alone render the whole search invalid and require suppression of all evidence seized, including that lawfully taken pursuant to the warrant.") It suggest that only a "flagrant disregard for the limitations of a search warrant" would demand such a remedy, and that Alqsous cannot establish such a violation. *Id*. at 93 (collecting cases); *see United States v. Richards*, 659 F.3d 527, 538 (6th Cir. 2011) (requiring a case-by-case analysis for computer searches, and noting that in computer searches, some innocuous documents may be inadvertently viewed) (citations omitted).

Moreover, the government insists that the attachments to the warrant were broad enough to justify the capture of certain communications between Alqsous and his fiancé because they

were not limited to communications between co-conspirators but also included other categories of evidence that provided context or location for the co-conspirator communications. (Warrant, Att. B3.) For example, a review of the cell phone data revealed a series of text messages between Hills and Alqsous discussing suspected bribery payments that were supported by evidence of deposit receipts from Hills' bank accounts. Interspersed through these messages are texts between Alqsous and his fiancé in which he either confirms that he is meeting with Hills or verifies his identity as the user of the phone. (Mot. Suppress Opp'n, Ex. 5.) Taken together, this evidence supports a finding that Alqsous was the individual meeting Hills for the purpose of providing bribe payments and was properly collected through the warrant. Similarly, a search of the iPhone also revealed text messages between Alqsous and his fiancé wherein the two discussed Alqsous' deal to supply Hills with an apartment for his mistress in exchange for later official acts.[5] These messages provide context for later messages between Hills and Alqsous relative to this financial arrangement and were also properly collected through the warrant.

The Court also finds that seizure of these text messages would be upheld under the plain view doctrine, as it would have been reasonable to examine these messages to determine if they fell within the scope of the warrant. To invoke the plain view doctrine, the evidence must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994) (citation omitted). The "immediately apparent" incriminating quality does not demand an

---

[5] In the conversation, Alqsous advised his fiancé that he had "made a deal with hills loool." "He is paying me 1000 dollar[s] every month for that room hahahah." The fiancé responded: "Oh no lol." "Sucker!!!!!!;););) lololol." Alqsous later texted his fiancé that "[w]e got the house for free looool." "Let the tax payers pay for it." The fiancé responded: "I know!!!!! Hahaaaaaahaaaa." (Mot. Suppress Opp'n, Ex. 6.)

"unduly high degree of certainty." *Texas v. Brown*, 460 U.S. 730, 741, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983) (quotation marks and citation omitted). Instead, a plain view seizure is "presumptively reasonable, assuming that there is probable cause to associate the property with the criminal activity." *Id*. at 738 (quotation marks and citation omitted).

Here, agents had a "lawful right of access to the" iPhone and were "lawfully located in a place from where the" text messages in question could be observed as they were acting pursuant to a lawfully issued warrant to search the phone. As part of the search, the text messages at issue—interspersed between co-conspirator communications—came into plain view. *See Richards*, 659 F.3d at 538 (noting that, difficulties inherent in conducting lawful computer searches may result in the capture of innocuous evidence unrelated to the warrant). Therefore, the Court finds that the search of these text messages can also be upheld under the plain view doctrine.

*Good Faith*

Even if the Master Affidavit and Warrant were fatally defective, or insufficiently broad enough to cover the evidence seized, the government argues that the searches could still be upheld under the good faith exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Under this exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (quoting *Leon, supra*). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In

making this determination, all of the circumstances … may be considered." *Leon*, 468 U.S. at 922-23 n.23.

The good-faith defense will not apply, however, where: 1) the supporting affidavit contains information the affiant knew or should have known is false, 2) the issuing magistrate lacked neutrality and detachment, 3) the affidavit is devoid of information that would support a probable cause determination making any belief that probable cause exists completely unreasonable, or 4) the warrant is facially deficient. *Leon*, 468 U.S. at 923; *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (citations omitted). Accordingly, the good faith exception is unavailable where the officer would not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Carpenter*, 360 F.3d at 595 (quoting *Leon, supra*).

Here, there is no evidence that SA Spielmaker gave a knowingly false affidavit or otherwise acted in bad faith, and the warrant was issued by a detached and neutral magistrate. Further, even if the warrant was deficient, it cannot be said that it was "so lacking" in indicia of reliability as to render the agent's reliance on his experience and training that the records and items sought were likely to be found in Alqsous' home entirely unreasonable. *See United States v. Neal*, 577 F. App'x 434, 449 (6th Cir. 2014) (good faith exception applied, despite the fact that nexus was not established, where evidence was sufficient to establish "a minimal nexus between the place to be searched and the potential for criminal activity"); *Carpenter*, 360 F.3d at 596 ("We have previously found *Leon* applicable in cases where we determined that the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched to support the officer's good-faith belief in the warrant's validity, even if the information

provided was not enough to establish probable cause.") (citation omitted); *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994) (officer's training and experience that contraband of drug activity would be found in safe deposit box was sufficient to support good faith exception).

Moreover, given the obvious effort exhibited by the applying agent to comply with the requirements of the Fourth Amendment, (including the level of detail and the care given to tie Alqsous and his co-defendants to the property to be searched and the fraudulent activity under investigation), it is unlikely that a reasonably well trained officer would have known that such a search was illegal, if, in fact, it was illegal. *See, e.g., United States v. Stelton*, 867 F.2d 446, 451 (8th Cir. 1989) (good faith exception applied where agents "took much care in drafting the descriptions of the items to be seized"); *United Sates v. Buck*, 813 F.2d 588, 593 (2d Cir. 1987) (good faith exception applied where officers provided details outlining the crimes and the evidence sought to a neutral magistrate).

For all of these reasons, Alqsous' motion to suppress is **DENIED**.

