# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:16CR329 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| EDWARD R. HILLS, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are the motions of defendants, Edward R. Hills ("Hills"), Yazan B. Al-Madani ("Al-Madani"), and Sari Alqsous ("Alqsous"), to reconsider the Court's order of remand and for release from detention pending sentencing. (Doc. No. 343 ["Hills Mot."]; Doc. No. 344 ["Al-Madani Mot."]; and Doc. No. 346 ["Alqsous Am. Mot."].) The government opposes the motions. (Doc. No. 348 ["Opp'n"].)

## I. BACKGROUND

On July 27, 2018, after a five week trial, the jury returned 16 or more guilty verdicts against each of the moving defendants. The jury also returned 5 guilty verdicts against a fourth defendant, Tariq Sayegh ("Sayegh"). The charges related to defendants' employment as dentists at MetroHealth Hospital, a public hospital receiving federal and state funding. The crimes of which defendants were found guilty included: RICO conspiracy, conspiracy to commit mail and wire fraud and honest services mail fraud, Hobbs Act conspiracy, bribery concerning programs receiving federal funds, solicitation or receipt of healthcare kickbacks, and obstruction of justice.

Hills was also convicted of multiple counts of filing false tax returns, and Al-Madani was separately convicted of making false statements to a federal officer. (Doc. No. 337 (Hills Verdicts); Doc. No. 338 (Alqsous Verdicts); Doc. No. 339 (Al-Madani Verdicts).) Sentencing for the moving defendants and Sayegh is currently set for November 27, 2018.

Immediately following the verdict, the government moved to revoke the bond of each defendant, and the Court conducted a bond revocation hearing, at which time the Court entertained oral argument from counsel. At the conclusion of the hearing, the Court granted the government's motion, and remanded the defendants into the custody of the U.S. Marshals. In revoking bond, the Court determined that it could not make the requisite finding by clear and convincing evidence that the defendants would not pose a flight risk. In reaching this conclusion, the Court emphasized the fraudulent and obstructive nature of the crimes for which the defendants had been convicted, as well as the deceptive behavior underlying these convictions. The Court also noted the substantial financing resources of each defendant, and, with respect to Al-Madani and Alqsous, the Court observed that both men were of foreign citizenship and had ties abroad.

Through the present motions, Hills, Al-Madani, and Alqsous move for release from detention. They seek to be free on bond through sentencing. In support of release, each defendant reiterates his compliance with pre-trial bond conditions, his timely appearance in court, and his strong network of family and friends. The moving defendants do not, however, identify any new circumstances that have developed since the Court revoked bond on July 27, 2018.

## II. Governing Law and Discussion

The pending motions are governed by 18 U.S.C. § 3143(a)(1), which provides:

> (a)(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c).

The statute creates a presumption in favor of detention, *United States v. Poulsen*, No. CR2-06-129, 2008 WL 928566, at *1 (S.D. Ohio April 7, 2008) (citing 27 *Moore's Federal Practice* § 646.13 (Matthew Bender 3d ed.) ("[T]he Bail Reform Act creates a presumption in favor of detaining a convicted defendant pending sentence or appeal.")). The burden rests with a defendant to prove by clear and convincing evidence that he does not pose a danger to the community and that he is not likely to flee. *See United States v. Vance*, 851 F.2d 166, 169 (6th Cir. 1988) (quotation marks and citation omitted).

In support of continued detention, the government offers several reasons why it believes that each moving defendant is likely to flee. It notes that all three defendants share the following risk factors: (1) the fraudulent and deceptive nature of their crimes, (2) access to substantial resources, and (3) the fact that they are each facing a lengthy prison sentence. With respect to the last reason, the government represents that a conservative estimate of any sentence the defendants may receive falls within either the 235-292 or the 292-365 month range. (Opp'n at 5986.) Such substantial ranges provide "powerful incentive to flee that did not exist pre-trial[.]" *United States v. Londono-Villa*, 898 F.2d 328, 329 (2d Cir. 1990) (denying pre-sentence bond, in part, because defendant's conviction and accompanying guidelines range was 292-364 months imprisonment); *see, e.g., United States v. Castiello*, 878 F.2d 554, 556 (1st Cir. 1989) (per curiam) (summarily dismissing defendant's appeal of detention order "in view of the potential sentence [he faced] and "strong inducement" to flee). The potential lengthy sentence awaiting