**IV. DEFENDANT ALQSOUS' MOTION FOR RETURN OF PROPERTY**

Pursuant to Fed. R. Crim. P. 41(g), Alqsous seeks the return of $88,895.00 in cash that was contained in a safe and in other locations in his residence. The money—which was contained in approximately 22 separate, marked envelopes—was confiscated during the September 29, 2015 search of his residence. He represents that the money is proceeds from his dental practice, rental income, and, in certain instances, money belonging to his fiancé. He incorporates the arguments made in support of his suppression motion and suggests that, if the search is determined to be unlawful, the money should be returned. He further argues, however, that even if the search is determined to be lawful, the property should still be returned if he is

harmed by the government's continued possession of it. The government opposes the motion on the ground that Alqsous has an adequate remedy at law—contest the forfeiture of these funds.

Rule 41(g) permits "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property [to] move for the property's return. The motion must be filed with the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings." It is established Sixth Circuit law that Rule 41(g) is an equitable remedy that may only be used when the defendant lacks an adequate remedy at law. *Shaw v. United States*, 891 F.2d 602, 603 (6th Cir. 1989) (denial of defendant's Rule 41 motion to return property where property was the subject of forfeiture and defendant could contest the forfeiture in that proceeding); *see, e.g., Brown v. United States*, 692 F.3d 550 (6th Cir. 2012) (money from safe seized and subject to forfeiture in a criminal proceeding against claimant's son-in-law could not be returned under Rule 41(g)).

Here, the indictment clearly and repeatedly identifies "$88,895 in U.S. Currency seized on September 29, 2015 at the East 15th Street residence of Defendant SARI ALQSOUS" as a subject of forfeiture, and defendant does not suggest otherwise. (Ind. at 92-93.) The government is correct that, under *Shaw* and *Brown*, Alqsous would have to wait and contest forfeiture at the end of the criminal proceedings. *See also United States v. Durante*, No. 11-277 (SRC), 2012 WL 2863490, at *1 (D. N.J. July 11, 2012) ("Ordinarily, the inclusion of the forfeiture allegation in the indictment is sufficient to bar the return of money unless and until a trier of fact determines whether the funds are subject to forfeiture.").

At the hearing, however, counsel for Alqsous attempted to distinguish *Shaw* and *Brown* on the ground that the seized funds were "in essence" substitute assets. According to counsel, there should be no dispute that the money in the labeled envelopes was entirely unrelated to any alleged criminal enterprise. In support of this position, counsel cited various cases providing that substitute assets are not subject to pretrial restraint. *See, e.g., United States v. Ripinsky*, 20 F.3d 359, 363 (6th Cir. 1994).

The government disagreed with defense counsel's assessment of the evidence in this case and the reach of *Brown* and *Shaw*, and further noted that the argument is academic as it has also sought forfeiture of these monies under RICO's source of influence provision, 18 U.S.C. 1963(a)(2). It is the government's position that these funds, in addition to representing proceeds from defendants' criminal activities, were also used by Alqsous as a "slush fund" to make bribery payments to Hills in furtherance of the RICO conspiracy. For example, the indictment cites a series of text messages between Alqsous and Hills wherein Alqsous advises Hills that "I have something to give you" and then, within a matter of days, Hills makes a deposit into a bank account. (*See, e.g.,* Ind. at 24-25.) The government also points to references in the indictment to Alqsous making monetary payments to Hills to cover the purchase of a luxury briefcase, a large-screen television, apartment and hotel rentals, and airline flights and upgrades. (*Id*. at 36-37, 40-41.) The indictment further provides that, in return for these items, Hills took favorable official actions on behalf of Alqsous and others.

The Court finds that, under either forfeiture provision, Alqsous' remedy lies in contesting forfeiture at the conclusion of the criminal proceedings. *See, e.g., Durante*, 2012 WL 2863490, at *2 (finding that a criminal defendant would have to wait until the conclusion of criminal

proceedings for a determination as to whether the funds, discovered in a safe in separate envelopes, were subject to forfeiture). Alqsous' motion to return property is **DENIED**.[6]

## V. CONCLUSION

For all of the foregoing reasons, defendants' discovery motions (Doc. Nos. 130, 131, 132, 137, 138, 165, 205, 208), and defendant Alqsous' motions to suppress (Doc. No. 207) and for the return of property (Doc. No. 204) are **DENIED**. Defendant Hills' motion to sever (Doc. No. 206) is **DENIED WITHOUT PREJUDICE**, and defendant Alqsous' motion to dismiss (Doc. No. 203) is **WITHDRAWN**.

**IT IS SO ORDERED**.


Dated: April 4, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[6] Alqsous also sought to dismiss Counts Six and Seven on the grounds that they were time-barred. (Doc. No. 203 ["MTD"]), defendant Sayegh ("Sayegh") joined the motion (Doc. No. 209 ["MTD Join"]), and the government opposed dismissal of these counts. (Doc. No. 212 ["MTD Opp'n"].) Alqsous conceded, however, that he was aware that the government had filed an ex parte order seeking the tolling of the limitations period. In its opposition brief, the government represented that the limitation period for these counts was tolled, pursuant to 18 U.S.C. § 3292, while it sought and received an ex parte order tolling the statute of limitations as it worked with the Hashemite Kingdom of Jordan to acquire evidence located in that country. (MTD Opp'n at 1545.) Section 3292(a)(1) permits the suspension of "the running of the statute of limitations for [an] offense if the court finds by a preponderance of the evidence that an official request has been for such evidence and that it reasonably appears or appeared at the time the request was made, that such evidence is, or was, in such foreign country." Based upon the government's representations that § 3292 had been properly invoked, counsel for Alqsous agreed at the hearing that the statute of limitations for these counts was properly tolled and withdrew his client's motion to dismiss.