3

Hills is especially troubling. At age 58, Hills is facing the possibility of a lengthy prison term that may result in him spending much of the remainder of his life in custody, and giving him every incentive to flee the jurisdiction. *See United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (affirming district court's denial of Madoff's motion for pre-sentencing release, noting that the "incentive to flee (based on his age and exposure to a lengthy imprisonment) . . . naturally bears upon and increases the risk of flight"); *United States v. Dimora*, No. 1:10CR387, 2012 WL 1409396, at *4 (N.D. Ohio Apr. 23, 2013) (56 year old defendant was denied pre-sentencing release because he posed a risk of flight given that he was "facing considerable time in prison" and "a drastic change in lifestyle in the form of incarceration").

As to the second cited factor, the record shows that each of the moving defendants has access to considerable resources that could facilitate any flight from this district. According to the pre-trial services report, Hills has approximately $900,000 in his pension funds, $100,000 in a Raymond James retirement account, separate $600,000 and $350,000 residences, businesses valued in excess of $2,000,000 and a monthly net cash flow in excess of $21,000 (though this amount may have diminished recently). Alqsous has $430,587.78 in various retirement assets, not including the equity in his residences, and by his own admissions and evidence at trial, he earns over $2,000/month in rental income from one of his properties, and averages monthly net income in excess of $20,000 from his dental practices. Finally, Al-Madani has more than $500,000 in liquid assets from five different accounts, a residence worth in excess of $640,000, a separate parcel of land worth more than $150,000, and he enjoys a monthly net cash flow of approximately $38,200 from his dental practices. Additionally, Alqsous and Al-Madani appear to

have resolved and satisfied any debts associated with their businesses. (*See* Doc. No. 225-2 (Satisfaction of Judgment).)

It is not surprising that courts have recognized that defendants who have significant financial means simultaneously have the ability to flee and thereby pose an increased risk of flight. *Madoff*, 316 F. App'x at 59 ("[T]he district court's finding that [Madoff] has the means—and therefore the ability—to flee was not clear error."); *United States v. Khanu*, 370 F. App'x 121, 121-22 (D.D.C. 2010) (affirming post-conviction detention order due, in part, to defendant's "extensive financial resources" and concurrent flight risk); *see, e.g., United States v. Poulsen*, 521 F. Supp. 2d 699, 704 (S.D. Ohio 2007) ("When one considers further the apparently substantial resources that [Lance] Poulsen has available, which could be used to finance his flight, the conclusion that he poses at least some risk of absconding becomes—no pun intended—inescapable.")

The fact that defendants have involuntarily forfeited their passports does not serve to eviscerate the risk of flight. *See, e.g., United States v. Bonilla*, 388 F. App'x 78, 80 (2d Cir. 2010) (affirming district court's detention order "even though [defendant] offered some evidence to challenge the statutory presumption of flight" based on surrender of his passport); *United States v. Jinwright*, No. 3:09-cr-67, 2010 WL 2926084, at *5 (W.D.N.C. July 23, 2010) (voluntary surrender of passport did not overcome presumption that convicted defendant posed a flight risk). Given their substantial resources and the universal nature of their skills as dentists, it is not fanciful to suggest that defendants could find gainful employment in any of the number of countries around the world that do not have an extradition treaty with the United States. *See*

*United States v. MacDonald*, 485 F. Supp. 1087, 1088 (E.D.N.C. 1979) (denying bail pending appeal for physician who could practice anywhere in the world).

When the first factor cited by the government—the nature of the crimes—is factored into the equation, the possibility of flight becomes even more likely. While all three defendants point to their limited or non-existent criminal records, the evidence at trial demonstrated that defendants' conduct was no momentary aberration. Rather, it was the result of an on-going eight-year long racketeering conspiracy in which defendants undertook multiple opportunities to engage in unlawful conduct for their own benefit. *See Dimora*, 2012 WL 1409396, at *3 (noting that defendant's conduct "did not involve a momentary lapse in judgment, but represented repeated, concerted acts over a number of years"). That these same crimes involved fraudulent, dishonest, and obstructive conduct is even more disturbing. *See United States v. Nicolo*, 706 F. Supp. 2d 330, 334 (W.D.N.Y. 2010) (defendant's deceitful and fraudulent behavior stretched over many years and demonstrated that he could not be trusted to abide by any conditions of release) (citations omitted); *United States v. Davis*, 664 F. Supp. 2d 86, 90 (D.D.C. 2009) (agreeing with government's assertion that "defendant consistently lied" in the course of committing fraud offenses); *United States v. Nouri*, No. 07 Cr. 1029 (DC), 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (noting that defendant "has engaged in dishonest and obstructive conduct" and had "committed fraud"). Based upon the evidence in this case, it appears that defendants' actions over this time period were calculated to deceive others, including MetroHealth, the Ohio State Dental Board, law enforcement, and the public, all for their personal gain. The Court is unpersuaded that defendants would not employ similar conduct to elude

capture. This level of disregard for the law leaves the Court skeptical that defendants would abide by the terms and conditions of release.

Nor is the Court persuaded by defendants' respective claims of substantial contacts with this district. Hills's adult son is his only family member living in this district. Neither of his other two children reside here. Similarly, other than his fiancé, Alqsous has no family in this district. The Court does not view these as substantial contacts. *United States v. Vinson*, No. 1:12-CR-20-MR-DLH-5, 2013 WL 5775063, at *2 (W.D.N.C. Oct. 25, 2013) ("[W]hile the Defendant has ties to the community, in that his 18-year-old daughter and girlfriend reside in this District, such ties cannot be considered to be substantial, as they are limited to these two individuals, neither of whom relies upon the Defendant for support").

This, of course, leads the Court to reiterate that two of the defendants are not even citizens of the United States. Alqsous is a citizen of Jordan who speaks Arabic. By his own admissions and evidence at trial, Alqsous has traveled extensively outside the United States (Alqsous Am. Mot. at 5974), and he is subject to deportation upon the completion of his sentence. Moreover, while he considers the United States to be "home," the government correctly notes that his first and second acts upon securing employment in his adopted home were to solicit a bribe from Dr. AlSaad and lie about his arrest in Boston on unrelated charges. "Having so thoroughly exploited this connection, it cannot now be relied upon to support post-trial release." *Dimora*, 2012 WL 1409396, at *2 (citing *United States v. Santiago-Mendez*, 599 F. Supp. 2d 95, 109 (D.P.R. 2009) (further quotation marks and citation omitted)).

Al-Madani has, perhaps, the strongest ties to the area. His wife and two children, age seven and one, are United States citizens. His parents live with his family in the United States,

yet they are not citizens of this country. More importantly for the present analysis, neither is Al-Madani. Like Alqsous, Al-Madani is a citizen of Jordan, and he is also potentially subject to deportation upon completion of his sentence. He speaks Arabic and has past employment experience in Saudi Arabia. When added to the substantial resources to which Al-Madani and Alqsous have access, any ties they have to this community "are undermined by the fact that [they] face[] deportation after serving [their] sentence[s.]" *See Khanu*, 370 F. App'x at 121-22 ("The combination of appellant's citizenship in Sierra Leone, his trip there prior to his indictment, his mandatory deportation after serving his sentence, his extensive finance resources" all contribute to a finding that defendant failed to provide clear and convincing evidence that he would not continue to pose a significant flight risk); *see also United States v. Sabhnani*, 529 F. Supp. 2d 377, 381-82 (E.D.N.Y. 2007) (defendant's to ties to various countries, family members that reside abroad, her own travel to foreign countries, substantial financial resources, and the fact that she speaks Indonesian all prevent defendant from meeting her burden of establishing that she is not a flight risk).

In so ruling, the Court is sympathetic to Al-Madani's concern that his children will suffer "severe psychological stress due to the loss of companionship of their father." (Al-Madani Mot. at 5945.) Understandably, "[t]he family would like the opportunity to minimize the impact by taking the appropriate steps to counsel the family, especially young George, who has a particularly strong bond with his father." (*Id*.) However, "circumstances that are 'purely personal' do not rise to the level of exceptional circumstances that would warrant release." *Sabhnani*, 529 F. Supp. 2d at 382 (rejecting as exceptional circumstances the need to care for four children and manage business affairs) (quotation marks and citation omitted); *see United*

States v. Lippold. 175 F. Supp. 2d 537, 541 (S.D.N.Y. 2001). In *Lippold*, the court rejected the defendant's argument that the need to care for his three young children and train a replacement at his place of employment was sufficient to justify release pending sentencing, noting that "[a]lthough the need to follow Congress's mandate regrettably results in separating him from his family and work, such is the case with every defendant facing a custodial sentence." *Lippold*, 175 F. Supp. 2d at 540-41. Similarly here, while Al-Madani presents these and other concerns as "humanitarian" reasons to support his pre-sentence release, these reasons are not so unique that they overcome the presumption in favor of incarceration.[1]

Finally, each defendant cites to his appearance for all court proceedings, as well as his compliance with all pre-trial reporting conditions imposed by Pretrial Services. "It is not unusual for persons seeking pre-sentence release to point to their *compliance* with pre-trial release orders as evidence that they will appear for sentencing." *United States v. Hanhardt*, 173 F. Supp. 2d 801, 806 (N.D. Ill. 2001) (emphasis in original) (citations omitted), *rev'd in part on other grounds*, 361 F.3d 382 (7th Cir. 2004). "The argument is routinely rejected because prior to trial there is the possibility of no imprisonment, which evaporates upon a finding of guilt." *Id.* (citing *United States v. Manso-Portes*, 838 F.2d 889 (7th Cir. 1987)). Prior to trial, each defendant had asserted his innocence. Now that acquittal is no longer a possibility, an important incentive for

---

[1] Al-Madani also insists that he needs time to "wrap up his affairs, including the potential sale of interest in real estate and the closure of his private dental clinic." (Al-Madani Mot. at 5945.) The fact that it would be more convenient, and perhaps even more effective, to wind down his business from outside the penal institution, does not make it any less likely that he would flee this jurisdiction if released. For this reason, courts have routinely rejected such personal justifications for pre-sentence release. *See, e.g., Jinwright*, 2010 WL 2926084, at *1, 6 (desire to "more easily facilitate the sale of his funeral home business" did not "satisfy [defendant's] burden to show . . . that he is not likely to flee that he does not pose a danger to the economic safety of the community").

them to appear in court is gone.[2] *See United States v. Malquist*, 619 F. Supp. 875, 879 (D. Mon. 1985) (rejecting evidence of pre-trial appearance in court where defendant had previously appeared because he believed that he would prevail at trial); *see United States v. Dailey*, 650 F. App'x 193, 194 (5th Cir. 2016) (citing *United States v. Lopez,* 504 F. App'x 297, 298 (5th Cir. 2012) (affirming denial of release on bail pending sentencing where defendants had remained free on bond prior to trial and produced additional evidence that they were unlikely to flee)); *see also Jinwright*, 2010 WL 2926084, at *5 ("Something has changed since trial; Defendant is no longer presumed innocent but is guilty of the counts of conviction. His legal status has changed, increasing his incentive to flee.")

The Court finds that the moving defendants have failed to establish by clear and convincing evidence that they do not pose a flight risk. The defendants are facing considerable time in prison, which carries with it the prospect of a drastic change in lifestyle from the privileged existence they enjoyed as dentists. Based on all of the factors identified above, and after separately considering the relevant factors as they relate to each defendant, the Court concludes that each moving defendant poses a significant risk of flight, and denial of their

---

[2] Additionally, defendants' contentions that they can be adequately tracked and monitored with GPS tracking devices are not well founded. As the government notes, electronic monitoring is insufficient to guarantee defendants' appearance as it simply gives authorities notice that a defendant has left the jurisdiction and does not necessarily assist in location or capture. *See United States v. Bergrin*, No. 09-369, 2009 WL 1560039, at *10 (D.N.J. May 29, 2009) ("[I]t is well settled that electronic monitoring, use of GPS home device and home detention do not guarantee against flight.") (citation omitted).

respective motions is appropriate. Therefore, defendants' motions for release pending sentencing (Doc. Nos. 343, 344, 346) are **DENIED**.

**IT IS SO ORDERED**.


Dated: August 17, 2018

                                                **HONORABLE SARA LIOI**
                                                **UNITED STATES DISTRICT JUDGE**