IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16CR329 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | |
| EDWARD R. HILLS, | ) | GOVERNMENT'S CONSOLIDATED |
| SARI ALQSOUS, | ) | SENTENCING MEMORANDUM |
| YAZAN B. AL-MADANI, | ) | |
| TARIQ SAYEGH, | ) | |
| | ) | |
| Defendants. | ) | |

Now comes the United States of America, by and through its counsel, Justin E. Herdman, United States Attorney, and Om M. Kakani, Michael L. Collyer and James P. Lewis, Assistant United States Attorneys, and submits this *Consolidated Sentencing Memorandum* in advance of sentencing proceedings for Defendants Edward R. Hills, Sari Alqsous, Yazan B. Al-Madani and Tariq Sayegh, scheduled to begin at 9:00 a.m. on February 11, 2019.

## Contents

I.     PRELIMINARY STATEMENT ........................................................................5

II.    THE OFFENSE CONDUCT IN THIS CASE .................................................7

    A.     THE RESIDENT BRIBERY SCHEME (COUNTS 3-7 – ALQSOUS, ALMADANI AND SAYEGH)................................................................8

    B.     THE HOBBS ACT STREAM OF BENEFITS SCHEME (COUNT 2 – HILLS, ALQSOUS AND AL-MADANI) ..........................................................10

        1.     Benefits Flowing to Hills ...................................................10

        2.     Hills' Acts in Return .........................................................12

    C.     THE ORAL HEALTH ENRICHMENT SCHEME (COUNTS 8-12 – HILLS, ALQSOUS AND AL-MADANI) ..........................................................21

    D.     THE DENTAL PATIENT KICKBACK SCHEME (COUNTS 13-28 – HILLS, ALQSOUS AND AL-MADANI) ..........................................................25

    E.     THE ANTHONY JORDAN SCHEME (COUNT 1 – RICO CONSPIRACY – HILLS AND ALQSOUS) ...................................................................27

    F.     THE NOBLE DENTAL CLINIC RENT-A-DENTIST SCHEME (COUNT 1 – RICO CONSPIRACY – HILLS, ALQSOUS AND AL-MADANI) ....................30

    G.     ALQSOUS, AL-MADANI AND HILLS OBSTRUCTED JUSTICE (COUNTS 29-30)................................................................................32

    H.     DEFENDANT HILLS MADE FALSE TAX RETURNS THAT UNDERSTATED HIS TOTAL INCOME (COUNTS 31-33) ..............................35

III.   CALCULATING THE SENTENCING GUIDELINES .................................36

    A.     TOTAL ECONOMIC LOSS/GAIN FROM THE SCHEMES............................37

    B.     APPLICABLE LAW REGARDING SENTENCING...........................................37

    C.     §2C1.1 IS THE PROPER UNDERLYING GUIDELINES SECTION TO APPLY TO THE CONVICTIONS ...................................................................41

    D.     DEFENDANTS WERE PUBLIC OFFICIALS AND EDWARD HILLS WAS A HIGH LEVEL PUBLIC OFFICIAL....................................................42

        1.     The Defendants Are All Public Officials ...................................42

        2.     Defendant Hills was a High-level Decision Maker at MetroHealth .........48

E.  UNDER 2C1.1(B)(2), THE GREATEST LOSS AMOUNT IN EACH OF THE DEFENDANTS' BRIBERY SCHEMES WAS THE BENEFIT THAT THE BRIBE PAYORS EXPECTED TO RECEIVE ....................................................50

　　1.  Resident Bribery Scheme ...........................................................52

　　2.  Hobbs Act Conspiracy ...............................................................55

　　3.  Dental Patient Kickbacks ...........................................................62

　　4.  Fair-Market Credit Does Not Apply to § 2C1.1 ........................63

F.  OTHER FRAUD LOSSES ....................................................................65

　　1.  Oral Health Enrichment .............................................................65

　　2.  Anthony Jordan ...........................................................................69

　　3.  Noble Dental – Rent-A-Dentist ................................................71

G.  DEFENDANTS ALL TARGETED VULNERABLE VICTIMS .........................72

H.  AGGRAVATING ROLE ENHANCEMENTS .....................................................73

　　1.  Hills Should Receive a Four-Level Leadership Enhancement under § 3B1.1(a) ....................................................................................73

　　2.  The Two-Level Enhancement Pursuant to U.S.S.G. § 3B1.1(c) Applies to Alqsous and Sayegh ...................................................74

IV.  INADEQUACIES OF THE SENTENCING GUIDELINES – NON-ECONOMIC HARMS CAUSED BY DEFENDANTS ...............................................................76

V.  THE RELEVANT § 3553(A) FACTORS .......................................................79

A.  NATURE AND SERIOUSNESS OF THE CRIME OF PUBLIC CORRUPTION ......................................................................................79

B.  DETERRENCE AND PROMOTING RESPECT FOR THE LAW ...................81

C.  CHARACTERISTICS OF DEFENDANTS AND NEED TO DETER THEM ....87

　　1.  Defendants' history and characteristics (3553(a)(1)) ................87

　　2.  Defendant Edward Hills ............................................................95

　　3.  Defendant Sari Alqsous .............................................................98

　　4.  Defendant Yazan Al-Madani ...................................................102

3

D.    UNWARRANTED SENTENCING DISPARITIES ............................................103

      1.    The Guidelines are an important factor to consider throughout the entire sentencing process. ......................................................................................103

      2.    A Sentence Within the Advisory Guidelines is Designed to Avoid Disparities ..............................................................................................106

      3.    Examples of Recent Public Corruption Sentences ....................................106

VI.    OTHER MISCELLANEOUS FACTORS .......................................................................109

   A.    METROHEALTH IS A VICTIM AND RESTITUTION SHOULD BE MADE TO THE HOSPITAL ................................................................................109

      1.    Applicable Law ......................................................................................109

      2.    MetroHealth is a Victim ............................................................................112

      3.    MetroHealth Should Further Be Awarded Restitution for Attorney's Fees Resulting from Defendants' Criminal Conduct ........................................114

      4.    For Counts 31-33, restitution should be made payable by Defendant Edward R. Hills to the victim, the Internal Revenue Service, in the amount of $80,426. .................................................................................................115

   B.    FINES SHOULD BE IMPOSED .......................................................................117

      1.    Applicable Law ......................................................................................117

      2.    The Inmate Financial Responsibility Program Provides a Future Ability to Pay ............................................................................................................118

      3.    The Court Should Impose Fines on All Defendants .................................119

   C.    COLLATERAL CONSEQUENCES SHOULD NOT BE CONSIDERED ........120

   D.    DEFENDANTS' CONDUCT IS NEITHER ABERRANT NOR DESERVING OF A ROLE REDUCTION ...............................................................................121

VII.    CONCLUSION ...............................................................................................................123

## I.     PRELIMINARY STATEMENT

The MetroHealth System is a public hospital open to all residents of Cuyahoga County, including the Cleveland Metropolitan area, regardless of their status, affiliation or ability to pay. Established by an 1837 decree of City of Cleveland, City Hospital as it was then known was created with the singular purpose of providing much-needed healthcare services to the poor. MetroHealth has continued this tradition uninterrupted for over 170 years, does not discriminate on a patient's ability to pay and does not turn any patient in need of care away. It is the only Cleveland area "Disproportionate Share Hospital" ("DSH") as identified by the Centers for Medicaid and Medicare Services, meaning that MetroHealth serves a significantly disproportionate number of low-income patients or charitable cases and, thus, the hospital has received supplemental payments from Medicaid/Medicare to avoid operating losses.[1] While the share of the population that is uninsured has dropped in the years following implementation of the Affordable Care Act, MetroHealth still provides more uncompensated care on average than the National, Ohio and Cleveland averages for other hospitals.[2]  In fact, in 2014 MetroHealth's Medicaid inpatient and low-income utilizations rates, metrics used by Medicaid to determine the percentage of hospital patients and care attributable to Medicaid or charity care coverage, were more than double the average rates for the Cleveland area and the state of Ohio.[3]  In 2015 close to 75% of MetroHealth's patients were on Medicare or Medicaid.[4]  MetroHealth also offers

---

[1]      *See* https://www.hrsa.gov/opa/eligibility-and-registration/hospitals/disproportionate-share-hospitals/index.html (last accessed January 23, 2019).

[2]      *See* https://www.macpac.gov/wp-content/uploads/2017/03/MetroHealth-Medical-Center.pdf, at 1, 3-4 (last accessed January 23, 2019)

[3]      *Id.* at 1.

[4]      *Id.*

various community benefit activities for the benefit of low-income, at-risk families in its community, addressing a range of issues, including infant mortality, addiction, unemployment, and crime.[5]  Put simply, MetroHealth is the primary safety net hospital for the Cuyahoga County/Cleveland Metropolitan area, drawing on funds from taxpayers and charities to provide care to all who come to its doors regardless of their ability to pay, including the neediest and the most vulnerable in the community.

Against this backdrop, and for almost two decades, Edward Hills held a position of great power at the MetroHealth Dental Department, and over the dental profession in the state of Ohio. For the last five years of that time, until he was forced to resign from the hospital, he was also one of the two most powerful individuals in the MetroHealth System – serving as the Chief Operating Officer of the entire hospital system while still retaining his role as director of the Dental Department.

Sadly, as the evidence at trial conclusively proved, Hills and his co-defendants and fellow public servants Sari Alqsous and Yazan Al-Madani repeatedly abused his (and their) position of power and public trust for private gain.  Hills enriched himself with bribes and kickbacks supplied by Alqsous Al-Madani, confident that his power and his repeated lies to other officials at MetroHealth would enable them to operate with total impunity.  Hills, along with Alqsous, Al-Madani and Tariq Sayegh, exploited the power entrusted in them by the public to serve themselves.

MetroHealth gave Defendants an opportunity to become dentists and obtain high-paying and rewarding careers.  Instead of honoring the hospital, Defendants spent years committing

---

[5]      *Id.* at 5.

crimes that corrupted it. Hills spent almost 20 years as the director of the Dental Department while Al-Madani and Alqsous spent several years as senior attending dentists. As fixtures in those positions, an entire generation of MetroHealth dentists served in an institution framed by their corrupt example. Their crimes struck at the core of good governance in a public hospital meant to provide critically needed healthcare to the indigent population of Cuyahoga County, not to line Defendants' pockets. Compounding their errors when confronted with the consequences of their conduct, Defendants lied, inveigled and intimidated others to obstruct justice.

The sentence imposed on Defendants should reflect the magnitude, duration and scope of their abuses of power. It should reflect the immeasurable damage their conduct wreaks upon the public's trust in their government and public servants. It should punish Defendants for their exploitation of power and harm they caused to the citizens of Northeast Ohio, deter other public officials from the temptations of corruption, and communicate to the public that the rule of law applies to all members of society, especially public servants like the Defendants.

## II.      THE OFFENSE CONDUCT IN THIS CASE

The Court is well aware of the trial record in this case, which overwhelmingly established that Defendants orchestrated numerous complex and long-running schemes to monetize their public positions for private gain.[6] Relevant to sentencing and as set forth in more detail below,

---

[6]      Trial in this matter lasted 19 days and consisted of testimony from approximately 48 government witnesses, along with over 650 government exhibits. For ease of reading, the government refers to transcripts of trial testimony by their ECF Record number, the witness and the directly relevant PageID cite, along with citations to relevant Government Exhibits ("GX").

Exhibits A through I consist of all referenced trial exhibits in the sentencing memorandum. Exhibit A consists of all referenced exhibits in the "0000" series (i.e., GX 100-0999) in sequential order. Exhibit B consists of all referenced exhibits in the "1000" series in sequential order. This numbering method continues through Exhibit I for the "8000" series. As such, the trial exhibits are not filed in the order they are referenced in this memorandum. Supplemental exhibits referenced herein begin with Exhibit J and continue through Exhibit N.

the Defendants' conduct demonstrated a long-standing commitment to the abuse of power. Defendants sought these benefits not only for their own benefit, but at the expense of and potential harm to the indigent and low-income patients of MetroHealth, the good name of the hospital, and the trust of the public in their public officials.

      A.    THE RESIDENT BRIBERY SCHEME (COUNTS 3-7 – ALQSOUS, ALMADANI AND SAYEGH)[7]

As the jury unanimously found, from approximately 2008 through 2014, Alqsous, Al-Madani and Sayegh conspired to engage in a *quid pro quo* scheme in which they solicited and accepted bribes in the form of cash payments, wire transfers and checks in exchange for their promise to assist foreign trained dentists obtain two-year paid residencies in the MetroHealth Dental Residency program.[8] For each applicant solicited for bribes, the *quid pro quo* entailed admission into the MetroHealth Dental Residency program, along with a guaranteed two-year paid position with a salary ranging from $45,000 to $55,000 per year.

Certain aspects of this scheme were particularly egregious and damaging to the public trust. Defendants selectively chose only applicants from Middle-Eastern countries such as Egypt and Jordan for their criminal solicitations. This discrimination was not accidental, but purposeful and directed at those applicants that in Defendant's eyes, based solely on their national origin, ethnicity and religious backgrounds, were susceptible to bribe solicitations in the application process and were also less likely to inform authorities of their conduct. The

---

[7]     For a more thorough analysis of the evidence of this scheme, the Government respectfully refers to its consolidated opposition to the defendants' Rule 29 and Rule 33 motions.

[8]     Defendant Alqsous was convicted in Counts 3 and 4 of Conspiracy to Commit the Crimes of Bribery in Federally Funded Programs (18 U.S.C. §371/666) and Honest Services Wire and Mail Fraud (18 U.S.C. §1349). Alqsous was further convicted in Count 5 of substantive Bribery in violation of 18 U.S.C. §666 related to the bribes solicited from Drs. Issa and Seim Salameh, but was acquitted in Counts 6 and 7 for bribes solicited from Drs. Karadsheh and Yacoub.

applicants were individuals with little or no connections in the Cleveland area or at MetroHealth, who had no prior interaction with the American justice system and believed that Defendants' demands left them with no options other than to pay the bribes or be denied an opportunity at the American dream. In carrying out this scheme, Defendants invoked the name and status of co-defendant Edward Hills to carry a thinly-veiled threat that the bribery scheme was known at the top levels of the hospital's administration and further trap the victims into believing that they had no options. *See* (R. 395, PageID 10771-72) (Dr. Issa Salameh testifying, "[Alqsous] said you have to pay $25,000 to my boss [Hills] to guarantee the process for [Seim Salameh] … when someone is asking you to pay … and you know [Alqsous and Hills are] powerful … now I don't know what to do.").

In other situations, the Defendants attempted to intimidate, harass or pay off their victims and others to prevent detection of the scheme by authorities.  For example, after Alqsous solicited a bribe from Issa Salameh, Dr. Salameh notified Dr. Hussein Elrawy of the scheme, and Dr. Elrawy then notified Hills.  (R. 405, PageID 13688-89) (Testimony of Dr. Hussein Elrawy). Shortly thereafter, Alqsous offered Elrawy $5,000 to stay quiet about the resident bribery scheme, which Elrawy declined.  (*Id.*, PageID 13689-90). Moreover, after Seim and Issa Salameh rejected Alqsous' request, he attempted to retaliate against Seim Salameh by attempting to get her fired following an accident that caused damage to her arm and by placing her on difficult rotations at the hospital.  *See* (R. 395, PageID 10913) (testimony of Dr. Seim Salameh) ("I knew that [Alqsous] was looking for waiting on me to make any mistake.").  Finally, after MetroHealth authorities began an internal investigation and this scheme became a potential matter of federal concern, Al-Madani purposefully sought out and threatened Dr. Yazan

9

Karadsheh by warning him not to cooperate with law enforcement because he could be deported by federal authorities.  *See* (R. 394, PageID 10562) (testimony of Dr. Yazan Karadsheh).

During the time periods listed below, the defendants in furtherance of the conspiracy solicited bribes from the resident applicants in exchange for promises to get them two-year paid positions at MetroHealth:

| Timeframe and Applicant | Bribe Solicited | Salary of Position | Reference |
|---|---|---|---|
| 2008-09 Dr. Ahmad Al-Saad | $20,000 | $44,600/year | (R. 392, PageID 9956); GX 1109 |
| 2010-11 Dr. Yazan Karadsheh | $15,000 | $47,501/year | (R. 394, PageID 10544); GX 1202 |
| 2010-14 Dr. Firas Yacoub | $20,000 | $46,500/year | (R. 394, PageID 10414-15); Exhibit J |
| 2011-12 Dr. Issa Salameh Dr. Seim Salameh | $25,000 | $48,353/year | (R. 395, PageID 10770-71); Exhibit K |
| **Total** | | **$373,908** | |

B.     THE HOBBS ACT STREAM OF BENEFITS SCHEME (COUNT 2 – HILLS, ALQSOUS AND AL-MADANI)

1.     Benefits Flowing to Hills

The Hobbs Act Stream of Benefits Scheme reflects similar greed and betrayal of trust. The jury again unanimously found Defendants Hills, Alqsous and Al-Madani guilty of engaging in a multi-year conspiracy in which Hills used his public office and power to obtain a steady stream of benefits from Alqsous, Al-Madani and Dr. Elrawy. This stream of benefits included tens of thousands of dollars in cash payments, meals at expensive restaurants, travel for Hills and his paramours, car repairs, a free apartment and MacBook for Hills' mistress, prescription medications, a television and luxury handbags and accessories as detailed below:[9]

---

[9]     This estimate is highly conservative, given the evidence presented at trial.  For example, Dr. Hussein Elrawy testified that over several years at MetroHealth he alone gave Defendant

| GX | Date | Description | Total |
|---|---|---|---|
| 4201 | 2013.02.14 | Flight for Hills | $1,022.00 |
| 4202 | 2013.03.08 | Autobahn Motors Invoice – Michelle Dase | $1,664.24 |
| 4203 | 2013.04.24 | Flight for Hills | $468.00 |
| 4204 | 2013.07.08 | Flight for Joyce Kennedy | $746.60 |
| 4205 | 2013.09.26 | Flight for Joyce Kennedy | $498.10 |
| 4210 | 2014.02.27 | Flight for Hills | $632.50 |
| 4213 | 2013.01.01 | Louis Vuitton Briefcase | $3,879.00 |
| 4217.1 | 2013.12.31 | $1500 Alqsous check to Elrawy – TV for Dr. Hills | $4,500.00 |
| 4218 | 2014.01.05 | TV installation | $556.36 |
| 4221 | 2014.10.30 | Event Tickets for Hills | $364.90 |
| 4224 | 2012.08.06 | $5,000 Deposit to Hills Account 8152 – For Angela Kane down payment on second house | $5,000.00 |
| 4301 | 2013.03.05 | Payment for Perry Payne[10] Rent | $9,205.00 |
| 4302 | 2013.03.18 | Payment for Perry Payne cable/internet | $1,039.57 |
| 4320 | 2014.05.19 | AmEx Wyndham Cleveland | $1,677.49 |
| 4404-D | 2011.12.30 | $1000 deposit to Hills Account | $1,000.00 |
| 4410-D | 2012.02.03 | $3000 deposit to Hills Account | $3,000.00 |
| 4414-D | 2012.04.23 | $1000 deposit to Hills Account | $1,000.00 |

Hills approximately $75,000 in things of value, and that Defendants Alqsous and Al-Madani provided things of value in similar amounts. (R. 405, PageID 13602) (Dr. Elrawy). This figure is corroborated by Defendant Alqsous' own words, wherein he admitted that he, Defendant Al-Madani and Dr. Elrawy provided hundreds of thousands of dollars in things of value to Defendant Hills, and that Hills had not paid for a meal in almost seven years. GX 8001TR (Arabic-to-English Translation of "Red Steakhouse Audio"). Moreover, according to testimony from Dr. Elrawy, corroborated by Joyce Kennedy and Alqsous himself in the Red Steakhouse recording, Hills attended multiple dinners with Alqsous, Al-Madani and Elrawy where he both received large sums of cash in envelopes and did not pay for his meal. These meals averaged $400 a meal and occurred as often as once a week for up to seven years.

[10]     The rent and cable/internet amounts shown are conservative estimates based on rent paid from March 2013-January 2014. Evidence at trial established that Alqsous vacated the apartment but kept it for Hills' use starting in December 2012.

| GX | Date | Description | Total |
|---|---|---|---|
| 4421-S | 2012.07.31 | Text Message Hills re: MacBook | $2,000.00 |
| 4426-D | 2012.08.10 | $1180 deposit to Hills Account | $1,180.00 |
| 4427-D | 2012.08.15 | $3000 deposit to Hills Account | $3,000.00 |
| 4428-D | 2012.09.05 | $2500 deposit to Hills Account | $2,500.00 |
| 4429-D | 2012.09.18 | $1200 deposit to Hills Account | $1,200.00 |
| 4430-D | 2012.10.09 | $2000 deposit to Hills Account | $2,000.00 |
| 4441-D | 2013.03.25 | $1000 deposit to Hills Account | $1,000.00 |
| 4446-D | 2013.06.11 | $1000 deposit to Hills Account | $1,000.00 |
| 4448-S | 2013.10.07 | Text Message Elrawy and Yazan re: Hills Birthday | $3,000.00 |
| 4519 | 2013.09.06 | Deposit by Hills into acct. 3342 | $2,000.00 |
| 4521 | 2014.02.20 | Deposit by Hills into acct. 3342 | $1,000.00 |
| 4522 | 2014.03.04 | Deposit by Hills into acct. 8152 | $1,000.00 |
| 4523 | 2014.09.18 | Deposit by Hills into acct. 3342 | $1,900.00 |
| **TOTAL** | | | **$59,033.76** |

      2.    <u>Hills' Acts in Return</u>

This stream of benefits was necessarily tied to Hills' role as one of the most powerful individuals in the MetroHealth System and his not insignificant ties to the Ohio State Dental Board. *See* GX 4436-S (text message discussing Luis Vuitton briefcase where Alqsous tells Hills "The guys are also very excited about their raise"). In return for this stream of benefits and as discussed below, Hills implicitly and explicitly agreed to benefit his patrons by, among other things, (1) influencing and promising to influence their incentive bonuses; (2) hiring certain dentists preferred by Alqsous and Al-Madani for the two-year paid residency program; and (3) manipulating their employment status to allow them to work four days a week instead of five.

      i.  <u>Promise to Maintain and Increase Incentives</u>

First, as this Court is well aware, MetroHealth incentivized physician and dentist performance and productivity by offering them a fair-market metric to reward high-performing employees. Referenced as the Provider Incentive ("PI") plan, MetroHealth considered the

12

overall productivity of a physician or dentist by calculating the difference between their monthly salary and fringe benefits (the "payback" amount) and the amount of money that the hospital received for the services they rendered billed under their name[11] (the "monthly receipts"). If a provider's monthly receipts exceeded their monthly payback amount, they were entitled to a monthly incentive payment of 25% of the difference (the "excess receipts"). *See generally* (R. 407, PageID 14054-58) (Cindy Meehan describing Incentive Calculation Equation and process). Written out, the equation was:

$$PI = [(Monthly\ Receipts) - (Payback)]\ x\ 25\%.$$

Testimony from Dr. Alfred Connors (the former Chief Medical Officer of MetroHealth), Cindy Meehan (Finance Director) and Kelly Andolek (Physician Enterprise Administrator) established that until approximately 2009-10, the hospital allowed department chairs to alter a provider's calculated PI, either up or down, at their discretion and resulting in a final "Actual Incentive" paid to the provider. *Id.* (PageID 14058-59). Starting in 2009 the hospital sought to eliminate any inequities in the administration of this compensation system by instituting a more rigid system designed to provide fair-market compensation to physicians. *See* (R. 403, PageID 13095-98, 13109-10) (Testimony of Dr. Alfred Connors). However, and ultimately

---

[11]    There was extensive testimony that Defendants received credit for services that they did not in fact personally rendered, but were performed by others and attributable to them through billing procedures. The most pervasive example of this inflation was the assignment of all "D1" cases, in which a patient began the five-step process of receiving dentures, to Defendant Alqsous. Evidence at trial showed that Hills, in return for receiving numerous things of value, to include a large screen television delivered and installed at his home, assigned Alqsous a "D1 Bonus" and maintained his status as the main biller for D1 procedures. *See* GX 4217.2-S (text message concerning delivery of television and Hills offer to give Alqsous a "D1 bonus" in return); *see also* (R. 402, PageID 12661, 12784-85) (Testimony of Dr. Waleed Elmallah concerning assignment of all D1 billings to Alqsous, even though other dentists and hygienists actually performed the services); (R. 405, PageID 13665-68) (Dr. Elrawy testimony about simplicity and high-payout of D1s and Hills' assignment of all D1s to Alqsous).

unfortunately, because the Dental Department lacked comparable metrics to the rest of the hospital, MetroHealth permitted Defendant Hills to retain discretion over the monthly incentives. *See id*. at (PageID 13114-18) (describing the lack of "Medicare RVU" metrics in Dentistry compared to other medical fields and the decision to retain discretion in dental incentives).

Each month, Hills met with Cindy Meehan to discuss and authorize the monthly incentives for the dental department, at which time he asserted control over the Actual Incentive payment made to the dentists. *See* (R. 407, PageID 14058-60, 14069-70) (Meehan testimony regarding Hills' discretion). Whereas other department chairs at MetroHealth did not fear transparency in this process and allowed Meehan to disclose the physician's Monthly Receipts, Payback, Excess Receipt amounts, and their properly calculated PI and Actual Incentive, Hills forbid Meehan from sharing this information with the Dental Department. *See id.* at (PageID 14062-64) (Meehan testimony on Hills' secrecy directive); *see also* (R. 405, PageID 13663-64) (Dr. Elrawy: "I spent years at Metro. I never, as of right now, understand the equation of how the incentives. It's only controlled by Dr. Hills. I doubt [Alqsous and Al-Madani] know how the incentives works … So anybody try to seeking like incentives, it's going to be in deep trouble, you know").

Instead, Hills used his secret knowledge of the incentive calculation and his ability to manipulate the incentives as a tool to entice Alqsous and Al-Madani, along with Elrawy, to provide him with things of value. *See generally* (R. 405 at PageID 13644-46) (Dr. Elrawy testifying to Hills offering incentive payments to Alqsous in exchange for a free apartment for his mistress, Joyce Kennedy: "Dr. Hills told [Alqsous] I will give you this money back in your incentives"); *id.* at (PageID 13663) ("[Hills] say, like, no matter what you work hard, he can deduct from your incentives. And he can give you also the excellent incentive. It's up to h[i]m.

So he is the one. He is running the show when comes to incentives"); (R. 401, PageID 12280, 12516-17) (Joyce Kennedy testimony regarding Hills' use of incentives at dinners with Alqsous, Al-Madani and Elrawy); GX 4300-s (text message from Alqsous to his fiancé describing the apartment arrangement and stating "Let the taxpayers pay for it lol … hahahahaha"); 4433-s, 4437-s, 4438-s, 4443-s and 4444-s (text messages discussing maintaining and refurbishing Alqsous' Perry Payne apartment for Hill's benefit); 4447-s, 5015-s and 5049-s (text messages between Hills, Alqsous and Al-Madani discussing incentives and payments to Hills).

Hills also hid these corrupt relationships from Meehan, Kelly Andolek and Dr. Connors, who could have otherwise acted as bulwarks against the Defendants. *See* (R. 404, PageID 13451-52); (R. 407, PageID 14101-03, 14115-17); (R. 408, PageID 14146, 14407-09). That Hills was the Chief Operating Officer and the number-two official in MetroHealth, placing him at or above Dr. Connors, further hindered the hospital's ability to keep the scheme in check. *See* (R. 403, PageID 13121-22) (Dr. Connors describing the "awkward" nature of his relationship to Hills and that he "didn't feel like [he] had the same relationship with [Hills] that [he] had with the other chairs.").[12]

---

[12]     Defendants attempted at trial to justify the incentive adjustments as "rewards" to Defendant Alqsous for covering additional shifts of work. This explanation was debunked by Dr. Connors, who testified:

> The issue would have been -- I wouldn't have worried about that so much because then there would have been billings. They would have been attributed to the physician who was doing the extra work, and there would have been some extra compensation for that which is part of the reason the incentive plan is there, to encourage people to pitch in when we're shorthanded if there is something like that.
>
> [***]
>
> In other words, if someone did extra work and saw someone else's patients, billed for them, and the revenues came in, that would be handled by the incentive program. There would be a calculated amount, and they would get that because

Because he was able to operate in the shadows, Defendant Hills was able to convince Alqsous and Al-Madani into believing that they otherwise received the benefit of their corrupt bargain from him. Under this cloak of secrecy and in part in return for the stream of benefits Dr. Elrawy and Defendants Alqsous and Al-Madani provided him, Hills routinely increased their monthly incentives as described below:

| Month | Dentist | Approximate Calculated Incentive | Approximate Actual Incentive | Approximate Adjustment by HILLS |
|---|---|---|---|---|
| August 2010 | AL-MADANI | $4,094 | $7,000 | $2,906 |
| March 2011 | ALQSOUS | $4,421 | $5,400 | $979 |
| April 2011 | ALQSOUS | $7,218 | $8,178 | $960 |
| November 2011 | ALQSOUS | $5,446 | $10,000 | $4,554 |
| February 2012 | AL-MADANI | $3,800 | $5,800 | $2,000 |
| February 2012 | ALQSOUS | $8,881 | $13,881 | $5,000 |
| March 2012 | ALQSOUS | $7,603 | $9,603 | $2,000 |
| May 2012 | ALQSOUS | $15,500 | $17,700 | $2,200 |
| June 2012 | ALQSOUS | $15,225 | $15,725 | $500 |
| July 2012 | ALQSOUS | $17,022 | $17,772 | $750 |
| August 2012 | ALQSOUS | $15,863 | $17,863 | $2,000 |
| September 2012 | ALQSOUS | $14,592 | $15,342 | $750 |
| October 2012 | ALQSOUS | $13,819 | $16,819 | $3,000 |
| November 2012 | AL-MADANI | $8,833 | $10,000 | $1,167 |
| November 2012 | ALQSOUS | $14,138 | $15,138 | $1,000 |

they had done that extra work. When you're talking about adjustments that would be something over and above that ….

(R. 404, PageID 13339-40). The jury agreed with Dr. Connors and rejected Defendants' arguments to the contrary.

| Month | Dentist | Approximate Calculated Incentive | Approximate Actual Incentive | Approximate Adjustment by HILLS |
|---|---|---|---|---|
| November 2012 | CW 9 | $2,939 | $10,000 | $7,061 |
| December 2012 | AL-MADANI | $7,453 | $17,453 | $10,000 |
| December 2012 | ALQSOUS | $17,135 | $17,385 | $250 |
| December 2012 | CW 9 | $2,697 | $12,697 | $10,000 |
| January 2013 | AL-MADANI | $6,299 | $19,017 | $12,718 |
| January 2013 | ALQSOUS | $11,288 | $12,538 | $1,250 |
| January 2013 | CW 9 | $6,961 | $11,366 | $4,405 |
| February 2013 | ALQSOUS | $12,922 | $14,172 | $1,250 |
| March 2013 | ALQSOUS | $7,852 | $10,602 | $2,750 |
| April 2013 | ALQSOUS | $14,642 | $16,642 | $2,000 |
| May 2013 | ALQSOUS | $13,040 | $15,540 | $2,500 |
| June 2013 | ALQSOUS | $11,380 | $12,880 | $1,500 |
| July 2013 | ALQSOUS | $12,332 | $13,832 | $1,500 |
| August 2014 | AL-MADANI | $8 | $2,008 | $2,000 |
| September 2014 | AL-MADANI | $(250) | $1,225 | $1,500 |
| October 2014 | AL-MADANI | $621 | $3,000 | $2,379 |
| TOTAL | | | | $92,829 |

GX 4803.

> ii.  Part-Time Scheduling for Full-Time Dentists and Secondary Employment

Additionally, in return for the stream of benefits that Dr. Elrawy and Defendants Alqsous and Al-Madani provided him, Defendant Hills took favorable official action by instituting a

17

"Flex Time" policy for the Dental Department. *See* GX 4607. Instead of requiring that "1.0" full-time-equivalent ("FTE") dentists work five days a week, as every other department in the hospital required of its faculty staff, *see* (R. 403, PageID 13150) (testimony of Dr. Connors), Hills allowed Alqsous, Al-Madani and Elrawy to retain their salary at a 100% full-time rate while working only three to four days a week. As explicitly stated by Dr. Connors, MetroHealth physicians were salaried employees, not hourly staff. (R. 403, PageID 13143). More specifically, Dr. Connors testified as the Chief Medical Officer responsible for all medical care, including that provided by dentists, "so we don't let people say I worked a certain number of hours and once you reach 40 you can stop […] we expect them to be there five days a week if they're full time." *Id*. at (PageID 13143-45).

Dr. Connors further explained that a "0.8" FTE would be considered an 80% full-time employee, meaning someone who formally was approved to work four days a week, and that such an arrangement had to be cleared through him as Chief Medical Officer. *Id*. at (PageID 13145-46). Nevertheless, Defendant Hills took official action in instituting a rigid 40 hour "Flex Time" policy that allowed Alqsous, Al-Madani and Elrawy to work fewer than five days a week while maintaining their full-time five-day-a-week salaries and without informing Dr. Connors of the change to patient access standards. *Id*. at (PageID 13147-48); GX 4607; (R. 404: 7.12.2018 Tr., PageID 13327) (Dr. Connors: "So the way that we explained it to people was if you're full time, you're supposed to be here five days a week and be available for other responsibilities of the job as are expected from the job"). Moreover, evidence demonstrates that Hills' implementation of the Flex Time policy squares directly and temporally as a favorable official action for the defendants. GX 4607 demonstrate that prior to February 2010, Al-Madani and Dr. Elrawy were part-time, four-day-a-week employees and were paid accordingly as 0.8 FTEs.

However, on February 1, 2010, right before Hills instituted the Flex Time policy, he also nominally increased them to 1.0 FTEs. *Id.* This designation allowed Al-Madani and Elrawy to reap all the salary benefits of a 100% full time employee, while simultaneously maintaining their ability to work four or fewer days a week. This favorable conduct extended to Alqsous as well, as demonstrated by the trial testimony of numerous individuals. *See* (R. 402, PageID 12780) (testimony of Dr. Waleed Elmallah: "[Sari] worked Monday from 9:00 to 11:00, 12:00 max. And he worked Saturday half day. And two days in the week, Wednesday and Friday."); (R. 400, PageID 12155-56) (testimony of Nicole Pistilli: "[Alqsous and Al-Madani would be] missing … fairly often."); (R. 404, PageID 13218-19) (Dr. Connors confirming that Alqsous and Al-Madani were working part-time as late as April 2015 and in the months following Hills' departure).

The other side of the coin conferred by Hills was to allow Alqsous, Al-Madani and Elrawy the freedom to subsidize their undeclared employment in their private clinics. By taking official actions to have MetroHealth pay them full-time salaries for *at most* four days of work, Hills not only squandered at least one-fifth of their base salaries and deprived MetroHealth patients of access to care, but he also granted them an additional benefit to work in conflict at clinics competing with MetroHealth with no repercussions. *See* (R. 402, PageID 13218-19, 13223-26, 13441-44) (testimony of Dr. Connors noting that Alqsous and Al-Madani, under Hills' authority, failed to report secondary employment despite policies and specific training provided by MetroHealth); (R. 392, PageID 9838-42) (Daniel Lewis testimony regarding Alqsous, Al-Madani and Hills' affirmative failure to report secondary employment); GX 4614, pp. 25-26 (2013 Compliance Module administered to Alqsous and Al-Madani, requiring reporting of secondary employment). That this conduct was always against hospital policy and made possible only through the official acts of Hills became clear after Hills was forced to resign

19

from his position and the policy was actually enforced. *See* (R. 402, PageID 12743-44) (Dr. Loiy Al-Shami testimony: "Yes. I want to clarify something about that. Before I get hired by Angel Dental or even before applying, I went back to Metro because they did have restriction on me, not to work within Cuyahoga County. So I told them I found a good offer with Angel, and they kept the strict on me, so that's why I'm working the Angel Dental branch in Akron. So that's why I drive to get there.").[13]  Finally, and as discussed in further detail below, Alqsous, Al-Madani and Elrawy working at most four days a week on a full time salary caused a quantifiable economic harm to MetroHealth in terms of lost productivity.

### iii.  Selection of Lutfi Nassar to MetroHealth Residency Program

Hills also acted favorably for Alqsous and Al-Madani by ordering Dr. Elrawy to create a fourth resident spot in 2014 for Lutfi Nassar, a dentist desired by Alqsous and Al-Madani.  Hills created this position even though the hospital only had three spots available for that rotation.  (R. 402, PageID 12734-75) (Dr. Al-Shami explaining taking only three residents for 2014-15 years); GX 4715 (National Matching document demonstrating MetroHealth only intended to hire three residents).  The evidence demonstrated that Nassar was not among the top three ranked or

---

[13]      The government anticipates defendants may attempt to argue that because Dr. Al-Shami worked one day at a private clinic and four days/40 hours a week for MetroHealth, and was still considered a 1.0 FTE at the time of his testimony that his situation somehow inures to their benefit, either by showing that no official act occurred or that MetroHealth is somehow inequitable in its enforcement of its own policies.  A proper reading of the testimony demonstrates this is simply not true.  Instead of hiding his secondary employment, Dr. Al-Shami was upfront and honest with MetroHealth prior to accepting the second job.  (R. 402, PageID 12743-44).  Moreover, Dr. Al-Shami was assigned to work exclusively at the Cuyahoga County Correctional (CCC) facility, serving the needs of inmates.  As Dr. Al-Shami explained, he discussed the drawbacks of working at CCC with MetroHealth and worked out his arrangements, in the open, to allow one day of private practice so that he could maintain his acumen.  (R. 402, PageID 12746).  Unlike Alqsous, Al-Madani and Hills, Dr. Al-Shami did not place his own personal interests before MetroHealth and his work arrangement should be considered in the context in which he secured it – in the open and with full disclosure to MetroHealth.

desired resident applicants for that year. GX 4701 (Initial Match List); GX 4707 (Ranking List of Alternates); (R. 402, PageID 12791-94) (Dr. Elmallah explaining that Nassar fared poorly in application process). Nevertheless, Alqsous and Al-Madani expressed great interest in and lobbied for Nassar for an artificially created fourth residency spot, perhaps owing to his established connections to Sayegh. *See* GX 4704-s, 4705-s, 4706-s, 4708-s (text messages between Al-Madani and Alqsous concerning Nassar and a fourth spot); GX 4710 at 3 (Nassar application showing connection to Sayegh). Hills explicitly created this position for the benefit of Alqsous and Elrawy, as he cornered Dr. Elrawy and told him to hire Nassar, whom Hills referred to as "Sari's boy," for the two-year paid residency position. *See* GX 4708-s; (R. 402, PageID 12711-14) (Dr. Al-Shami explaining Alqsous deliberately campaigning for Nassar and Hills' directive to Dr. Elrawy to create a fourth spot for "Sari's Boy"); (R. 405, PageID 13681-82) (Dr. Elrawy explaining Hills' directive to take "Sari's Boy"). Nassar later left his employment at MetroHealth to work directly for Alqsous and Elrawy at Buckeye Family Dental. (R. 402: Dr. Elmallah testimony, PageID 12793).

## C.    THE ORAL HEALTH ENRICHMENT SCHEME (COUNTS 8-12 – HILLS, ALQSOUS AND AL-MADANI)[14]

From approximately 2000 to 2009, Hills was a member of the Ohio State Dental Board (OSDB). As his tenure on OSDB neared an end, Hills created a private for-profit business, Oral Health Enrichment (OHE), which provided remediation services to dentists across the country whose licenses were revoked, suspended or lapsed. Other than Hills, the only other person

---

[14]    Defendant Hills was found guilty of Counts 8-12. Defendants Alqsous and Al-Madani were found guilty of Count 8 (Conspiracy to Commit Money and Property Mail and Wire Fraud, 18 U.S.C. 1349) but were acquitted of Counts 9-12 (substantive offenses of Mail Fraud, 18 U.S.C. 1341).

affiliated with or employed by OHE was his former mistress, Julia Solooki, who was not a dentist.

Starting in early 2009, Hills oversaw a scheme to steer training contracts from various state dental boards to OHE. However, OHE lacked the facilities, equipment, and staff to train dentists. So Hills, through his position as Chair of the Dental Department and later as a hospital executive, commandeered MetroHealth's facilities, supplies, and staff to operate OHE inside the hospital. OHE never obtained MetroHealth's permission to take or use the hospital's resources, nor did OHE ever reimburse MetroHealth for the hospital's losses in terms of facilities, supplies, staff, and revenue.

Alqsous and Al-Madani helped Hills carry out the fraud by training OHE client dentists inside MetroHealth during their hospital shifts, when they would meet and evaluate OHE clients in MetroHealth Dental offices and operatories, thereby using MetroHealth resources and occupying spaces that MetroHealth could have used to see patients. *See* GX 2501-S, 2601-S, 2701-S, 2702-S, 2703-S 2801-S (text messages between Hills, Alqsous, and Solooki discussing Alqsous conducting OHE clinical evaluations for Hills); (R. 398, PageID 11424) (testimony of Dr. Jean Kennedy explaining that Hills assigned a MetroHealth dental assistant named "Jackie" to "remain[] with me throughout the day," and that "throughout the day there were dentists and assistants working on patients in the other chairs that were in that area."). Hills, Alqsous, and Al-Madani hid the scheme from MetroHealth by not disclosing it on the annual conflict of interest surveys administered by the hospital. Hills also directly lied to MetroHealth general counsel Michael Phillips when Phillips confronted him about the scheme. *See* (R.399, PageID 11778) (testimony of Michael Phillips: "I specifically asked [Hills] . . . had any Oral Health business been done by anyone within the MetroHealth facility or using MetroHealth personnel

22

on MetroHealth time or in any way using the resources of MetroHealth . . . And [Hills] denied, said that had never happened to all three of those questions.").

Certain OHE clients required ***both*** book-based remediation and hands-on clinical remediation. OHE clients paid between $3,000 to $32,000 to Hills and OHE for these services, explicitly because OHE marketed itself as a cutting-edge facility with access to a "major Midwest health care system" and qualified dental staff. *See* GX 2090, 2093 and 2095 (OHE website). Because each of these OHE clients required hands-on clinical remediation, their choice of OHE was necessarily predicated on OHE's ability to provide those clinical services. *See* (R. 398, PageID 11448) (testimony of Dr. Jean Kennedy: "The value of the clinical assessments . . . That was the most valuable aspect of this entire process"); GX 2015 (email exchange between Solooki and Lili Reitz focusing on OHE's ability to provide clinical education); GX 2013 (Reitz email extolling the efficiency of OHE in providing remediation, including clinical training); GX 2096 (OHE website showing efficiency in clinical process).

Furthermore, OHE clients paid OHE directly and MetroHealth was never compensated for the use of its resources, staff or facilities. Hills further used and abused his contacts at the Ohio State Dental Board in this and other schemes by sidestepping the OSDB approval process for remediation programs and to find and steer clients to his business despite apparent conflicts of interest. *See* GX 2010 (January 2009 OSDB memo adding OHE to list of providers without disclosing that Hills' owned the business); (R. 406, PageID 13739) (testimony of Dr. Elrawy that Hills had a sexual relationship with former OSDB director Lili Reitz and that Hills "[took] care of her with gifts, money"). Another sign that OHE was a wholly fraudulent enterprise came in Hills' directions to Stacey Kime to literally transcribe textbooks from the dental library to pass

23

off as OHE written materials.  (R. 400, PageID 12079-81) (testimony of Stacey Kime).[15]  In the course of this scheme to defraud, Hills had Reitz provide him with confidential and attorney-client privileged materials without OSDB approval.  *See* GX 2027 (Reitz blind copying Hills and Solooki on confidential OSDB email discussing whether OHE was improperly added to the list of remediation providers); GX 2049-51 (OSDB attorney-client privileged emails obtained by Hills); GX 8003 (January 2015 email between Hills and Reitz discussing confidential tip to OSDB about resident bribery scheme).

As a result of this scheme to defraud, Defendants Hills, Alqsous and Al-Madani obtained business from and provided services to the dentists shown below at MetroHealth's expense.  The evidence showed that these dentists were individuals who required clinical remediation and who often could have obtained didactic-only learning from other providers.  *Cf*. GX 2010 (Showing alternative correspondence-based courses).

| Client | Amount | Evidence: |
| --- | --- | --- |
| Jean Kennedy | $10,500 | • GX 2200 - Letter of Agreement for $10,500<br>• GX 2201 - Check from Kennedy to OHE for $10,500 |
| Sadar Abadi | $32,000 | • GX 2300 - Cashier's Check from Abadi to OHE for $32,000 |
| Charles Akin | $12,500 | • GX 2400 - Letter of Agreement for $12,000<br>• GX 2405 - Check from Akin to OHE for $12,000<br>• (R. 398, PageID 11,571) (Dr. Akin testimony concerning paying an additional $500 to OHE while in Cleveland |
| Joseph Walker | $3,000 | • GX 2055 - Checks from Walker to OHE totaling $3,000 |

---

[15]    *See also* (R. 398, PageID 11377) (Dr. Stuart Katz testimony: "They were just Xeroxed pages."); (R. 398, PageID 11466) (Dr. Sadar Abadi testifying the materials he received from OHE were "very similar" to textbooks from his dental school); (R. 398, PageID 11409) (Dr. Jean Kennedy testimony: "They appeared to look like something that was put together at some sort of a discount copy center […] Not very professional.  Doesn't indicate who wrote the material.  There is no copyright on it.").

| | | |
|---|---|---|
| Stuart Katz | $14,000 | • GX 2111 – OHE Letter of Agreement for $14,000<br>• GX 2104, 2112-14 - Checks from Katz to OHE totaling $14,000. |
| David Bower | $12,500 | • GX 2500 - OHE Letter of Agreement for $12,500<br>• GX 2602 - FedEx Receipts for Norden and Bower<br>• GX 2501-S - Text message exchange between Hills and Alqsous, and Solooki concerning Dr. Bower |
| John Norden | $12,000 | • GX 2600 - OHE Letter of Agreement for $12,000<br>• GX 2602 - FedEx Receipts for Norden and Bower<br>• GX 2601-S - Text message exchange between Hills and Alqsous, and Solooki concerning Norden |
| Kathleen Donley | $12,000 | • GX 2700 - OHE Letter of Agreement for $12,000<br>• GX 2704 - FedEx receipt for Donley<br>• GX 2701-S, 2702-S, 2703-S - Text messages between Solooki and Alqsous concerning Dr. Donley |
| Derek Tillman | $2,900 | • GX 2800 - OHE Letter of Agreement for $2,900<br>• GX 2801-S - Text between Solooki and Alqsous concerning Dr. Tillman |
| **Total[16]** | **$111,400** | |

D.   THE DENTAL PATIENT KICKBACK SCHEME (COUNTS 13-28 – HILLS, ALQSOUS AND AL-MADANI)

In another example of Defendants placing their own interests before the public's, Defendants Hills, Alqsous and Al-Madani concocted a scheme to provide kickbacks and bribes to Hills in exchange for Hills ordering MetroHealth to generally refer patients, including and encompassing federally insured patients and others, to Alqsous' and Al-Madani's jointly-owned[17] clinic Buckeye Family Dental ("BFD"). Alqsous and Al-Madani began this scheme as

---

[16]   This amount, like others referenced herein, does not take into account undeterminable losses to MetroHealth such as those arising from lost revenue, increased insurance liability, potential patient privilege violations caused by unauthorized access to patient areas, and detriments to patient access.

[17]   At multiple times during trial, Defendant Alqsous inexplicably claimed that he did not own Buckeye Family Dental until after the referral order was made. This was simply a fiction. The government exhibited numerous text messages and emails in which Alqsous exerted control and influence over BFD's salary and expenses, *before* March 14, 2014. *See* GX 5028-S, 5032, 5033, and 5039. Perhaps most debilitating to this argument was Alqsous' willful decision to claim a $57,000 business expense loss from BFD for **Tax Year 2013** in his personal income tax

early as 2013 when they first incorporated and began planning BFD. *See* (R. 406, PageID 13742-43) (Dr. Elrawy describing an early 2014 dinner with Alqsous, Al-Madani and Hills – "Hills came with a crazy idea … we should … start referring patients to private practice"); (*id.* at PageID 13749-50) (Alqsous later meeting with Hills to finalize details of kickback scheme and "discuss how much we are going to pay him per patient"); (*id.* at PageID 13752) (Hills telling Elrawy that "Sari will take care of me" for the March 2014 referral directive); (R. 393, PageID 10261-62) (Bara Karadsheh – "I think [Al-Madani] was having trouble or something at Buckeye. And I just remember that [he] said that . . . We gave Hills a big fat check"); (R. 394, PageID 10572, 10576-77) (Dr. Yazan Karadsheh – discussing Al-Madani and Alqsous attempting to use his name for BFD and Al-Madani stating he paid Hills to refer patients to BFD).

Hills held a meeting on March 14, 2014 with the entire Dental Department staff to tell them to refer patients to Buckeye Family Dental under the pretext of alleviating patient over-crowding. Hills, Alqsous and Al-Madani did not provide any alternative dental facilities that were also in the area at the time to also alleviate the over-crowding. To conceal the scheme from detection, Alqsous, Al-Madani and Hills agreed to pay Hills by a series of checks ostensibly written for "professional services" or "consulting" fees, as follows:

| GX. | Check Amount |
|---|---|
| 5005 | $1,100 |
| 5010 | $2,100 |
| 5014 | $3,100 |
| 5017 | $3,100 |
| 5018 | $2,100 |
| 5019 | $3,100 |
| 5020 | $3,000 |
| **Total** | **$17,600** |

return, in which he admitted to owning a 30% share of BFD with Al-Madani and his wife. GX 5030.

Of note, the $3,100 check exhibited in GX 5014, coupled with a text message exchange between Hills and Alqsous (GX 5050) in which Alqsous agreed to meet Hills in his C-Level suite after the March 14, 2014, meeting, shows that Alqsous gave Hills this kickback check after and in reward for referring patients from MetroHealth to Buckeye Family Dental. Testimony from numerous witnesses demonstrated that indiscriminate, wholesale referrals had never been authorized before, and several hospital employees expressed concern over the situation. *See* (R. 402, PageID 12719) (testimony of Dr. Al-Shami that MetroHealth was able to complete all dental procedures except orthodontics, and that "we were never asked before to refer any patients outside, even we're really busy and really overwhelmed and working like 12 hours, nobody asked us to refer any patients or to not treat any patients."). Further, Dr. Alfred Connors was never notified of the referral program even though such a decision would necessarily come under his review as Chief Medical Officer. (R. 404, PageID 13213-14) (testimony of Dr. Connors). The evidence ultimately did not establish how many referrals were actually made, but certain employees testified that Alqsous and Al-Madani pressured them to refer MetroHealth patients to Buckeye Family Dental after the March 2014 meeting. (R. 402, PageID 12719-21) (testimony of Dr. Al-Shami that Alqsous asked him to refer two separate patients to Buckeye, one of whom needed "extensive work" that could have been completed at MetroHealth); (R. 402, PageID 12670-71) (testimony of Amy Anderson that Al-Madani asked her to refer a patient to Buckeye).

E.    THE ANTHONY JORDAN SCHEME (COUNT 1 – RICO CONSPIRACY – HILLS AND ALQSOUS)

Hills owned a condominium in Aurora, Ohio. In or around 2008 and continuing through 2009, Hills failed to pay the condo fees attendant with ownership, and the condo association subsequently filed a foreclosure suit against him. Hills retained the services of Attorney Anthony Jordan to represent him in the foreclosure matter. To pay for the legal services, Hills,

27

assisted by Alqsous and others, crafted a scheme to deprive MetroHealth of property and money by directing dental care to Jordan without MetroHealth charging him for the same. Hills directed others at MetroHealth to treat Jordan but to mark his case as "educational" so that the hospital would not bill Jordan directly. *See* (R. 399, PageID 11824-25) (Dr. Bogdan Butriy testimony). Alqsous in particular expressed great interest in Jordan's case and allowed his name and billing information to be used in furtherance of the scheme. *See* GX 7014. In doing so, Alqsous allowed and approved the use of his billing codes to perpetuate a fraud on MetroHealth that Jordan's treatment was "follow-up" care although he was in fact receiving substantial treatments. *See* (R. 399, PageID 11862, 11878) (Dr. Butriy agreeing that billing attending are "the ones responsible for signing off on the files that day").

Alqsous further participated in this scheme by writing a check for $1,600 to Jordan to help with Hills' legal fees, and in turn, to keep the scheme from being discovered by preventing a falling out between Hills and Jordan over fees. GX 7017; (R. 408, PageID 14357) (Jordan testimony about receiving check from Alqsous despite complete absence of attorney-client relationship). In total, Hills intended for Jordan to receive in excess of **$21,597**[18] worth of dental treatment from MetroHealth as summarized below:

| Tooth | Date | Code | Completed/ Treatment Plan | Amount |
|---|---|---|---|---|
| 3 | 12/6/2010 | D2752 | Completed | $880.00 |
| 5 | 12/6/2010 | D2752 | Completed | $880.00 |
| 5 | 9/28/2010 | D2950 | Completed | $219.00 |
| 5 | 9/28/2010 | D3320 | Completed | $631.00 |
| 5 | 9/28/2010 | D6752 | Treatment Plan | $912.00 |
| 6 | 9/28/2010 | D6242 | Treatment Plan | $912.00 |
| 6 | 12/6/2010 | D6752 | Completed | $912.00 |

---

[18]    The government notes an accidental double-counting of certain intended treatments in the sum cited in the PSR.

| 7 | 9/28/2010 | D6242 | Treatment Plan | $912.00 |
|---|---|---|---|---|
| 7 | 12/6/2010 | D6242 | Completed | - |
| 8 | 9/28/2010 | D6752 | Treatment Plan | $912.00 |
| 8 | 12/6/2010 | D6752 | Completed | - |
| 9 | 9/21/2009 | d6010 | Completed | $1,368.00 |
| 9 | 12/6/2010 | D6056 | Completed | $739.00 |
| 9 | 12/6/2010 | D6059 | Completed | $1,274.00 |
| 9 | 10/21/2009 | D6060 | Treatment Plan | $1,477.00 |
| 10 | 12/6/2010 | D6240 | Completed | $912.00 |
| 10 | 9/21/2009 | d6242 | Treatment Plan | $912.00 |
| 11 | 9/21/2009 | d6010 | Completed | $1,368.00 |
| 11 | 12/6/2010 | D6056 | Completed | $739.00 |
| 11 | 12/6/2010 | D6059 | Completed | $1,274.00 |
| 11 | 10/21/2009 | D6060 | Treatment Plan | $1,477.00 |
| 12 | 9/28/2010 | D2752 | Treatment Plan | $880.00 |
| 12 | 12/6/2010 | D2752 | Completed | - |
| 14 | 9/28/2010 | D2752 | Treatment Plan | $880.00 |
| 14 | 12/6/2010 | D2752 | Completed | - |
| - | 6/6/2008 | parts | - | $785.15 |
| - | 10/30/2009 | parts | - | $342.25 |
| **Total** | | | | **$21,597.40** |

*See* GX 7008 (Dentrix treatment records showing Jordan's planned treatment and actual treatment from September 2009 to December 2010); GX 7002 (June 6, 2008 invoice for $785.15 for supplies used to treatment Anthony Jordan); GX 7010 (October 30, 2009, invoice for $342.45 in supplies for Anthony Jordan). And as if giving away over $20,000 of public resources were not enough, Hills then instructed Jordan to pay him approximately $13,000 personally for the treatment. (R. 408, PageID 14349-50) (testimony of Anthony Jordan). In that sense, Hills benefited twice from the scheme: once by using hospital resources to finance his personal legal matter, and again by collecting roughly $13,000 from Jordan.[19]

---

[19]    And then Hills benefited a third time by falsely deducting the Anthony Jordan legal work from his taxes as an OHE business expense. *See* GX 6070; GX 6073.

F.    THE NOBLE DENTAL CLINIC RENT-A-DENTIST SCHEME (COUNT 1 –
      RICO CONSPIRACY – HILLS, ALQSOUS AND AL-MADANI)

Beginning in or around 2008 Hills entered into a business arrangement with Dr. Chan
Wang, the owner of Noble Dental Care/Clinic[20], a clinic in East Cleveland that was not affiliated
with MetroHealth.  Dr. Wang was not licensed to practice dentistry in Ohio, and needed dentists
to staff her clinic.  Hills agreed to provide licensed and insured dentists, including Alqsous and
Al-Madani, to Wang and she in return agreed to pay Hills for their services, both by directly
paying him and by issuing checks to Oral Health Enrichment as follows:

| Description | Government Exhibit | Amount |
|---|---|---|
| NDC 1099s issued to Hills for TY 2009-10 | 6061, pp. 37, 44 | $91,961.00[21] |
| Checks from NDC to OHE | | |
| 5/14/2009 | 2104 | $500.00 |
| 5/28/2009 | 3012 | $1,000.00 |
| 6/12/2009 | 3013 | $1,500.00 |
| 6/12/2009 | 3014 | $1,000.00 |
| 6/28/2009 | 3015 | $1,000.00 |
| 7/7/2009 | 3016 | $1,000.00 |
| 7/10/2009 | 3016 | $1,000.00 |
| 7/16/2009 | 3017 | $1,000.00 |
| TOTAL | | $99,961.00 |

---

[20]    Defendants take issue with whether the name for this dental facility ended with "Care" or
"Clinic."  In the context of the offense, where the defendants deprived MetroHealth of money
and property in the form of dentists' services, wages and productivity, the distinction is
meaningless.  In fact, it is telling that this scheme led to Alqsous and Al-Madani later purchasing
NDC – a situation hard to imagine had they not defrauded MetroHealth in the first place – and
later using NDC as a front to facilitate other schemes in the RICO conspiracy.

[21]    The government notes an arithmetic error in this calculation and that reflected in the PSR,
which overstates the amount of income reflected in Hills' 1099s by double-counting the checks
issued to OHE. This error is attributable to the government and was discovered in preparation of
this memorandum. The government in this memorandum has corrected the table to reflect this
difference.

At the relevant time, Alqsous and Al-Madani had limited licenses to practice dentistry that restricted them to practice only at MetroHealth. *See* GX 3004 (Alqsous limited license); GX 3005 (Al-Madani limited teaching license). Hills then directed Alqsous and Al-Madani to work at Noble Dental Clinic instead of MetroHealth, although for part of the time they were insured and paid a full-time salary by MetroHealth. MetroHealth was never compensated for the salary paid to Alqsous and Al-Madani for the time they worked at Noble Dental Clinic. *See* (R. 392, PageID 9852) (testimony of Daniel Lewis). Further, once Alqsous and Al-Madani gained their full licenses to practice, they continued to work at Noble Dental Clinic without ever properly declaring their secondary employment, while retaining all their benefits and pay from MetroHealth. This scheme extended to other MetroHealth resident dentists under the control and influence of Hills, Alqsous and Al-Madani, including Yazan Karadsheh, (R. 395, PageID 10757) (Karadsheh testifying that Al-Madani asked him to work at Noble during his residency), Firas Yacoub, (R. 394, PageID 10440-41) (Yacoub testifying that one of his attending dentists, possibly Alqsous or Al-Madani, directed him to work at Noble during his shift as a MetroHealth resident), Ahmad Al-Saad, (R. 393, PageID 10112) (Al-Saad testifying that Alqsous asked him to work at Noble during his residency on a Saturday), as corroborated by testimony from Stacey Kime and Nicole Pistilli, (R. 400, PageID 12008) (Kime testifying that when she worked on the clinic floor, there "would always be [one resident] missing"); (R, 400, PageID 12155-56) (Pistilli testifying that Alqsous or Al-Madani would be missing from the hospital because they were believed to be working at another clinic).

31

G.  ALQSOUS, AL-MADANI AND HILLS OBSTRUCTED JUSTICE (COUNTS 29-30)[22]

The jury also unanimously found that Hills, Alqsous and Al-Madani conspired to obstruct justice in response to the federal criminal investigation of their various schemes as described above. In particular, Hills instructed the others on how to speak and answer questions from the FBI in order to conceal their illegal activities. These instructions included falsely telling the FBI that things of value provided by Alqsous, Al-Madani and others were based upon their "Middle-Eastern culture," or that patients referred from MetroHealth to NDC and BFD would not cause economic harm to the hospital. Al-Madani further cornered and intimidated Dr. Yazan Karadsheh in an attempt to prevent him from cooperating in the investigation into the Resident Bribery Scheme, which given MetroHealth's receipt of federal funding implicated the potential for a federal criminal investigation, and specifically threatened him with the possibility that he could be deported (an action clearly within the purview of the federal government).

Hills also instructed Alqsous, Al-Madani and others to not cooperate with the FBI because it was "not the American way" and in particular, Hills instructed Alqsous, Al-Madani and Elrawy that,

> The s**t we got ourselves in this year is because motherf*****s running they mouth snitching … y'all know about Law and Order, they do it every f*****g week … what does Law and Order do? Snitches. Y'all watch 48 Hours? Snitches … but if we tight like this and you know each other, you laugh at it … y'all got to be tight to do that. You can't have distrust … if y'all started together, can't no man take you down. My friend [T.C.], you remember my friend L.A. Tony, we tight like this. Can't nothing get between us, I don't give a f**k what. FBI, CIA, ex-wives, God. It don't matter. You ain't coming between us. We got a bond that don't break. Because he know I got his back, he got mine … We just playing the game right now. Y'all get like that, man, y'all be great … listen to me on this, the day that you doubt each other is the day [unintelligible] y'all lose faith in each

---

[22]    As part of the obstructive conduct, Al-Madani affirmatively made materially false and fraudulent statements to FBI SA Shaun Roth in violation of 18 U.S.C 1001 (Count 29).

other and start second guessing each other, you'll never achieve what you [unintelligible].

GX 8001 (Red Steakhouse Audio).

Rather than sit as a passive or uninterested listener, Defendant Alqsous readily volunteered and agreed that he would hide incriminating information from his fiancé to protect the other members of the corrupt enterprise:

> HILLS:    Y'all know Sari's getting married. (UI)
> [***]
> HILLS:    Time out I got some more advice. So, I was in Metro Dentistry 2007. Memphis, Tennessee, I'm sitting in Court. (UI) I'm going through a divorce. (UI). And her lawyer says s--t to me like, uh, I can't f---ing believe she told him that, right. And then, she trying to get her best – and everything I thought was sacred, she violated it. And I'm saying like – Wow! So my lawyer said time out. He called me in a room and said: Did you do all that s--t? You did. You don't want this s--t to go to a jury to make a decision that you are a f---ing jerk. Womanizing, this that and that. Cause that's what she is telling them. And you got – you just told me that all that she said is f---ing true. It was over years. *'Til this day, I never tell a woman nothing, about my business. Nothing. - If something goes wrong they will tell.* I thought she would never tell. So, I'm telling you.
> ALQSOUS:  *What we get from the story is (UI) what's going on in our lives*.
> HILLS:    Not true (UI).
> ALQSOUS:  *Because if in five years we get divorced.*
> HILLS:    (UI).
> ALQSOUS:  (UI) *You guys don't worry about it.* Cause I don't tell her nothing. *None of you guys will get in trouble.*

GX 8001 and 8001-M (Emphasis added to transcription). Alqsous also expressed his agreement to obstruct at the Red Steakhouse dinner by completing Hills' thoughts on how to use the "James Bond" phone, which the group surmised the FBI would not be able to wiretap, compared with how to speak on the "MetroHealth" phone, upon which the federal government in Defendants' eyes could eavesdrop:

> ALQSOUS:  *You have three phones?*

33

> HILLS:      […] (describing his different cell phones) ***This is Metro, this is James Bond 000000***, that means the only people that got this, I don't even give it to Hussein, (UI) ***Cause I don't know who's watching you*** - I don't want nobody to use it. I got this phone in August, three people have this number, my dad, Larry Zukerman and Sharron. […] Then ***this one is my secret***, this, this phone is not even in my name, it's like in five different people, - it's like my cousin's cousin, cousin to my cousin's cousin cousin phone. ***FBI trace this s--t.*** (LAUGHTER)Okay.
>
> ALQSOUS:    Which number is 314-72XX?
>
> HILLS:      ***That's Metro. - You can use it but just be like, hi Doctor Hills***,
>
> ALQSOUS:    ***Life is beautiful!***
>
> HILLS:      ***Life is beautiful.***

GX 8001 and GX 8001-N (Emphasis added to transcription).

In furtherance of the obstruction of justice scheme, Hills also misused his prior position on the Ohio State Dental Board and his relationship with then-OSDB executive director Lili Reitz to obtain confidential information protected by Ohio state statutes and in order to obstruct any potential investigation and threaten potential witnesses. In particular, in January 2015, close to six years after Hills left the OSDB, an anonymous individual called the OSDB anonymous tip line to lodge a complaint against Hills specifically alleging that he had been arrested by the FBI for allowing unqualified residents into the dental program for bribes. GX 8004 (email from OSDB investigator Jeremy Kimble to Lili Reitz, which Reitz and Hills then discussed in their own email chain). Reitz, upon hearing of this complaint, shared the information with Hills, who directed her to assign an OSDB investigator to determine the source of the anonymous complaint by conducting numerous reverse phone searches. *See id.*

Through Reitz, Hills obtained confidential OSDB database information on a Dr. Alexander DiFilippo, an Ohio-licensed dentist misidentified as the anonymous caller but who did not actually leave the anonymous tip. *See* (R. 408, PageID 14249-5044) (testimony of Jeremy Kimble). Hills then directed his attorney, Larry Zukerman, to write a threatening letter to Dr.

DiFilippo to prevent him from communicating information about Hills to others, and demanded that DiFilippo submit to an interview with Zukerman or face a lawsuit. *See* GX 8006 (letter from Zukerman to DiFilippo). Hills later learned that Dr. DiFilippo was misidentified and again tasked Reitz and the OSDB investigator to determine the identity of the anonymous caller. He then received additional confidential information about Patricia Forkapa, who was positively identified as the caller, and Hills passed that information on to Zukerman who sent a similar threatening letter to her. *See* GX 8021 (letter from Zuckerman to Forkapa); GX 8019 (confidential database entry with Forkapa's name, address, social security number, birthdate and other sensitive personal information). Reitz was arrested and charged with Ohio state misdemeanors violations for her misconduct in this regard.

Finally, Defendant Al-Madani lied, misled and prevaricated when interviewed by FBI SA Shaun Roth about the purpose of the NDC checks issued in 2014 to Hills. Al-Madani affirmatively attempted to mislead SA Roth by stating that the NDC checks were for a "finder's fee" to reward Hills for helping Alqsous and Al-Madani purchase NDC. Evidence at trial demonstrated that Hills had no role in the purchase, and that his last contact with Qian Wang was 2010 – at least three years before the NDC checks to Hills began. This misconduct was material as it was an attempt to mislead the FBI and hide the connection between the NDC checks and the Dental Patient Kickback scheme.

H.     <u>DEFENDANT HILLS MADE FALSE TAX RETURNS THAT UNDERSTATED HIS TOTAL INCOME (COUNTS 31-33)</u>

The jury's verdicts also reflected that Hills maximized the value of his variously ill-gotten gains by failing to accurately report his income from unexplained cash deposits, much of which is necessarily tied to and overlaps with his receipt of bribes and kickbacks, and OHE partnership income he received during Tax Years 2011-13. Hills not only failed to disclose his

unaccounted-for cash deposits and OHE partnership income, but he also falsely claimed various personal expenses related to parts of the overall RICO scheme as deductible OHE business expenses. These deductions included falsely claiming a dishwasher for OHE's office, landscaping costs for his condominium, and settlement fees for the Deer Island litigation. The total taxes due and owing are:

| Year | Underreported income | Taxes due and owing |
|------|----------------------|---------------------|
| 2011 | $84,713 | $28,726 |
| 2012 | $81,993.63 | $26,897 |
| 2013 | $90,890.82 | $24,803 |
| **Total** | | **$80,426.00** |

GX 6025, 6084.

In sum, Defendants maximized and abused their power and status as public officials to exploit others and solicit and accept bribes in return for the promise of favorable official actions. They further engaged in schemes to steal from a taxpayer funded public hospital that primarily served indigent patients. In doing so, they not only accrued hundreds of thousands of dollars of income and other anticipated benefits in their favor, they caused measurable harm to MetroHealth that dwarfed those figures and reached into the millions of dollars.

### III.     CALCULATING THE SENTENCING GUIDELINES

In preparation for sentencing, the parties have exchanged their objections to the guidelines calculations. Those objections warranting merit are addressed herein. However, the great bulk of the objections lodged by Defendant Alqsous essentially consist of continuing or new denials of wrong-doing, and at best are an attempt to re-litigate his motions for acquittal and new trial under Rules 29 and 33. These objections are, without exception, inconsistent with the evidence at trial and the jury's rejection of defendant's arguments.

A.     TOTAL ECONOMIC LOSS/GAIN FROM THE SCHEMES

As shown in detail herein, the government submits that the total *economic* loss and gain from the various schemes is approximately **$4,819,960.24** for the combined schemes in the RICO conspiracy and **$4,900,386.24** with the tax loss. These sums are based on the factual background set forth above in Section II, and the law and argument discussed below in Sections III.B through III.F.

| Scheme | Total |
|---|---|
| Resident Bribery, Counts 3-7 | **$373,908** |
| Hobbs Act Conspiracy, Count 2 – Incentives | $92,829 |
| Hobbs Act Conspiracy, Count 2 – Nassar | $105,126.94 |
| Hobbs Act Conspiracy, Count 2 – Part-Time Salary | $661,176.90 |
| Hobbs Act Conspiracy, Count 2 – Lost Productivity | $3,335,858 |
| Dental Patient Kickbacks, Counts 13-28 | $17,600 |
| Oral Health Enrichment, Count 8-12 | $111,900 |
| Anthony Jordan Treatment, Count 1 | $21,597.40 |
| Noble Dental Rent-A-Dentist | $99,964 |
| False Statements on Taxes | $80,426 |
| **Total** | **$4,819,960.24 / $4,900,386.24 (with Taxes)** |

B.     APPLICABLE LAW REGARDING SENTENCING.

As the Court is well aware, after the decision of the United States Supreme Court in *United States v. Booker*, 125 S. Ct. 738 (2005), the Sentencing Guidelines were rendered advisory for all criminal cases, and district courts were given enhanced discretion in the sentencing of criminal defendants. *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir. 2005).

Nonetheless, to secure nationwide consistency, "the [Sentencing] Guidelines should be the starting point and the initial benchmark." *United States v. Gall*, 128 S.Ct. 586, 596-97 (2007); *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* (citing *United States v. Rita*, 127 S. Ct. 2456, 2465 (2007)) (observing that Congress mandated

that the United States Sentencing Commission write sentencing guidelines that would carry out the objectives of 18 U.S.C. §3553(a)). *See* 28 U.S.C. § 991(b). Once the guidelines have been considered, the court should, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, consider all the § 3553(a) factors and "make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 596-97.

In particular, after making the Guideline calculation, a sentencing judge is to consider the factors outlined in Title 18, United States Code, Section 3553(a)(1):

(i)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(ii)   the four legitimate purposes of sentencing (described below);

(iii)  the kinds of sentences available;

(iv)   the Guidelines range itself;

(v)    any relevant policy statement by the Sentencing Commission;

(vi)   the need to avoid unwarranted sentence disparities among defendants; and

(vii)  the need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1)-(7).

Section 3553(a)(2) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing, which are as follows:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from future crimes of the defendant; and

> (D)  to provide the defendant with needed training, medical
> care, or other correctional treatment in the most effective
> manner.

18 U.S.C. § 3553(a)(2)(A)-(D).

The Sixth Circuit Court of Appeals requires that a district court provide a reasonable explanation of its application of the sentencing factors set forth in Title 18, Section 3553 of the United States Code in imposing sentence.  In *United States v. Blackwell*, 459 F.3d at 739, 773 (6th Cir. 2006), the Sixth Circuit announced:

> The job of the district court is to impose "'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)."  In reaching a sentence that complies with the purposes of § 3553(a), the district court must consider the Sentencing Guidelines range and all relevant § 3553 factors.  While a district court need not explicitly reference § 3553 or recite a list of factors, it must provide a reasoned explanation for its choice of sentence and its explanation must be sufficiently thorough to permit meaningful appellate review. . . . This Court will only uphold a sentence if it is reasonable.  Reasonableness contains two facets: substantive and procedural.  In reviewing for reasonableness, the Court employs a presumption for substantive reasonableness.

(Citations omitted.)  *Id*.  The Sixth Circuit has stated that, "while a district court need not engage in a 'ritualistic incantation' of the § 3553(a) factors, its reasoning must be 'sufficiently detailed to reflect considerations listed in § 3553(a) and to allow for meaningful appellate review." *United States v. Tanner*, 2010 WL 2545589, No. 09-5177, (6th Cir. June 11, 2010) (*quoting United States v. Bolds*, 511 F.3d 568, 581 and *United States v. Mayberry*, 540 F.3d 506, 518 (6th Cir. 2008)).  Therefore, a district court must impose a reasonable sentence while expressing enough of its rationale to permit an appellate court to understand the basis for the sentence imposed.

At sentencing, the district court "may accept any undisputed portion of the presentence report as a finding of fact."  Fed. R. Crim. P. 32(i)(3)(A);  *United States v. Carter*, 355 F. 3d 920 (6th Cir. 2004) ("the district court is allowed to accept as true all factual allegations in a pre-

sentence report to which the defendant does not object") (quoting *United States v. Levy*, 250 F. 3d 1015, 1018 (6th Cir. 2001)); *see also, United States v. Duckro*, 466 F. 3d 438, 449-450 (6th Cir. 2006) (finding district court's acceptance of the uncontested facts from the pre-sentence report was appropriate). A jury's verdict of acquittal on certain charges does not preclude a sentencing court from considering the underlying conduct as long as it finds that conduct proven by a preponderance of the evidence. *Watts v. United States*, 519 U.S. 148, 149 (1997) (*per curiam*); *United States v. White*, 551 F.3d 381, 383-86 (6th Cir. 2008) (*en banc*) (affirming earlier circuit precedent and collecting similar cases from other circuits).

The sentencing judge may hear arguments by the parties that the Guidelines sentence should not apply in some cases. This may be due to the case falling outside the 'heartland' to which the Commission intends individual Guidelines to apply, or the Guidelines sentence failing properly to reflect § 3553(a) considerations, or the case warranting a different sentence regardless. "Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita,* 127 S.Ct. at 2465; *see also United States v. Liou*, 491 F. 3d 334, 338 (6th Cir. 2007) (sentencing judge should satisfy the procedural requirement of setting forth enough to satisfy an appellate court that she has considered the parties' arguments and has a reasoned basis for exercising her own decision making authority). A sentence within the properly calculated Guidelines range is presumed reasonable. *United States v. Elmore*, 743 F.3d 1068, 1072 (6th Cir. 2014) (citing *United States v. Christman*, 607 F.3d 1110, 1118 (6th Cir. 2010)).

C.     §2C1.1 IS THE PROPER UNDERLYING GUIDELINES SECTION TO APPLY TO THE CONVICTIONS[23]

Defendants Alqsous and Al-Madani contend in arriving at the conclusion their total offense levels are 9 and 10, respectively, that Guidelines Section 2C1.2 (Gratuities) applies to the offenses of their conviction. They do so by focusing on the fact that *one* of their sixteen-plus offenses of conviction concerns a violation of 18 U.S.C. § 666, which in turn is contemplated under both §§ 2C1.1 and 2C1.2. This difference is significant because it allows them to start at a Base Offense Level 9 under § 2C1.2 and avoid the inconvenience of a starting base offense level 14 under § 2C1.1. This argument ignores that in addition to violating Section 666, defendants were also convicted of honest services fraud under 18 U.S.C. §§ 1341, 1343, 1346, and Hobbs Act Extortion Under Color of Official Right under 18 U.S.C. §1951. Accordingly, their convictions are not limited to some post-verdict theory of gratuities under Section 666 but necessarily include the bribery and honest services fraud portions of the Guidelines. The Sentencing Guidelines provide that violations of 18 U.S.C. § 666 may be sentenced under either Sections 2B1.1, 2B1.5, 2C1.1 or 2C1.2, the latter of which applies, inter alia, to receipt and solicitation of gratuities, *see* U.S.S.G. app. A, at 580. The Guidelines also provide that violations of Sections 1341 and 1343 are to be sentenced under either Section 2B1.1 or 2C1.1, and violations of Section 1951 are to be sentenced under either Sections 2B3.1, 2B3.2, 2B3.3, 2C1.1. However, the Guidelines do not provide that honest services fraud convictions under Sections 1341, 1343 or 1951 are to be sentenced under the 2C1.2 gratuities Guideline. *See* U.S.S.G. app.

---

[23]    Defendants Hills, Alqsous and Al-Madani were all convicted in Count 1 of a RICO Conspiracy, in violation of 18 U.S.C. §1962(d). The appropriate starting Guidelines section for this offense is § 2E1.1, which provides for a minimum offense level of 19, or the properly calculated offense level for the underlying predicate racketeering conduct, whichever is higher. Defendants Alqsous and Al-Madani appear to ignore this fact in their calculations.

A, at 584 and 586; *see also United States v. Bahel*, 662 F.3d 610, 645 (2d Cir. 2011) (rejecting a similar gratuities argument in a 666 bribery and honest services fraud case involving a U.N. official).

Defendants' arguments also ignore that they were specifically convicted of soliciting, accepting and providing things of value in exchange for promises of favorable official acts. This element was an explicit part of the Court's jury instructions, and a jury found beyond a reasonable doubt that the defendants engaged in a series of *quid pro quo* arrangements concerning official acts. *See* (R. 412, PageID 15287-88) (jury instructions on honest services fraud). The jury was not instructed and the evidence did not support a finding that these payments were somehow transformed into gratuities. Accordingly, the Court should start with the appropriate Guidelines Section, 2C1.1, for this Public Corruption case predicated on numerous *quid pro quo* arrangements.

D.     **DEFENDANTS WERE PUBLIC OFFICIALS AND EDWARD HILLS WAS A HIGH LEVEL PUBLIC OFFICIAL**

1.     The Defendants Are All Public Officials

The Final PSRs do not find Alqsous, Al-Madani or Sayegh to be a public official under § 2C1.1(a)(1). This causes their base offense level under 2C1.1 to start at Level 12 rather than Level 14. The government submits that because these defendants: 1) were public employees of a public hospital established under the laws of the State of Ohio as a distinct branch of government and funded by public monies; 2) were defined by Ohio statutes as public officials; and 3) committed offenses that required an exercise of their inherent and implicit powers and influence as public officials, that their base offense level should start at Level 14.

In its definitions, Section 2C1.1 provides that the phrase "'Public Official' shall be construed broadly." U.S.S.G. § 2C1.1, cmt. n. 1. A "public official" includes, inter alia, a

42

"member of a state or local legislature," an "officer or employee or person acting for or on behalf of a state or local government, or any department, agency, or branch of government thereof," as well as appointed officials and individuals who have been elected and are waiting to take office. *Id*. Moreover, as relevant here, the definition includes a catchall provision that defines a "public official" as "[a]n individual who, although not otherwise covered by [the other] subdivisions [of the definition] ... (i) is in a position of public trust with official responsibility for carrying out a government program or policy; (ii) acts under color of law or official right; or (iii) participates so substantially in government operations as to possess de facto authority to make governmental decisions (e.g., which may include a leader of a state or local political party who acts in the manner described in this subdivision)." *Id*.

The definition of a public official is also broadly defined because it was based on the on the Sentencing Commission's considered assessment of the high level of culpability of public officials who abuse the public trust, and the severity of the harm caused by their crimes. Indeed, approximately ten years ago, the Sentencing Commission increased the offense levels applicable to public corruption offenses. *See* U.S.S.G. Manual app. C (Amendment 666). In doing so, the Commission stated, in relevant part:

> This amendment increases punishment for bribery, gratuity, and "honest services" cases while providing additional enhancements to address previously unrecognized aggravating factors inherent in some of these offenses. This amendment reflects the Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses.... ***The higher alternative base offense levels for public officials reflect the Commission's view that offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them***, and their offenses present a somewhat greater threat to the integrity of governmental processes.

*Id.* (Emphasis added).

Section 2C1.1 is not limited to those who work for a federal, state or local government, but has been applied to leaders of political parties, officials of Indian tribes, and foreign public officials. *See* U.S.S.G. § 2C1.1, cmt. n. 1(E) & background. Indeed, the phrase "public official" encompasses any individual who either (1) is in a position of public trust with official responsibility for carrying out a government program or policy; (2) *acts under color of law or official right*; or (3) possess de facto authority to make governmental decisions. *See* U.S.S.G. § 2C1.1, cmt. n. 1(E) (emphasis added).

Ohio Revised Code Section 2921.01(A) defines a "public official" as "any elected or appointed officer, or employee, or agent of the state or any political subdivision, whether in a temporary or permanent capacity," and Section 2921.01(B)(1) defines a "public servant" as "any public official." Alqsous, Al-Madani and Sayegh were employees and agents of MetroHealth Hospital, which in turn was a politically created subdivision of Ohio's government as it was a County Hospital created pursuant to Chapter 339 of the Ohio Revised Code. *See* (R. 392, PageID 9805) (testimony of Daniel Lewis). MetroHealth was owned by Cuyahoga County, also a political division of the State of Ohio. Further, while not a necessary factor, it is dispositive that all defendants were given notice of their unique status as public employees of a public institution through the onboarding and continuing education provided by MetroHealth. GX 502 at 1 (Conflict of Interest) ("the Ohio ethics laws were enacted to promote confidence in government"); GX 4614 at 23-27 (2013 Legal Compliance Module) (explaining MetroHealth employees' special status as public employees and their attendant fiduciary duty to the public). Thus, all defendants were employees of a political subdivision of the State of Ohio and were public officials under Ohio law. In *United States v. Jones*, 260 Fed. App'x 873 (6th Cir. 2008), the Sixth Circuit concluded that a defendant who "worked as a [state driver's] licensing clerk,"

*id.* at 875, and was convicted of accepting bribes from a driving school to make it easier for applicants sent by the school to obtain a driver's license, "clearly falls within the [guidelines] definition of 'public official'" because "[a]s an official employee ..., [she] acted 'on behalf of a state agency.'" The same should hold true here where Alqsous, Al-Madani and Sayegh served as official employees of MetroHealth, and acted on behalf of that same political subdivision of the state in soliciting bribes from others in relation to their official duties.

The Probation officer concedes this reading of the Guidelines but contends that such a reading is overly broad. However, the history behind this provision demonstrates that the Commission, recognizing the outsized harm caused by corrupt public officials, specifically intended to broaden this specific offense characteristic. In 2004, the Sentencing Commission amended the Guidelines and commentary by cutting in half the enhancement from eight to four levels, dropping the word "supervisory" from its reference to law enforcement officers, and adding the current definition of high-level decision-making or sensitive position. U.S.S.G. App. C, Amendment 666. "These changes signify an intent to encompass more public officials within the ambit of the enhancement." *United States v. Hill*, 645 F.3d 900, 909 (7th Cir. 2011). A person who solicits bribes relating to their public job, whether a driver's license clerk or a physician at a public hospital, should fall under the Guidelines' "broad" definition of a public official and a decision to the contrary would undermine the Commission's intent.

Further, the Probation officer contends that, "if all of the definitions are considered collectively, it does not appear that the Guidelines intended to encompass varying degrees of public officials …. through a roundabout way of citing various definitions and MetroHealth's status as a county government entity, the Government has determined that any employee of that hospital is a public official no different than a state senator or elected judge." (R. 436: Alqsous

45

Final PSR, PageID 16130-31). This argument is antithetical to the Guidelines' comprehensive and inclusive definition of public official, demonstrated not only by the commentary to the section, but also because § 2C1.1 provides a separate, larger enhancement "[i]f the offense involved ... any public official in a high-level decision-making or sensitive position," U.S.S.G. § 2C1.1(b)(3), and thus *does* explicitly consider varying levels and strata of culpable public officials. The commentary states that "'[h]igh-level decision-making or sensitive position' means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." *Id*. cmt. n. 4(A). It follows that to qualify merely as a "public official," and not as a "public official in a high-level decision-making or sensitive position," one need not possess "direct authority to make decisions for, or on behalf of, a ... government entity," nor wield "substantial influence over the decision-making process." A reading to the contrary requiring a mere public official to be some high-level decision-making official would thus run afoul of the Commission's stated intent to create a distinction between those who seek to corrupt their office and those who simply pay bribes, *see* U.S.S.G. Amendment 666, and would render the high-level decision maker enhancement under § 2C1.1(b)(3) redundant, a result the Supreme Court has urged sentencing courts to avoid. *See, e.g.*, *Dodd v. United States*, 545 U.S. 353, 370 (2005).

Also, Defendants were specifically convicted of Bribery in Federal Programs crimes under Title 18 U.S.C. § 666, which provides, in relevant part:

> d) As used in this section—
> …
> (2) the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a **corporation or other legal entity established, and subject to**

> control, by a government or governments for the execution of a
> governmental or intergovernmental program.

18 U.S.C. § 666(d)(2) (Emphasis added). Government-created corporations and organizations whose mission is to perpetuate a public purpose have regularly been found to come within the meaning of the statute. *See United States v. Dransfield*, 913 F.Supp. 702, 707 (E.D.N.Y. 1996) (holding that a New York public benefits corporation created by the state legislature was an entity "subject to control" by a government agency under 666(d)(2)); *United States v. Moeller*, 987 F.2d 1134, 1137 (5th Cir. 1993) (Non-government entity, the Texas Federal Inspection Service, which was created to perform federal and state inspections, was a "government agency subject to control" by the Texas state government for the execution of inter-governmental programs); *United States v. Reese*, 681 Fed. App'x 846, 849–50 (11th Cir. 2017) (employees of county transit authority created by act of state legislation were public officials under § 2C1.1(a)(1)).

Under § 666, the term "agent" is defined as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). This list is not exhaustive. *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). Hills, Alqsous, Al-Madani and Sayegh were also all found guilty of crimes that required a finding that they were public officials. *See generally* (R. 1: Indictment, Counts 2, 3-7, 28). Indeed, as charged in this case, to be guilty of 18 U.S.C. § 666, the jury had to determine that the defendants acted "corruptly", meaning that they acted with "an intent to give some advantage inconsistent with official duty." *See* (R. 412: Jury Instructions, PageID 15263). The only way for the Defendants to act inconsistent with their official duty is if they were public officials in the first place. A finding now that the Defendants were not in fact public officials would directly

conflict with the jury's verdict, a result explicitly prohibited by the Sixth Circuit. *See United States v. Reed*, 264 F.3d 640, 646-48 (6th Cir. 2001). Accordingly, all defendants should start at Base Offense Level 14 pursuant to § 2C1.1(a)(1).

2.  Defendant Hills was a High-level Decision Maker at MetroHealth

U.S.S.G. § 2C1.1(b)(3) provides, in relevant part, that "[i]f the offense involved an elected public official or any public official in a high-level decision-making or sensitive position, increase by 4 levels." The Commentary to that section provides:

> 3. Application of Subsection (b)(3) --
> (A) Definition.--"High-level decision-making or sensitive position" means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision making process.

U.S.S.G. § 2C1.1(b)(3), Application Note 3.

Hills suggests that in his capacity as director of the dental department, he possessed distinctly different and substantially lesser powers than in his roles as Interim CEO/President and COO of MetroHealth. Hills goes on to suggest that any bribes he received from the co-defendants were in this distinctly less-capable role. Not only is this argument nonsensical, it illustrates a distinction with no real meaning. Defendants would have the court suspend disbelief and assume that Hills purposefully donned a different hat each and every time he accepted a thing of value from Alqsous and Al-Madani, and that they only gave him things of value in recognition of some trivial position he held. The argument ignores the very nature of his position and power in the office and is contrary to specific pieces of evidence demonstrating their desire to influence him in his position as one of the two most powerful people at MetroHealth.

Contrary to Defendant Alqsous' contention that no evidence showed that things of value were directed to Hills in his high-level role, GX 4434-S, 4436-S, 4214 and 4215 demonstrate that

Alqsous, Al-Madani and Elrawy purposefully purchased a $3,700 Louis Vuitton briefcase for Hills, at his insistence, around January 1, 2013, for Hills "to start [his] new job as #1" in the MetroHealth system. This timing coincided with Hills' brief elevation to interim President and CEO from January to June 2013. This bribe was not somehow compartmentalized to relate only to a minor role Hills played in the hospital. Instead, the bribe was directed to Hills in his role as a high-level official over the entire MetroHealth System.

Finally, these arguments are illogical as they beg the question (while ignoring the overwhelming evidence and obvious answer): why even pay bribes to Hills in the first place if he was such an ineffectual and limited official? Rather, Hills falls squarely within the wide array of public officials covered by the enhancement; thus, the "measure of seriousness provided by the [4-level] enhancement is in fact reasonable" on the facts of this case. *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009); *cf. United States v. Harris*, 490 F.3d 589, 595 (7th Cir. 2007) (applying a broad definition to "financial institution" for purposes of the enhancement in U.S.S.G. § 2B1.1(b)(13)(B)(i), and noting that "the list of financial institutions in the Guidelines note is non-exhaustive and contains a catchall provision that requires that 'any similar entity' be considered a financial institution."). The commentary requires a flexible approach in applying the enhancement to varying factual situations, and the examples demonstrate the Commission's intent to apply the enhancement to a range of public officials with varying responsibilities. *Hill*, 645 F.3d at 911.

That Hills was a powerful figure as he facilitated and enabled the schemes was firmly established at trial and by the jury's verdict. There was a reason Alqsous and Al-Madani provided a steady stream of benefits to him. There was a reason they provided him with kickbacks for promised patient referrals. It is because he possessed the authority in MetroHealth

to provide them with official acts in their favor.  It is because he was able to provide them with increased incentives, full-time salaries on part-time hours, and hiring their preferred dentists.  It is because he held ultimate control over the dental department at MetroHealth to facilitate the patient referrals.  And it is because his control of the dental department was only enhanced, not diminished, by his position as the COO of the entire system.  Alqsous and Al-Madani did not repeatedly bribe Hills because of his ineffectual position.  They did so because he possessed power, influence and control over money and others.  Accordingly, Defendants Hills, Alqsous and Al-Madani should all receive a four-level increase under § 2C1.1(b)(3).

    E.      UNDER 2C1.1(B)(2), THE GREATEST LOSS AMOUNT IN EACH OF THE DEFENDANTS' BRIBERY SCHEMES WAS THE BENEFIT THAT THE BRIBE PAYORS EXPECTED TO RECEIVE

In bribery cases, the Guidelines direct the Court to apply the "greatest" of the loss to the government, the value of the payment, "the benefit received *or to be received* in return for the payment," and "the value of anything obtained *or to be obtained* by a public official or others acting with a public official." U.S.S.G. § 2C1.1(b)(2) (emphasis added). "The guideline's language thus requires the district court to enhance the offense level by the number corresponding to the *greatest* of the following values: (1) the payment (*i.e.*, the bribe), (2) the benefit received or to be received in return for the payment ..., or (3) the loss to the government." *United States v. Muhammad*, 120 F.3d 688, 700 (7th Cir. 1997) (emphasis in original).  As an initial matter, a district court is required to make a finding as to loss amount by a preponderance of the evidence using a reasonable estimate predicated upon the facts of the case. The Sixth Circuit has announced that a district court determines loss by a preponderance of evidence standard.  *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006) (citing *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005)).

In describing the above standard for ascertaining a loss amount, the Sixth Circuit noted that, "the district court's findings are not to be overturned unless they are clearly erroneous." *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006) (citing *United States v. Guthrie*, 144 F.3d 1006, 1011 (6th Cir. 1998)). With respect to adjudicating the loss amount arising from financial frauds, the *Triana* court noted, "[i]n situations where the losses occasioned by financial frauds are not easy to quantify, the district court need only make a reasonable estimate of the loss, given the available information. Such estimates 'need not be determined with precision.'" *Triana*, *supra*, at 320 (citations omitted) (citing *United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003) and Application Note 2, subpart (C), to U.S.S.G. ' 2B1.1).[24] The *Triana* court also noted the Guidelines' distinction between "actual loss" and "intended loss." *Id*. "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id*. (citing Application Note 2, subpart (A)(I) and (ii), to U.S.S.G. § 2B1.1).[25] "Intended loss" is "the pecuniary harm that would have been possible or likely to occur." *Id*. (citations omitted.). In analyzing the foregoing distinction, the *Triana* court followed Application Note 2 to U.S.S.G. § 2B1.1 which states that, "loss is the greater of actual loss or intended loss." *Id*. Therefore, a district court must determine the greater of actual loss and intended loss, making a reasonable estimate, by a preponderance of the evidence.

In the context of jointly undertaken offenses, such as an ongoing criminal conspiracy, a defendant is responsible for all reasonably foreseeable acts and omissions of others that were

---

[24]     In the 2018 edition of the U.S.S.G., the notion of a "reasonable estimation of loss" is set forth in 2B1.1, Application Note 3(C).

[25]     In the 2018 edition of the U.S.S.G., the definitions of "Actual Loss," "Intended Loss," and "Pecuniary Harm" as described in 2B1.1, Application Note 3(A)(i)(ii) and (iii), respectively.

done in furtherance of the jointly undertaken criminal activity. To hold a defendant responsible for the conduct of others as "relevant conduct," the district court must make separate and specific findings that the conduct was in furtherance of the joint activity and that the conduct was known or reasonably foreseeable. *United States v. Campbell*, 279 F.3d 392 (6th Cir. 2002); *United States v. Jenkins*, 4 F.3d 1338 (6th Cir. 1993); U.S.S.G. § 1B1.3(a)(1)(B).

      1.    <u>Resident Bribery Scheme</u>

As discussed above, the Resident Bribery Scheme preyed upon individuals from foreign countries seeking the distinct opportunity to obtain a dental residency and ultimately a license to practice in the United States, avoid paying tuition to a dental school and receive a stipend or salary. Certain portions of these benefits are immeasurable but still extremely valuable and lucrative. *Cf.* (R. 394, PageID 10460) (Dr. Yacoub testimony that he is now earning $250,000 per year). Evidence established that the MetroHealth Dental Residency program was unique in that it did in fact pay a stipend, rather than charge tuition. This benefit was one expected by its applicants and thus made it attractive to them. In soliciting and accepting bribes, Defendants Alqsous, Al-Madani and Sayegh, who each also went through the residency program and themselves received the same benefits, knew what the readily quantifiable expectations were for their solicitees – namely, paid salaries as resident dentists.[26] Accordingly, the greater value between the bribe solicited and the expected benefit is the latter. Due to these specific and articulable facts, and further owing to the distinct and incorrigible harm posed by public

---

[26]    The government submits that limiting loss to the resident salary expected by Drs. Al-Saad, Yacoub, Karadsheh and Salameh is a conservative number as it that does not take into account their current and demonstrated earning potential. *Compare* (R. 394, PageID 10404) (Dr. Yacoub testifying his monthly average salary in Jordan was $500-700 month) *with* (*id.* at PageID 10460) (Dr. Yacoub presently making $250,000 per year).

corruption and explicitly recognized by the Guidelines, the Court should apply the expected benefit for the resident applicants as the applicable loss amount and determine that loss in this scheme is **$373,908**. The Probation officer states that because the stipend was not the "primary" benefit sought by the resident applicants, the benefit they received would not hold.

First, as testified by several resident applicants, including Dr. Al-Saad, Dr. Elmallah and Dr. Al-Shami, the MetroHealth residency program was unique precisely *because* it was one of the few programs that paid a stipend rather than charge tuition. This was a motivating factor for several residents to apply to the program and distinguished MetroHealth from other programs. Second, § 2C1.1 does not limit the analysis of the benefit to be received to only "primary" benefits. Instead, it is broadly envisioned by the Commission, as noted in the Background Comment to § 2C1.1, which states that "for deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is greater." Here, a readily measurable "gain" to the resident applicants was the paid residency corruptly promised in return for bribe payments.

Third, the Probation Officer's finding undervalues and underestimates the type of harm foreseen by the Guidelines. While U.S.S.G. § 2C1.1, cmt. n. 3 does not address job-buying cases, such as this, cases from the Fourth and First Circuits provide guidance for such a situation. In *United States v. Acevedo-Lopez*, 873 F.3d 330 (1st Cir. 2017), and the companion case *United States v. Acevedo-Hernandez*, 898 F.3d 150 (1st Cir. 2018), Acevedo-Lopez bribed a judge (Acevedo-Hernandez) overseeing his negligent homicide trial by promising the judge an appellate court position, which implicitly included a higher salary and benefits, in return for the judge taking official actions to ensure the defendant's acquittal. There, the First Circuit held that it was appropriate and warranted for the district court to hold the defendant bribe payer

53

accountable for the value of the benefit he offered to the judge, i.e., the annual salary increase the judge would have received if appointed to an appellate court, even though the judge never applied for or received the appellate position.  *See Acevedo-Lopez*, 873 F.3d at 335-36 (earlier panel decision finding enhancement based on potential increased salary was warranted), and *Acevedo-Hernandez*, 898 F.3d at 171-72 (noting fact that judge did not apply for appellate position and that any error in light of sentencing court's statement that it would have imposed same sentence regardless of loss calculation would have been harmless).  The *Acevedo-Lopez* case is instructive to this case, as the forward-looking benefit to be conferred was the expectation of a new position as an appellate judge, and thus that was the proper extent of the harm to be obviated.  Similarly here, the "benefit received *or to be received*," U.S.S.G. § 2C1.1(b)(2) (emphasis added), as part of a bribery conspiracy includes not only benefits that came to fruition but also benefits that the participant intended or reasonably expected when he engaged in the bribery solicitation, acceptance or payment.  *See also United States v. Crawley*, 533 F. 3d 349 (4th Cir. 2008) (holding that district court, in union voting fraud case, properly calculated loss amount as the salary and pension of the union president elected to his position through fraud).

Alternatively, should the Court determine that the residents did not have actual knowledge of this benefit, the government submits that the Probation Officer misidentifies the foreseeability issue by focusing on what the ***resident applicant*** reasonably expected instead of viewing it from the defendants' perspective.  *See United States v. Vázquez-Botet*, 532 F.3d 37, 67 (1st Cir. 2008) (determining benefits to be received from extortion by looking at what "a person in the defendant's position" would have foreseen and rejecting invitation to see if defendant in fact assisted in obtaining contract for solicitee) citing *United States v. Griffin*, 324 F.3d 330, 366 (5th Cir. 2003).  The reason for this forward-looking inquiry from the defendant's particular

point of view is to ensure that the defendant's punishment is set "at a level commensurate with the degree of his moral culpability [and] it is not determinative what loss the victim actually ended up suffering." *Id.* By contrast, a backward looking inquiry is only appropriate in a restitution context to determine if a victim need be made whole. Applied here, Alqsous, Al-Madani and Sayegh all went through the very same dental residency program at MetroHealth for which they later solicited bribes. They each received paid stipends as part of that program, and through this personal experience certainly had knowledge that an offer to guarantee acceptance into the program in exchange for things of value intended and reasonably created the expectation of a position as a paid resident.

Moreover, as the Dental Resident Bribery scheme was, by necessity, cyclical in nature and specifically targeted foreign individuals of Middle-Eastern heritage based on the applications received each year, it is reasonably foreseeable that one of the conspirators would solicit one or more candidate each year, and the entire amount attributable to the conspiracy should apply to all three defendants.

    2.    <u>Hobbs Act Conspiracy</u>

Evidence at trial established that the readily-demonstrable value of the bribes and things of value Alqsous, Al-Madani and Elrawy provided to Hills over was in excess of approximately $59,000.[27] This amount did not account for the "hundreds of thousands" of dollars that Alqsous

---

[27]    To the extent a defendant argues that the Court should not use the total amounts of cash, meals, entertainment, travel, prescription medications or luxury items, because he was not personally involved in those corrupt payments, such distinction is meaningless. The "loss amount," whether calculated as the total value of bribes accepted by public officials, or the total value of benefit received in exchange for those bribes, includes not just a singular defendant's specific conduct, but all conduct reasonably foreseeable to him that was undertaken as part of the conspiracy. The Ninth Circuit confronted this issue in *United States v. Kahlon*, 38 F.3d 467 (9th Cir. 1994). There, the defendant's sentence was enhanced based on bribes paid not just by him but by other members of the conspiracy, so that the "value of the payment" exceeded what the

admitted  he, Al-Madani and Elrawy  provided  Hills  over the years  after the Red Steakhouse

dinner.  Regardless,  as shown below, the amount Hills  received  from his co-conspirators  was less

than their expected  and received benefits  from the scheme.

### Incentive Adjustments

Starting  first  with the adjustments  to the incentives,  the evidence  was clear that Hills  used

the promise  of upward incentive  adjustments  as a means to secure  things  of value  from Alqsous,

Al-Madani  and Elrawy.  Accordingly,  the benefit  they believed  they were getting,  regardless  of

the secrecy  with which Hills  shrouded  the incentive  calculations,  was that Hills  would maintain

or increase  their incentives.  Evidence  at trial established  that it was not until  Hills  was out of

power that Alqsous and Al-Madani  even knew they were not always  receiving  upward

adjustments  that Hills  promised.  *See* (R. 408: PageID 14181-85, 14247) (Cindy Meehan

discussing  that Al-Madani  and Alqsous  did not request  verification  of their incentives  while  Hills

was in office  and creating  a detailed  spreadsheet  for Al-Madani  at some point in 2015 after Hills

left MetroHealth).  While  Hills  was in charge  and they were providing  him with things  of value,

Alqsous, Al-Madani  and Elrawy expected to receive  any and all upward adjustments  that came

their way.  Accordingly,  the Court should  apply the **$92,829** in upward incentive  adjustments  he

provided  to them during  the course  of the conspiracy.

### Hiring  Lutfi Nassar

The government  submits  that Nassar's salary,  shown in Exhibit L, which but for Hills'

official  acts in favor of Alqsous and Al-Madani,  would not have been provided  to him as

---

defendant  himself  gave. "Bribes  paid by others not in the presence  of the defendant,"  the court
held,  "but in furtherance  of the conspiracy,  can be 'reasonably  foreseeable.'"  *Id*. at 470.

MetroHealth did not have a fourth opening for a resident and Nassar was not among the top-three candidates for that year, is the appropriate expected benefit for this offense. Nassar's inherent value to Alqsous and Al-Madani is made clear because by obtaining a paid residency position for him, he was presumably indebted to them. This is borne out by the fact that after he completed his two-year residency he began working for Alqsous and Al-Madani at BFD. Further, Nassar's purpose in their larger scheme was to serve as a resident that Alqsous and Al-Madani could "own" and use in the future to make more and more money. *See* GX 8001 (Red Steakhouse Audio) (Hills – "Train your residents, make a lot of money. When they leave, they belong to you. Figure out how to do it. You'll make millions.").

Because the future value and earning potential of indentured resident dentists who only gained admission to MetroHealth through Alqsous' and Al-Madani's stream of benefits to Hills is difficult to quantify, but their readily apparent benefit in terms of a paid salary is easily shown (although it may greatly underestimate the extent of harm), the government submits this Court should consider this expected benefit under § 2C1.1. Additionally, as discussed below in the section concerning Fair Market Value Offsets, and because finding otherwise is antithetical to the harms sought to be deterred by corruption crimes, no credit should be given to the fact that Dr. Nassar appears to be an otherwise qualified dentist. *See generally* U.S.S.G. § 2C1.1 (no exception for fair market value in public corruption cases); (R. 412: Jury Instructions, PageID 15289) ("The offense of honest services fraud is not concerned with the wisdom or results of the public official's decisions."). Accordingly, the full salary of **$105,126.94** paid for Dr. Nassar was a reasonably expected benefit that would not have been provided had Hills not completed the *quid pro quo* to Alqsous and Al-Madani and ordered his hiring and should be considered under § 2C1.1.

*Part-Time Schedules for Full-Time Attending Dentists*

Starting with monetary losses, the attending dentists were paid a negotiated salary on the agreement and presumption they would work at least five days a week. This was so because dentists and physicians do not punch clocks, but instead, as medical providers in a public hospital they were expected to provide services to MetroHealth's patients on a full-time basis. By implementing a "Flex-Time" policy for dentists that was not applied to any other department at MetroHealth, the defendants not only acted to the detriment of the hospital's core mission, they pocketed a sizeable difference in income that did not correlate to the actual days they were expected to work. As testimony and evidence established that, at most, Defendants Alqsous and Al-Madani, along with Dr. Elrawy, worked four days[28] a week while being paid for five days salary and thus only provided 80% of the labor for their negotiated salaries. The remaining 20% is the readily quantifiable and most conservative excess benefit they received from Hills' official acts allowing them to work part time. Attached as Exhibit M to this memorandum are the official payroll reports for Defendants Alqsous and Al-Madani and Dr. Elrawy for the relevant time period. Based on this information, below is a summary of the total salary and benefits they earned as full-time employees, but not including the provider incentives, and 20% of those totals.

| Al-Madani | Full Time Salary | 20% of Full Time Salary |
|---|---|---|
| 2010 | $132,455.57 | $26,491.11 |
| 2011 | $138,997.04 | $27,799.41 |
| 2012 | $192,963.30 | $38,592.66 |
| 2013 | $249,625.00 | $49,925.00 |
| 2014 | $280,055.74 | $56,011.15 |

---

[28]    In fact, testimony established that Alqsous worked as few as three full days a week at the hospital. *See* (R. 402, PageID 12780) (Dr. Elmallah – "[Sari] worked Monday from 9:00 to 11:00, 12:00 max. And he worked Saturday half day. And two days in the week, Wednesday and Friday.")

| Al-Madani | Full Time Salary | 20% of Full Time Salary |
|---|---|---|
| 2015 | $143,831.76 | $28,766.35 |
| Total – Al-Madani | | $227,585.68 |
| Elrawy | Full Time Salary | 20% of Full Time Salary |
| 2010 | $123,690.27 | $24,738.05 |
| 2011 | $118,467.25 | $23,693.45 |
| 2012 | $190,778.17 | $38,155.63 |
| 2013 | $242,908.09 | $48,581.62 |
| 2014 | $265,261.92 | $53,052.38 |
| 2015 | $132,630.96 | $26,526.19 |
| Total – Elrawy | | $214,747.33 |
| Alqsous | Full Time Salary | 20% of Full Time Salary |
| 2010 | $70,869.96 | $14,173.99 |
| 2011 | $145,954.60 | $29,190.92 |
| 2012 | $195,443.76 | $39,088.75 |
| 2013 | $253,039.66 | $50,607.93 |
| 2014 | $284,737.72 | $56,947.54 |
| 2015 | $144,173.76 | $28,834.75 |
| Total – Alqsous | | $218,843.89 |
| Total for All Three | | $661,176.90 |

However, this does not demonstrate the total amount that MetroHealth lost as a result of the part-time program. As Defendants consistently exalted at trial, they were some of the most productive faculty at MetroHealth. *See, e.g.*, (R. 407, PageID 14135) (counsel for Hills asking Cindy Meehan if "[Alqsous was] [k]ind of like the Lebron James of the department, right?"). While the underlying metrics are open to some debate as dentists bill and code for services in a completely separate fashion than physicians, what is not debatable is that MetroHealth, on top of losing excess salary paid to part-time employees, also lost out on the potential revenue these "All Stars" would have made had they actually worked five days a week. *See* (R. 402, PageID 13453) (Dr. Connors – "Q. Let me break that down. So by working these extra days, they would have been producing; is that correct? A. Right."). By only working four days (at most) a week, the

defendants deprived MetroHealth of an extra day, or an extra 25%, of potential revenue in terms of patients that could have been seen by these defendants.  Below is a tabulation, based on GX 4803 (Incentive Calculation Sheet), showing the total monthly receipts (Column B) generated by each dentist from February 2010 (the earliest known time period for the initiation of the part-time program) through June 2015 (the end of the part-time program) and the additional 25% in potential lost revenue to the hospital.

| Incentive Month (Worksheet Month) | Receipt Month | Al-Madani | Alqsous | Elrawy |
|---|---|---|---|---|
| Apr-10 | Feb-10 | $ 58,797.00 | $ - | $ 46,957.00 |
| May-10 | Mar-10 | $ 69,181.00 | $ - | $ 53,541.00 |
| Jun-10 | Apr-10 | $ 52,694.00 | $ - | $ 54,849.00 |
| Jul-10 | May-10 | $ 51,174.00 | $ - | $ 61,110.00 |
| Aug-10 | Jun-10 | $ 41,753.00 | $ - | $ 24,332.00 |
| Sep-10 | Jul-10 | $ 62,065.00 | $ - | $ 44,075.00 |
| Oct-10 | Aug-10 | $ 68,625.00 | $ - | $ 53,023.00 |
| Nov-10 | Sep-10 | $ 82,526.00 | $ 3,332.00 | $ 43,169.00 |
| Dec-10 | Oct-10 | $ 58,556.00 | $ 8,147.00 | $ 19,003.00 |
| Jan-11 | Nov-10 | $ 48,561.00 | $ 6,339.00 | $ 46,305.00 |
| Feb-11 | Dec-10 | $ 66,600.00 | $ 22,530.00 | $ 51,007.00 |
| Mar-11 | Jan-11 | $ 43,571.00 | $ 35,601.00 | $ 36,552.00 |
| Apr-11 | Feb-11 | $ 68,505.00 | $ 50,795.00 | $ 46,793.00 |
| May-11 | Mar-11 | $ 62,609.00 | $ 73,160.00 | $ 48,740.00 |
| Jun-11 | Apr-11 | $ 63,239.00 | $ 63,237.00 | $ 34,491.00 |
| Jul-11 | May-11 | $ 66,913.00 | $ 65,396.00 | $ 18,604.00 |
| Aug-11 | Jun-11 | $ 62,659.00 | $ 89,063.00 | $ 28,424.00 |
| Sep-11 | Jul-11 | $ 67,647.00 | $ 52,990.00 | $ 24,879.00 |
| Oct-11 | Aug-11 | $ 45,658.00 | $ 66,672.00 | $ 38,786.00 |
| Nov-11 | Sep-11 | $ 37,952.00 | $ 64,815.00 | $ 48,510.00 |
| Dec-11 | Oct-11 | $ 23,251.00 | $ 65,411.00 | $ 56,825.00 |
| Jan-12 | Nov-11 | $ 45,339.00 | $ 79,292.00 | $ 31,144.00 |
| Feb-12 | Dec-11 | $ 59,898.00 | $ 71,848.00 | $ 35,068.00 |
| Mar-12 | Jan-12 | $ 54,432.00 | $ 63,548.00 | $ 40,456.00 |
| Apr-12 | Feb-12 | $ 86,107.00 | $ 76,517.00 | $ 50,618.00 |
| May-12 | Mar-12 | $ 96,049.00 | $ 97,518.00 | $ 70,195.00 |
| Jun-12 | Apr-12 | $ 66,457.00 | $ 96,562.00 | $ 88,576.00 |
| Jul-12 | May-12 | $ 21,550.00 | $ 117,777.00 | $ 98,865.00 |
| Aug-12 | Jun-12 | $ 74,915.00 | $ 102,305.00 | $ 70,790.00 |

| Incentive Month (Worksheet Month) | Receipt Month | Al-Madani | Alqsous | Elrawy |
|---|---|---|---|---|
| Sep-13 | Jul-12 | $ 113,849.00 | $ 104,149.00 | $ 59,486.00 |
| Oct-12 | Aug-12 | $ 96,557.00 | $ 102,201.00 | $ 93,240.00 |
| Nov-12 | Sep-12 | $ 72,714.00 | $ 116,199.00 | $ 49,693.00 |
| Dec-12 | Oct-12 | $ 63,764.00 | $ 128,687.00 | $ 45,184.00 |
| Jan-13 | Nov-12 | $ 56,966.00 | $ 77,552.00 | $ 66,829.00 |
| Feb-13 | Dec-12 | $ 45,070.00 | $ 105,347.00 | $ 80,383.00 |
| Mar-13 | Jan-13 | $ 68,102.00 | $ 80,533.00 | $ 83,872.00 |
| Apr-13 | Feb-13 | $ 79,242.00 | $ 105,549.00 | $ 67,320.00 |
| May-13 | Mar-13 | $ 74,355.00 | $ 109,229.00 | $ 100,346.00 |
| Jun-13 | Apr-13 | $ 72,052.00 | $ 108,852.00 | $ 100,416.00 |
| Jul-13 | May-13 | $ 78,752.00 | $ 105,256.00 | $ 96,141.00 |
| Aug-13 | Jun-13 | $ 79,778.00 | $ 99,026.00 | $ 91,675.00 |
| Sep-13 | Jul-13 | $ 81,720.00 | $ 111,194.00 | $ 111,338.00 |
| Oct-13 | Aug-13 | $ 92,219.00 | $ 117,484.00 | $ 100,242.00 |
| Nov-13 | Sep-13 | $ 72,958.00 | $ 63,659.00 | $ 117,053.00 |
| Dec-13 | Oct-13 | $ 68,970.00 | $ 106,800.00 | $ 108,656.00 |
| Jan-14 | Nov-13 | $ 72,926.00 | $ 107,933.00 | $ 81,723.00 |
| Feb-14 | Dec-13 | $ 67,666.00 | $ 97,268.00 | $ 63,463.00 |
| Mar-14 | Jan-14 | $ 53,611.00 | $ 90,938.00 | $ 33,905.00 |
| Apr-14 | Feb-14 | $ 33,179.00 | $ 54,622.00 | $ 48,111.00 |
| May-14 | Mar-14 | $ 23,579.00 | $ 56,650.00 | $ 41,165.00 |
| Jun-14 | Apr-14 | $ 24,162.00 | $ 58,535.00 | $ 41,669.00 |
| Jul-14 | May-14 | $ 100,339.00 | $ 143,002.00 | $ 206,659.00 |
| Aug-14 | Jun-14 | $ 27,817.00 | $ 89,623.00 | $ 77,497.00 |
| Sep-14 | Jul-14 | $ 43,057.00 | $ 108,047.00 | $ 68,798.00 |
| Oct-14 | Aug-14 | $ 40,965.00 | $ 95,283.00 | $ 85,332.00 |
| Nov-14 | Sep-14 | $ 57,312.00 | $ 133,559.00 | $ 74,177.00 |
| Dec-14 | Oct-14 | $ 62,694.00 | $ 112,374.00 | $ 110,406.00 |
| Jan-15 | Nov-14 | $ 58,024.00 | $ 188,008.00 | $ 66,237.00 |
| Feb-15 | Dec-14 | $ 72,069.00 | $ 117,537.00 | $ 92,969.00 |
| Mar-15 | Jan-15 | $ 55,160.00 | $ 99,540.00 | $ 83,770.00 |
| Apr-15 | Feb-15 | $ 72,968.00 | $ 117,428.00 | $ 35,097.00 |
| May-15 | Mar-15 | $ 79,628.00 | $ 110,177.00 | $ 83,762.00 |
| Jun-15 | Apr-15 | $ 53,723.00 | $ 80,580.00 | $ 56,199.00 |
| Jul-15 | May-15 | $ 65,211.00 | $ 114,351.00 | $ 47,375.00 |
| Aug-15 | Jun-15 | $ 41,087.00 | $ 110,494.00 | $ 77,508.00 |
| Total | | $ 4,029,528.00 | $ 5,100,521.00 | $ 4,213,383.00 |
| 25% of Total | | $ 1,007,382.00 | $ 1,275,130.25 | $ 1,053,345.75 |
| 25% of Total for Alqsous, Al-Madani and Elrawy  Combined | | | | $ 3,335,858.00 |

Accordingly, the loss to MetroHealth was two-fold. First, because the hospital did not receive the labor it contracted for with the salaried dentists, it overpaid Alqsous, Al-Madani and Elrawy by at least 20% of their salary, or approximately **$661,176.90**. Second, because MetroHealth also lost out on revenue from their absence by at least an additional 25% of their productivity, MetroHealth was unable to bill for an additional **$3,335.858** in revenue.

Additionally, there was an unquantifiable but substantial harm caused to MetroHealth by the part-time schedule. The indigent and poor patients who sought treatment at this public safety-net hospital were denied access to the care that MetroHealth generously paid Alqsous, Al-Madani and Elrawy to provide. *See* (R. 403, PageID 13094) (Dr. Connors - "[Patient] access means that when, just when someone calls and wants to get an appointment, we're able to accommodate within a reasonable period of time. If we don't have enough physicians or sites, then people trying to get in to see us and they're having trouble doing that, that would be inadequate access."). Arguments to the contrary that mechanically assert that the dentists satisfied a 40-hour requirement simply demonstrate what the defendants refuse to accept – that they were supposed to work for the benefit of the public, not themselves. As discussed above, MetroHealth was the only Disproportionate Share Hospital in the Cuyahoga County area. Its bottom line was patient care and access, not the money it made. While MetroHealth, like any public institution, certainly needed to have a balanced budget and accountability to provide the services it offered, it did so not to turn a profit by to provide and expand upon those services for the public and the poor.

### 3. Dental Patient Kickbacks

Further demonstrating their selfish character, defendants attempt to justify their later conduct in the Dental Patient Kickback scheme as an altruistic attempt to alleviate the waiting

62

times at the hospital, but ignore that their very self-serving decision to shirk their responsibilities had an immeasurable qualitative and quantitative effect on the care MetroHealth sought to provide. Indeed, rather than diminish the waiting times at the hospital, Hills, Alqsous and Al-Madani only worsened the situation. As this scheme involved the corrupt solicitation, payment and acceptance of remuneration in return for Defendant Hills referring and promising to refer patients from MetroHealth to the BFD, this offense falls squarely under § 2C1.1.

The fact that the scheme was not successful because other dentists and employees at MetroHealth placed the public's interest ahead of their own does not mean the Court should consider this to be a no-loss situation of corruption. Instead, it simply means that the amount of the bribes paid, in this case the **$17,600** in kickback checks paid to Hills, is the greater calculable amount for purposes of § 2C1.1.

4.     Fair-Market Credit Does Not Apply to § 2C1.1

Defendants may attempt to argue that they should get a credit for the fair-market value of any services they rendered to the hospital. This argument must fail for two reasons. First, nowhere in § 2C1.1, which controls, is there an exception for the fair-market value of services corruptly solicited or procured to offset the value of a bribe or the net benefit to the bribe payor. To provide an offset based on the "wisdom" of a corrupt relationship would run afoul of well-established public corruption law. Specifically, by dictating that the *greater* amount of either the bribes paid or expected to be paid, or the net benefit to the bribe payor, the Guidelines dictate that this figure will always remain positive. For example, if a contractor pays a $25,000 bribe to a government official for a contract, and anticipates making $100,000 in net profit from the contract, the latter amount holds. If however, the net benefits are less than the bribe paid, the higher number dictates. Accordingly, the value of services is both accounted for and considered by the Guidelines but is not given special or additional consideration. The government further

represents that it is unaware of any decisions by district or circuit courts of appeals that have

given credit against the net benefit for good public works corruptly obtained and sentenced under

2C1.1. The commentary to Guidelines § 2C1.1 states that "for deterrence purposes, the

punishment should be commensurate with the gain to the payer or recipient of the bribe,

*whichever is higher*." U.S.S.G. § 2C1.1, background cmt. (2018) (emphasis added). This

conforms with the Guidelines' recognition of the greater harm and danger that corruption

wreaks. Rather than hold these offenses to a lower standard under the fraud guidelines, the

Commission recognizes that the harms are more expansive and thus permit a more expansive

review of the losses and gains to take the greatest harm into account.

Second, this argument overlooks that the services Alqsous and Al-Madani actually

rendered were expected by and remunerated by the hospital. That was the point of the incentive

program – to provide them with a fair-market valuation of their services – when they actually

worked. *See* (R. 404, PageID 13403-05) (Dr. Connors: "the incentive, as it was set up, was

adequately rewarding people for working hard and that there wasn't a need for additional

incentives on top of that. […] Examples of how he was working over and above what other

people were doing that were given, and I would contend that yes, he is being rewarded for that

because what he is doing generates revenues and he is getting 25 percent of every dollar over.").

That was the purpose of the incentive equation, to assess their cost (monthly payback) and value

(excess receipts) to the hospital and compensate them adequately while eliminating other

inequities in compensation. They were already compensated for their services to the hospital and

the services that they did provide were precisely those expected. They do not get credit for being

good dentists, because that is what was expected of them and they were already rewarded for it.

What is not excused is the fact that they obtained additional benefits corruptly through a stream

of benefits provided to Hills. Accordingly, the Court should consider the $92,829 in upward incentive adjustments as the expected benefit amount in this calculation. Additionally, the Court should not credit the value of when they actually showed up for work against the lost 20% salary or extra 25% productivity because, by definition, the hospital received no services rendered for the time that the defendants were not working or producing revenue.

F.    OTHER FRAUD LOSSES

Because several of the counts involve the same victim (MetroHealth Hospital) and two or more acts or transactions connected by a common criminal objection or constituting part of a common scheme or plan (RICO conspiracy), and one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts, the offense levels for these offenses is based largely on loss and are grouped together. U.S.S.G. §§ 3D1.2(b) and (c). Those loss amounts that fall under § 2B1.1 but are grouped with § 2C1.1 are addressed below.

1.    Oral Health Enrichment

The evidence and testimony demonstrated that the dentists who contracted with Oral Health Enrichment did so because they needed clinical remediation. This was a necessary "but-for" that dictated their choice in remediation programs and guided them to OHE. Further, as the evidence demonstrated, OHE was, at best, a sham operation predicated on numerous acts of deceit and theft. In establishing OHE, Hills stole time and resources from MetroHealth and even stole the teaching materials he used from other textbooks and authors. He falsely and fraudulently used the aura of MetroHealth's facilities as a "Major Midwestern Medical Facility" to lure customers to his business and convince the OSDB and other state dental boards to authorize his program. He used a corrupt relationship with Lili Reitz to obtain sensitive and privileged materials from the OSDB to benefit his business, violating their right to the attorney-

65

client privilege in the process. All of these acts of deceit, theft and dishonesty were done with the singular purpose of attracting clients with offerings OHE did not have – namely, the ability to conduct clinical remediation. The evidence further established that the unique ability to provide clinical remediation is what set OHE apart from other providers who only provided didactic training or full-scale and established university-based dental schools. It placed OHE in a middle ground between dentists having to return to dental school and pay for two years of tuition, and those providers that only provided didactic materials. Because of the fraudulent representations about OHE's abilities to conduct remediation services, they were recommended to dentists by various state dental boards. Accordingly, for those individuals who retained OHE because they needed clinical remediation, the total value of their contract with OHE should be loss amount.

Defendants may attempt to parse the loss between the didactic portions and the clinical portions of the training under a misguided services rendered theory. This Court should not be led astray. Not only were these price points artificially and self-servingly devised by Hills, but because the business was never authorized to provide those services and use MetroHealth resources, and thus their approvals by the OSDB and other boards were based on falsehoods, the entire business was a fraud. In *United States v. Washington*, 715 F. 3d 975 (6th Cir. 2013), the Sixth Circuit addressed the appropriate methodology for determining the reduction of the loss amount based on services rendered. In *Washington*, the defendant was convicted of conspiracy to commit federal program bribery due to her involvement in a scheme to overbill Detroit Public Schools (DPS) for the rendering of "wellness" services. *Id.* at 977-78. In 2005, the defendant was invited by the Executive Director of Risk Management for DPS, to submit a proposal to provide "wellness" services for DPS employees. *Id.* at 977. Subsequently, the defendant, along with others, joined an entity, Associates for Learning, for the purposes of submitting a bid to

DPS. *Id.* Although it was DPS procedure to conduct a competitive bidding process, Hill did not do so and Associates for Learning received the contract. *Id.* In exchange, Hill received a 5% fee on every invoice for getting the invoices paid, with Associates for Learning overbilling to compensate for the cost. *Id.* In total, $3.32 million was paid from DPS to Associates for Learning by virtue of these invoices. *Id.* at 977-78. At sentencing, the judge determined that the amount of loss was at least $2.5 million and applied the appropriate enhancement pursuant to U.S.S.G. § 2B1.1.

On appeal, the defendant argued that the sentencing judge failed to properly account for the fair market value of services rendered when determining the amount of loss. *Id.* at 984. The Government argued that although Associates for Learning may have rendered some services, the entirety of the payments should be considered the loss amount because the program was a sham. *Id.* In affirming the sentencing judge's determination, the Sixth Circuit emphasized four important facts. *Id.* at 984-85. First, that the defendant "d[id] not explain how the court could have made a more detailed calculation of the value of work performed, given that [Associates for Learning] did not keep records of hours or work completed." *Id.* at 984. Second, that the burden was on the defendant to prove "the specific value by which [the loss value] should be reduced." *Id.* at 985. Third, that "[t]he district court's obligation is only to make a reasonable estimate of loss based on available information . . . as appropriate and applicable under the circumstances." *Id.* (citing U.S.S.G. § 2B1.1 cmt. 3(C)) (quotations omitted). Finally, and most importantly, the Sixth Circuit concluded that the sentencing judge would have been justified in attributing the entire $3.32 million loss to the defendant because the court had found the entire program was a sham. *Id.*

67

Because OHE was born of lies, deceit and theft, it too should be considered a complete sham. Indeed, OHE's placement on the OSDB list of approved providers in January 2009 was fraught with trickery and deceit by Hills, aided by Lili Reitz. This carried through to Hills' use of Reitz to spy upon and gain access to privileged discussions of the OSDB. His constant obfuscation was aided by Alqsous and Al-Madani, who willingly accepted directives from Solooki knowing full well that neither she nor the OHE clients had any right to use MetroHealth facilities and nevertheless aided the private business. That this business was a sham was further demonstrated by Hills' outright lie to Michael Phillips, the general counsel for MetroHealth, when confronted about Dr. Akin's use of hospital facilities for OHE purposes, an act demonstrating his knowledge that the business should not operate in MetroHealth, much less contract with others based on such a promise. Accordingly, because: 1) the business was never authorized to provide the services at MetroHealth; 2) Hills lied about OHE's use of MetroHealth facilities when confronted by Mr. Phillips; 3) Alqsous and Al-Madani knew and should have known that the OHE clients and Solooki were not authorized to use the hospital, but they still hid the same from the hospital; 4) Hills used his corrupt relationship with Reitz to act unilaterally in placing OHE on the authorized provider list, and to obtain sensitive and privileged information to ensure the OSDB authorized his business; and 5) Hills misrepresented to OSDB and other state dental boards that he had facilities at his disposal when in truth and fact he did not, this Court should determine that the entire business was a fraud and that the total amount of funds obtained by OHE is the attributable amount of loss in this case.

Using OHE's gain is also appropriate because the loss to MetroHealth is not easily quantifiable. MetroHealth has provided the government with a measurement of the Dental Department's overhead over the years OHE operated, and the government has provided the same

to defendants who may attempt to use this calculation to reduce the loss in this case. However, this metric is flawed as it only accounts for the day-to-day operations of the Dental Department and does not consider the start-up costs for the hospital in building and maintaining that department. Further, this calculation does not account for the revenues lost because OHE clients occupied the chairs that could have been used by MetroHealth staff to see patients. Because this figure could range into the tens of thousands of dollars per day, but is impossible to measure due to a lack of details, the defendants' gain should be substituted in this matter and the entire **$111,900** should be attributed to the Guidelines calculations.

2. <u>Anthony Jordan</u>

Because Defendants Hills and Alqsous intended to benefit Anthony Jordan to the detriment of MetroHealth, and their intended loss should govern this calculation. It is axiomatic that intended loss, when quantifiable and higher than actual loss, governs under § 2B1.1. *See* U.S.S.G. § 2B1.1(b)(1), cmt. n.3(A) and (ii) (loss is the "greater of actual loss or intended loss" and intended loss includes even harm "that would have been impossible or unlikely to occur."). Here, the clearly demonstrable intended loss is shown in Anthony Jordan's treatment plan, which contemplates extensive dental work over the course of several years, for which Hills ordered Alqsous and others to not charge and instead mark as educational.

Moreover, this figure is conservative. As Anthony Jordan testified, he separately paid Hills approximately $13,000 for his procedures, none of which was paid to MetroHealth. Further, the evidence established that this treatment began as early as 2007 and continued on through 2009, when Dr. Butriy was reprimanded by Defendant Hills for providing services to others without billing on behalf of MetroHealth. Unbeknownst to MetroHealth, Hills was doing the same on behalf of Anthony Jordan, as the testimony established that Jordan had a series of operations at MetroHealth, none of which were reflected in his medical records. It was only after

Dr. Butriy was reprimanded that Anthony Jordan's medical records began reflecting treatments he received at the hospital. That the extent of loss to MetroHealth exceeds the treatment plan is further shown by the fact that the plan contemplates numerous "follow-up" treatments, but never demonstrates what they were following.

Alqsous may argue that the evidence was simply that he was "interested" in Jordan's treatment and that Dr. Butriy was his primary provider. However, the evidence further established that Alqsous was a supervising attendant who oversaw the billing for Jordan and allowed Jordan's extensive and aggressive treatment to be marked "educational," thus causing a loss to MetroHealth. Further, Defendant Alqsous cannot have it both ways. He cannot both be "very interested" in Jordan's case but totally lackadaisical about his billing responsibilities as the responsible attending dentist. *See* (R. 408, PageID 14382, 14386) (Anthony Jordan testifying that Alqsous was "very interested" in his extensive dental work). If Alqsous was truly so interested in this case, which he would be because of the extensive and expensive work involved and not because it was a standard filling or cleaning, it stands to reason that he would know that his residents did not do minimal procedures as suggested in the billing charts, but that there was substantial work that needed to be billed. Also, Defendant Alqsous cannot claim to be the "LeBron James" of the MetroHealth System because of his superhuman efforts without acknowledging that, as here, the billing that occurs under his name is really the work of others that he simply takes credit for. In any event, the evidence demonstrates that he played a role in this scheme to defraud by allowing the billing to proceed under his name and at no charge to the hospital, and by issuing checks to Jordan to both maintain the relationship between Hills and Jordan and prevent disclosure of the offense to MetroHealth.

70

Moreover, that Alqsous knew how to treat patients to his benefit and at the hospital's expense is not a far-fetched conclusion. Testimony at trial demonstrated that at the same time Dr. Butriy was sanctioned for similar conduct, Alqsous saw Arabic patients on Saturdays at MetroHealth who were not registered as patients and for whom MetroHealth did not appear to bill. *See* (R. 400, PageID 12159) (testimony of Nicole Pistilli). This testimony allows the inference that Alqsous also took advantage of MetroHealth facilities to run a private practice for his own benefit like Dr. Butriy, but he was not reprimanded. The key difference being that Dr. Butriy, unlike Alqsous, did not provide a steady stream of benefits to Hills.

Accordingly, the Court should determine that the total intended value of the treatment plan, **$21,597.40** is the attributable loss amount.

### 3.    Noble Dental – Rent-A-Dentist

Evidence established the defendants, although paid to be full-time employees and residents at MetroHealth, instead knowingly and intentionally worked instead at NDC pursuant to an agreement between Hills and Dr. Wang. In this situation, the actual loss to MetroHealth, and by proxy the intended loss, is impossible to calculate given the lack of records of these misdeeds, which ostensibly would have been in disposed of or destroyed by Alqsous and Al-Madani after they purchased NDC from Wang.

However, Dr. Wang did keep track of what she owed Defendant Hills under this obligation and timely filed 1099s for her payments to him for Tax Years 2009 and 2010. These records, along with checks to OHE and the terms of the agreement between Dr. Wang and Hills demonstrate that at a minimum, she paid him for at least **$99,961** worth of services of MetroHealth residents. As with other schemes in this case, this calculation is conservative as it does not account for lost wages for the MetroHealth residents or the lost productivity and revenues to the hospital had they actually worked. Indeed, according to testimony from

71

numerous witnesses, a productive resident like Defendant Al-Madani could bill up to $10,000 a day per chair. Here, the evidence established that NDC would pay Hills and OHE $500 a day per dentist. GX 3011, at ¶ 4. Based on the evidence admitted at trial, NDC issued approximately $8,000 worth of checks to OHE. GX 2104, 3012-17. This translates, at a minimum to 16 days-worth of service under the contract, and potentially $160,000 in lost revenue to MetroHealth. Alternatively the contract provided that NDC could pay Hills approximately 30% of the monthly revenue from NDC, minus a set amount per month. GX 3011, at ¶ 5. Under this arrangement, for tax years 2009-2010, NDC paid approximately $91,961 to Hills. GX 6061, pp. 37, 44 (1099s). At a minimum, this translates to approximately $306,536.67 in revenues earned by MetroHealth dentists working at NDC over those two years ($91,961/30%), *not* counting the monthly discount.

### G. DEFENDANTS ALL TARGETED VULNERABLE VICTIMS

The government submits that a two-level enhancement under 3A1.1(b) should apply as Defendants Alqsous, Al-Madani and Sayegh deliberately targeted the Salamehs and other Middle Eastern applicants to the dental residency program on the basis of their national origin and ethnicity. These characteristics, including the fact that the victims were foreign nationals whose status in the United States and ability to remain in the country were threatened by the defendants, and whose ability to obtain work in the country were jeopardized, makes the victims in the case vulnerable individuals highly susceptible to these types of crimes. Further, the defendants deliberately targeted only individuals from the Middle East in perpetrating the resident bribery scheme and thus preyed upon their unfamiliarity with or fear of the American justice system and their lack of contacts in the United States to perpetuate their scheme. Defendant Al-Madani's threat to Yazan Karadsheh in which he warns Karadsheh not to cooperate with law enforcement lest he be deported highlights the high susceptibility of the defendants' victims and also provides

a basis for the application under both the Resident Bribery and the Obstruction of Justice offenses. The victims' status as non-citizens in a foreign country, and the implied threat that their status could be jeopardized, places them in an untenable position and thus makes it highly likely that they could be victimized without repercussions against the Defendants.

Further, a vulnerable victim enhancement should apply to Defendants Hills, Alqsous and Al-Madani for their conduct in the Hobbs Act Stream of Benefits Scheme in allowing the Defendants to shirk their full-time responsibilities to the hospital. As trial evidence established, the Defendants were employees of a public hospital responsible for providing care to the indigent population of Cuyahoga County. These are individuals who had no other source of care and often had to wait several hours to receive treatment in the dental facility. Hills Alqsous and Al-Madani, exacerbated these waits and forced even further delays and congestion in the provision of care to these vulnerable individuals by working part-time shifts while on full-time salaries. Had they actually worked their intended days on a full-time schedule, the congestion at the hospital and the delays in providing needed dental treatment to the indigent clientele of the public hospital would have been alleviated. Conversely, had they foregone their full-time salaries, the hospital in turn could have hired additional staff with the savings in their part-time salaries. Instead, the Defendants victimized the indigent clients of MetroHealth Hospital to their advantage.

      H.       **AGGRAVATING ROLE ENHANCEMENTS**

           1.      Hills Should Receive a Four-Level Leadership Enhancement under § 3B1.1(a)

As the Court determined in its *Vinson* findings, Lili Reitz served as a co-conspirator in the criminal conduct. Further, the Court found in its Rule 29 and Rule 33 decision that Dr. Elrawy admitted to conduct that would make him a co-conspirator as well. Accordingly, the

criminal conduct involved at least five participants: 1) Hills; 2) Alqsous; 3) Al-Madani; 4) Sayegh; 5) Elrawy; 6) Reitz; 7) Raed Sayegh; and 8) Nidal Sayegh. Under *United States v. Moncivais*, 492 F.3d 652, 660-62 (6th Cir. 2007), the four level organizer/leader enhancement applies as long as there are four other participants and the defendant organized or led at least one of those other participants. The evidence established that Hills directed Reitz to provide him with privileged and confidential materials in both the Oral Health Enrichment and Obstruction of Justice schemes. Moreover, the complexity of the RICO conspiracy, which in turn entailed approximately seven different criminal schemes and, alone warrants the application of the four-level enhancement in this case as the evidence established that Hills warranted a high-level of command and control over Alqsous, Al-Madani and Elrawy during the course of the Hobbs Act, OHE, Patient Kickback and Obstruction of Justice schemes. *See United States v. Myers*, 854 F.3d 341, 358 (6th Cir. 2017).

### 2. The Two-Level Enhancement Pursuant to U.S.S.G. § 3B1.1(c) Applies to Alqsous and Sayegh

Section 3B1.1(c) provides for a two-level enhancement in criminal activity with fewer than five participants if the defendant "was an organizer, leader, or supervisor in any criminal activity." § 3B1.1(c). The Sixth Circuit has held that the "primary question for a § 3B1.1(c) enhancement is whether the defendant exerted control over at least one individual within a criminal organization." *United States v. Tanner*, 837 F.3d 596, 603 (6th Cir. 2016), citing *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000). Relevant factors include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt.

74

n.4. Moreover, "[t]here can...be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id*. *See United States v. Corrado*, 304 F.3d 593 (6th Cir. 2002) (no requirement under U.S.S.G. § 3B1.1(c) that only the most culpable participant is subject to the enhancement).

The evidence at trial established that defendant Alqsous should receive at least a two-level role enhancement under U.S.S.G. §3B1.1 for his participation and management in the Hobbs Act Stream of Benefits Scheme. Various pieces of evidence demonstrate that Alqsous served as a lieutenant and conduit for Hills in making demands for payments and the provision of things of value from the other Hobbs Act participants. On numerous occasions, Alqsous instructed Al-Madani and Elrawy to provide funds to pay Hills cash on his birthday. Alqsous also instructed and organized Al-Madani and Elrawy to meet him at Saks Fifth Avenue to purchase a $3,800 Louis Vuitton bag for Hills. On other occasions, Alqsous instructed Elrawy or Al-Madani to call in prescriptions for Cialis or other medications for Hills' benefit. All of this conduct demonstrates that Alqsous shared in larger share of planning and organizing the offense, and further that he exercised a certain level of control and authority over others as he served as the conduit through which Hills issued his demands on the other Hobbs Act participants, thus warranting a two-level increase for him.

Indeed, he was an indispensable party in the execution of the scheme. Alqsous served as the *aide-de-camp* to Hills and requisitioned bribes and payments from Al-Madani and Elrawy time and time again. He further coordinated the acquirement of prescription medications time and again by directing Al-Madani and Elrawy to facilitate Hills' whims. The great bulk of the government's evidence shows Alqsous serving as a willing manager in acquiring and distributing

bribe payments to Hills in a steady stream. Accordingly, he should receive a two-level enhancement as a leader in this scheme.

A two-level increase is also appropriate for Defendant Sayegh. At a minimum, the trial evidence demonstrated that Sayegh organized and instructed his brothers to meet with and accept money from victims in Jordan. This conduct demonstrates criminal conduct spanning across the world and further shows that Sayegh managed his criminal affairs through the recruitment of accomplices and the planning and organizing of the offense. Sayegh, at a minimum, directed his two brothers to solicit and accept bribes on his behalf in Jordan. This direction was essential to ensuring the crimes were completed, and would not be possible without Sayegh's direction and leadership of his brothers in Amman as they accepted bribe payments from Fu'ad Karadsheh and Dr. Yacoub.

## IV.  INADEQUACIES OF THE SENTENCING GUIDELINES – NON-ECONOMIC HARMS CAUSED BY DEFENDANTS

As noted throughout, the readily calculable loss figures do not consider other, non-economic harms that befell MetroHealth and should still be considered by this Court. First and perhaps foremost, patient access was unduly harmed by the selfish decision of these defendants to work part-time on full-time pay and send residents to work at NDC. Alqsous', Al-Madani's and Elrawy's additional $650,000-plus in salary could have easily been used to pay for additional dentists and alleviate congestion and patient waiting at the hospital. Second, this conduct, which occurred during and after the trial and conviction of Thomas Greco and John Carroll served to undermine public confidence in Cuyahoga County's primary safety-net hospital system. This would impact the hospital in two ways: a) discouraging individuals from coming to MetroHealth for care because of a perceived lower level of care and thus jeopardizing the health

of those patients who may not have other options; and b) impacting donations and philanthropy towards the hospital, as well as endangering approval of taxpayer funds directed to MetroHealth.

Third, by directing resident dentists, like Karadsheh, Yacoub, Al-Saad and others (and including Alqsous and Al-Madani for the relevant time periods) to work at NDC, the defendants exposed MetroHealth to potentially severe liability if issues arose at NDC. Fourth, MetroHealth's teaching program for its residents was necessarily impacted by both the lack of attendings working full-time and the assignment of residents to Noble. In both situations, residents lacked access to resources and guidance in the proper setting, and this thus harms the teaching reputation of the hospital.

Finally, by allowing completely unaffiliated dentists access to the dental facilities, Hills, Alqsous and Al-Madani created both safety and security concerns for the hospital and potentially violated patient confidentiality laws. Patient confidentiality is sacred in the medical profession and necessarily extends to dentists. As testified to by Dr. Kennedy and Dr. Abadi, the defendants violated that trust by sending random dentists to the hospital to observe MetroHealth's patients in what is supposed to be a trusting atmosphere and placing their own interests before not just the public but their patients as well.

While the above harms are not adequately considered by the economic harm tables in the Guidelines, there are two sections of the advisory Sentencing Guidelines that can be used to support an above Guidelines range sentence based on these aggravating circumstances and this Court could form the basis for an upward departure or variance on either or both of them.

First, comment 19 to § 2B1.1 of the Guidelines Manual provides that an above Guidelines range sentence may be warranted if the "offense caused or risked substantial non-monetary harm." As described above, Defendants corrupt conduct resulted in a threat to patient

77

access to needed medical services, violated public confidence in MetroHealth's ability to provide services, threatened and jeopardized MetroHealth's ability to raise funds, reduced confidence in MetroHealth's education program and detracted from the ability of residents to learn, exposed MetroHealth to severe liabilities, and violated a sacred oath of confidentiality between physicians and patients. These harms, in the context of this case, constitute significant, intangible, non-economic harms not adequately accounted for by the advisory Sentencing Guidelines. *See, e.g., United States v. Saxton*, 53 Fed. App'x 610, 613 (3d Cir. 2002) (affirming the district court's three level departure under U.S.S.G. § 5K2.0 because of intangible, non-monetary harm caused by [defendant's theft namely,] the loss of public confidence and trust in elected officials").

Second, § 5K2.7 of the Guidelines Manual provides that the Court may consider imposing a sentence above the guidelines sentencing range if a significant disruption in a governmental function occurred. Such a sentence should "reflect the nature and extent of the disruption and the importance of the governmental function affected." This enhancement can be applied to sentences for theft of government resources, and it can be applied when the disruption was a loss of public confidence in the government. *United States v. Gunby*, 112 F.3d 1493, 1500 n.10, 1502 (7th Cir. 1997). Here, as discussed, not only was there a loss of confidence in MetroHealth, but there was also a potential harm to patient access and treatment, as well as violations of patient confidentiality. Accordingly, the government submits that to the extent that the Guidelines do not adequately contemplate the Defendants sustained criminal conduct, the Court may consider these non-economic harms to form the basis for an above-Guidelines sentence.

## V.   THE RELEVANT § 3553(A) FACTORS

### A.   NATURE AND SERIOUSNESS OF THE CRIME OF PUBLIC CORRUPTION

*There can be no crime more serious than bribery. Other offenses violate one law while corruption strikes at the foundation of all law. Under our form of Government all authority is vested in the people and by them delegated to those who represent them in official capacity. There can be no offense heavier than that of him in whom sacred trust has been reposed, who sells it for his own gain and enrichment. He is worse than the thief, for the thief robs the individual, while the corrupt official plunders an entire city or State. He is as wicked as the murderer, for the murderer may only take one life against the law, while the corrupt official and the man who corrupts the official alike aim at the assassination of the commonwealth itself. Government of the people, by the people, for the people will perish from the face of the earth if bribery is tolerated.*

Theodore Roosevelt, Third Annual Address to Congress, December 7, 1903, available at https://millercenter.org/the-presidency/presidential-speeches/october-17-1803-third-annual-message (last accessed February 5, 2019).

For over 100 years leaders of the free world have warned against the multitude of dangers that public corruption pose against free and democratic societies. Sadly, at the same time that extensive corruption in Cuyahoga County's government was exposed in several proceedings in this Court alone, the above concerns went unheeded and ignored by Defendants as they repeatedly used their public positions of trust for their own personal benefit.

Congress has directed sentencing courts to consider "the nature and circumstances of the offense[s]" and that the sentence imposed must "reflect the seriousness of offense[s]." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). The offending conduct in this case—the sale of one's political influence as an elected official and proactive concealment of the transactions from the public and from regulators—can only be described in one way: corruption. Put plainly, "[c]orruption exists when institutions and officials charged with serving the public serve their own ends." Zephyr Teachout, Op–Ed., *Legalized Bribery*, N.Y. Times, Jan. 26, 2015, at A21.

Political corruption is a unique and infectious transgression with rippling and intractable societal consequences. Whereas political corruption is not a uniquely contemporary evil,

begrudging acceptance of it may be. A recent survey showed that approximately 74% of Americans believe that, in general, "elected officials put their own interests ahead of the country's." Pew Research Center, *Beyond Distrust: How Americans View Their Government* 72 (2015). That this figure is so shockingly high betrays an unfortunately casual acceptance of corruption in our public institutions that should be considered and rectified by this Court. The means of doing so are through severe and just application of our federal anti-corruption laws.

In his writings on good government and the rule of law, the Baron de Montesquieu had this to say about the love public servants should hold for their office:

> [P]olitical virtue is a renunciation of oneself, which is always a painful thing.

> One can define this virtue as love of the laws and the homeland. This love, requiring a continuous preference of public interest over one's own, produces all the individual virtues; they are only that preference.

> This love is singularly connected with democracies. In them alone, government is entrusted to each citizen. Now government is like all things in the world; in order to preserve it, one must love it.

Charles de Secondat, Baron de Montesquieu, *The Spirit of the Laws* Book 4, ch. 5 (Anne M. Cohler *et al.* trans., Cambridge Univ. Press 1989) (1748).

The trial evidence established that Defendants did not have this love for their public office, and only used their positions of power to further their personal interests over that of the public. "The hallmark of corruption is the financial *quid pro quo*: dollars for political favors." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) (quotation and citation omitted). Accepting "dollars for political favors" is the antithesis of civic virtue.

Moreover, public corruption:

> Demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of

law applies to all – not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano*, F.Supp. 2d 923, 940 (N.D. Ill. 2006).  Therefore, Defendants' conduct, viewed through the lens of a traditional understanding of the profound evils of political corruption, requires a substantial sentence.

A sentence of probation as requested by Alqsous and Al-Madani would in no way "reflect the seriousness" of Defendant's offenses. 18 U.S.C. § 3553(a)(2)(A).  It would simultaneously erode America's foundational, utter rejection of tolerance for corrupt governance. As Chief Justice Roberts noted, this Court, in discharging its duty to sentence Defendant, must act as the voice of the community.  Chief Justice John Roberts, *2016 Year-End Report on the Federal Judiciary*, p. 5 (Dec. 31, 2016), https://www.supremecourt.gov/publicinfo/year-end/2016year-endreport.pdf   (last accessed February 3, 2019).

When it comes to political corruption, the community – historically and presently – requires that real, tangible, and severe consequences meet those who gain a position of public trust and then abuse that trust for personal gain.  Unless that traditional principle is honored, political corruption will slowly corrode the foundations of our democracy until it collapses under its own weight.  Based on these considerations, a lengthy term of incarceration is required in this case.

B.     DETERRENCE AND PROMOTING RESPECT FOR THE LAW

These considerations are of particular importance in this case. It must be made plain to the public at large that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government.  When a corrupt office holder receives too lenient a sentence, the public understandably loses confidence in the integrity of its system of government.  And it sends a

signal to other elected officials and public servants that they can have one free bite at the apple when it comes to accepting money for political favors. Thus, in public corruption cases, it is important for anyone who might consider a similar course of action to see that someone who works to betray the public trust--first by engaging in a corruption scheme, and then trying to obstruct the investigation--will face strict punishment. *See United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (noting that general deterrence is particularly effective in cases involving economic and public corruption crimes); *see also United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (key objective of sentencing should be "to send a message to other [public officials] that [bribery] is a serious crime that carries with it a correspondingly serious punishment"); *United States v. Morgan*, 635 Fed. App'x 423, 450-51 (10th Cir. 2015) (noting that "[d]eterrence is a crucial factor in sentencing decisions for economic and public corruption crimes such as this one" and concluding a sentence of probation was unreasonable and "encourage[d] rather than discourage[d] [public officials] from engaging in [bribery] because they might conclude that the only penalt[y] they will face if they are caught [is probation]"). It is also important for members of the public to see that when their trust is betrayed, meaningful consequences follow. "Without meaningful consequences for a breach of trust, their trust is no more than blind trust." *Morgan*, 635 Fed. App'x at 450.

Likewise, a significant sentence will also assure the public that "white collar criminals will not be dealt with less harshly than those criminals who have neither the wit nor the position to commit crimes other than those of violence." *United States v. Brennan*, 629 F. Supp. 283, 302 (E.D.N.Y. 1986); *see also United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) (noting that "[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences

for other crimes").

In addition to promoting respect for anticorruption laws and deterring public officials from engaging in corrupt behavior, strict sentences also serve to protect the public from further harm. The PSR states there are "no victim-related adjustments" for the offenses of conviction. This language is used in a compartmentalized legal context related to a sentencing enhancement for vulnerable victims. However, there are in fact many identifiable victims in this case – the poor and indigent people of Cuyahoga County, and the taxpayers, who depended on the Defendants to provide their honest services at MetroHealth.

As another district judge stated in sentencing a former Connecticut mayor convicted of racketeering, bribery and other offenses, "corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process [and] has the potential to shred the delicate fabric of democracy." *United States v. Ganim,* 2006 WL 1210984, at *5 (D. Conn. May 5, 2006) (unpublished opinion declining to resentence *post-Booker), aff'd,* 510 F.3d 134 (2d Cir. 2007) and 256 Fed. App'x 399, 402-03 (2d Cir. 2007) (noting that district court "considered Ganim's good works as mayor, but believed his corruption was so severe that mitigation was not warranted; in other words, as she remarked, '[t]here is no exception for corruption for the good mayors'.").

Through their actions, Defendants have demeaned the integrity and work ethic of the many public servants in their community who strive each day to improve life and governance for their fellow citizens. The deviant acts of the corrupt public official are of course horrific, "but a hundred times worse is the demoralization of our people which results." Justice Louis Brandeis, *Speech to the Good Government Association* (1903). The public is also harmed "[w]hen trust in our institutions is low" due to "the corrosive influence of money in our politics" because that

83

lack of trust has become an integral part of a political climate that is "so corrosive that people of good character aren't even willing to enter into public service."  Barack Obama, *Farewell Address* (Jan. 10, 2017).

In determining its sentences, the Court should give the appropriately calculated Guidelines range careful consideration as "the starting point and the initial benchmark" for the appropriate sentence in this case. *Gall* v. *United States*, 552 U.S. 38, 49 (2007); *see also* 18 U.S.C. § 3553(a)(4) (requiring consideration of applicable Guidelines range in determining appropriate sentence).  For these public corruption offenses, the sentencing ranges advised by the Guidelines are necessarily high because they appropriately reflect the severity of those crimes.  The United States Sentencing Commission explicitly has recognized the "threat to the integrity of democratic processes" caused by public corruption offenses.  U.S.S.G. Manual app. C (Amendment 666).  This is based on the Sentencing Commission's considered assessment of the high level of culpability of public officials who abuse the public trust, and the severity of the harm caused by their crimes.  Indeed, approximately ten years ago, the Sentencing Commission increased the offense levels applicable to public corruption offenses.  *See* U.S.S.G. Manual app. C (Amendment 666). In doing so, the Commission stated, in relevant part:

> This amendment increases punishment for bribery, gratuity, and "honest services" cases while providing additional enhancements to address previously unrecognized aggravating factors inherent in some of these offenses. This amendment reflects the Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses.... The higher alternative base offense levels for public officials reflect the Commission's view that offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental processes.

(*Id.*).

There is a great risk that with rampant public corruption, citizens and residents in this District will become apathetic and will view corrupt leadership as the norm, making it more difficult to detect, investigate, and prosecute corruption.   Any sentence imposed must not ignore the reality that crimes such as this, left unpunished, contribute to an atmosphere of corruption, apathy, and mistrust of public institutions endemic in the community.

Defendants may also contend that white-collar felons such as themselves are peculiarly sensitive to the ignominy of conviction and, therefore, the fear of conviction alone, without a significant prison sentence, is sufficient to achieve general deterrence. This argument should be rejected. History has shown that the risk of a felony conviction alone has not been sufficient to deter individuals who are tempted to put their personal financial interests above their legal and fiduciary duties to make full and truthful disclosures to their shareholders and the SEC.

Indeed, Congress specifically recognized the importance of such deterrence for these types of cases:

> The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.

S. Rep. 98-225, 1984 U.S.C.C.A.N. 3182, 3259; see also at 3289 ("Certainly no correctional aims can be achieved whether the maximum sentence imposable is set at such a low level that it can be regarded merely as a cost of doing business—a cost that may in fact be more than offset by the gain from the illegal method of doing business."); Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005) ("Allowing these offenders to escape imprisonment, however, is inequitable and undercuts the law's deterrent and moral message condemning white-collar crime.").

Also, such an argument, at its core, relies on premises inimical to basic principles of equal application of the laws. According to this logic, one who is in a white collar profession and steals with bogus consulting arrangements and false representations to hospital officials should not be sent to jail for committing the same crime that would justify a sentence of imprisonment for a less well-heeled and well-regarded defendant. This argument turns on its head the notion that from those who have the greatest advantages in life, the most is properly expected. The Court should reject the notion that white-collar criminals should be sentenced more lightly than the poor and powerless because, for the former, the embarrassment of conviction alone (without any prison sentence) is more devastating than it would be for those who have enjoyed fewer advantages in life.

A severe, but just and sufficient punishment, will send a critically important message of deterrence to others who are confronted with the opportunity to commit similar crimes--the risk of punishment is not worth committing the crime. *See, e.g.*, Bibas, 47 Wm. & Mary L. Rev. at 724 (2005) ("[W]hite-collar crime is more rational, cool, and calculated than sudden crimes of passion or opportunity, so it should be a prime candidate for general deterrence. An economist would argue that if one increased the expected cost of white-collar crime by raising the expected penalty, white-collar crime would be unprofitable and would thus cease."); *Martin*, 455 F.3d at 1240 ("Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crimes therefore can be affected and reduced with serious punishment."). Society is served not just by deterring these specific defendants from further crimes, but by preventing others like defendants from committing these crimes of choice.

The people of the United States rely, as they must, on the integrity of our public officials and those that interact with them. The sentence in this case must, therefore, send a clear message

should that corrupt conduct is not tolerated, and if the corrupt conduct is discovered, the punishment will be just, appropriate, and severe enough to counter the damage that the corrupt conduct has had on democracy. When the purveyors of corruption are found and convicted, they must be punished appropriately. A conviction without significant punishments for such egregious and highly profitable corruption of public officials and government institutions will only invite future offenders. On the other hand, sentences that outweigh the benefits of crime, ensure that defendants are unable to engage in any cost-benefit analysis in determining whether to commit future offenses. Such crimes are therefore deterred.

It is clear that public corruption, when left without consequence, multiplies and spreads as the flow of federal money spreads the corruption like an air borne virus. Similar concerns exist for white collar crime. Only consequences—significant, painful, and certain consequences—will stem the tide of fraud and abuse. Others similarly tempted to use public trust for personal enrichment must be deterred by fear. The grief of discovery and punishment must outweigh the rewards of secrecy and graft.

C.      CHARACTERISTICS OF DEFENDANTS AND NEED TO DETER THEM

1.      Defendants' history and characteristics (3553(a)(1))

The Court must consider the "history and characteristics of the defendant[s]" in imposing sentence. 18 U.S.C. § 3553(a)(1). Although the history and characteristics of each Defendant must be considered separately, there are several characteristics relevant to this matter that apply equally to each of the Defendants.

*Defendants Crimes Targeted a Public Hospital*

The Court should also carefully consider Defendants' conscious decision to target a public hospital funded by taxpayers and meant to provide services to the indigent population of Cuyahoga County. Placing their own interests over those of their patient population reflects the

true nature and character of these Defendants.  They had years of training and experience, provided by the very institution they corrupted, that taught them what the right thing was to do in a given situation.  Yet they deliberately, repeatedly and selfishly targeted this safety-net hospital and perhaps even added to the public safety and health problems in the Dental Department by misappropriating resources (for Anthony Jordan, OHE, NDC Rent-a-Dentist, and Part-Time and Secondary Employment) to advance their own private interests and line their pockets, conduct which was integral to their offenses and reflecting a deeply troubling aspect of their character.

*The Conduct Occurred During and After Previous, Well-Publicized Corruption Cases*

To make matters worse, the Defendants committed these crimes during and after a time when numerous members of Cuyahoga County's government, and MetroHealth in particular, were being convicted of public corruption offenses.  Many of these prior cases were before this Court and they were well publicized.  Moreover, the sentences imposed for conduct similar to that in this case were not probationary sentences or "slaps on the wrist."  Thomas Greco, a former MetroHealth employee, received 10 years of incarceration, while James Dimora received 28 years and Frank Russo received in excess of 20 years.  In total, from approximately 2010-2013, over 60 defendants were convicted in the Cuyahoga County Corruption cases. The Greco and John Carroll (another MetroHealth employee) matters were resolved at a time when Defendant Hills was not just the chair of the Dental Department, but also the Chief Operating Officer of the entire hospital system.  It is virtually impossible to believe that he and the other Defendants were not aware of the very well-known public corruption scandals rocking Cuyahoga County and MetroHealth at the same time they were committing very similar crimes.  To continue undeterred with their varied schemes in the face of such well-publicized, well-punished

and close-to-home corruption scandals speaks volumes as to the nature and character of the Defendants.

*Defendants All Demonstrated a Clear Lack of Remorse*

A lack of remorse or acceptance of responsibility for the offense are relevant considerations when determining the sentence necessary to promote deterrence and respect for the law. *See, e.g.*, *United States* v. *Martinucci*, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under Section 3553(a)); *see generally United States* v. *Keskes*, 703 F.3d 1078, 1090-91 (7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform …)'" (citation omitted)); *United States v. Jahagirdar*, 466 F.3d 149, 157 (1st Cir. 2006) (noting district court's reliance on lack of remorse, among other factors, in upholding sentence as reasonable). Here, and as described in greater detail concerning Defendant Alqsous, the Defendants have shown no remorse for their conduct and the harms they have caused to their victims and society in general. Accordingly, this Court should consider the Defendants' indifference to their offenses in considering the sentencing factors, including whether rehabilitation is even possible for remorseless convicts.

*Lack of Necessity*

"Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999). Defendants are all well-educated professionals with well-paying jobs. Defendants Hills, Alqsous and Al-Madani legitimately earned large six-figure incomes from MetroHealth (even discounting the amounts they stole from MetroHealth in full-time salary and incentive adjustments).

MetroHealth tried to pay them enough to retain their services, and one would think that their salaries were sufficient to obviate corrupt temptations. They had job security. None reported any pressing financial concerns during the commission of the crimes. Moreover, each reported a happy childhood, good upbringing and solid family life. In sum, the Defendants did not commit these crimes out of any necessity or because of a troubled upbringing. They had solid foundations that allowed them to accumulate assets beyond those of many defendants who appear in court. That this was insufficient for them speaks volumes about the Defendants, their unbridled greed and ambition, and their willingness to corrupt the institution that provided them all of these luxuries.

### *Defendants' Standing in the Community*

The Government anticipates that Defendants may submit testimonials from family, friends, and colleagues. As with the testimony of any character witnesses or post-conviction videos, the Government expects that those submissions will support that, in many respects, Defendants are devoted to their families and friends and have engaged in many commendable acts and kindnesses over many years.

It is of course fitting and proper that Defendants submit those letters and that the Court weigh them and the good deeds they may describe in considering the appropriate sentence. But such letters should not be dispositive as many defendants who receive them often are deserving of imprisonment. *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 423 (S.D.N.Y. 2004) (commenting that the "vast majority of defendants … continue to receive the love and support of their families," and "[m]any, in turn, love their families and friends … and participate in charitable activities"). The fact that many of Defendants' family, friends and neighbors (and others they showered with money and benefits) think highly of them make them different from

90

most other white-collar criminals. *See United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her").

Although defendants may have supporters who will describe their good deeds and character, the Seventh Circuit suggests that this type of evidence should be weighed cautiously (at best) in deciding a sentence for a public official. In *United States v. Vrdolyak,* 593 F.3d 676, (7th Cir. 2010), Judge Posner found that the district court placed too much weight on letters written on behalf for a number or reasons, including:

> Politicians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politicians' largess should not weigh in sentencing.

*Id.* at 683. Instead, Defendants' actions and words they did when they thought no one was listening or observing them speak louder than any after-the-fact testimonials in their favor.

Additionally, while Defendants may lay claim to various good deeds they have performed, various courts of appeals have reversed as an abuse of discretion departures predicated on service to the public that was extremely compelling. *See United States v. Winters*, 105 F.3d 200, 209 (5th Cir. 1997) (reversing a downward departure based on the defendant's distinguished military service, during which he was twice wounded in combat and awarded two Purple Heart medals); *United States v. Rybicki*, 96 F.3d 754, 758-59 (4th Cir. 1996) (reversing a departure based on the national service of "a highly decorated Vietnam War veteran who had saved a civilian's life during the My Lai incident and had an unblemished record of 20 years of service to his country, both in the military and in the Secret Service").

Moreover, those good deeds described by the character witnesses or detailed in any letters on the Defendants' behalf must be squared with their actions and words in this case. Here, past good deeds do not mitigate the Defendants' actions in using a public hospital serving the indigent population of Cuyahoga County to line their own pockets. Nor do they alleviate the harms caused by their selfish decisions to divert resources from MetroHealth to other purpose, thus increasing patient wait times, decreasing learning opportunities for residents, reducing revenue for the hospital and causing other economic and non-economic harms to the hospital.

More broadly, individuals in Defendants' shoes, who have had the opportunity to do good work and build relationships with influential people, are not entitled to a get-out-of-jail-free card, particularly for serious crimes. As the Eighth Circuit stated, in general, white-collar criminals "enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities." *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994). "[W]e expect the district courts to view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses." *Id.*; *see also United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (finding defendant's good works unremarkable); *United States v. Millar*, 79 F.3d 338, 345 (2d Cir. 1996) (refusing to review the district court's decision not to depart based upon the defendant priest's charitable works and public service, where the district court recognized its authority to depart; the defendant "had benefits that few defendants have, including education, respect in his work, skills of advocacy, intelligence, and the calling to serve as a priest"); *United States v. Jordan*, 130 F.Supp.2d 665, 672-73 (E.D. Pa. 2001) (denying a departure for a defendant convicted of money laundering, despite numerous letters detailing substantial charitable contributions, generosity to community members in need of food, and service as mentor for neighborhood youths; these acts, "while

92

commendable, are not so exceptional or extraordinary for a person" like the defendant who owned a small business); *United States v. Scheiner*, 873 F.Supp. 927, 933-35 (E.D. Pa. 1995) (departure was not warranted for a doctor convicted of conspiring to defraud an insurance company, despite his contributions to the young and poor minorities, including financial sponsorship of several basketball teams, serving on several community boards, working in a podiatry clinic where free services were provided to the poor, and "generally [having] served as a source of support and inspiration to many).

These decisions are grounded in the recognition that individuals with sufficient stature, ability and opportunity to earn sizable incomes are often involved in community service and charitable endeavors, and such activities do not remove the defendant from the contemplated heartland of defendants charged with white-collar offenses. Indeed, it is widely recognized that "the [Sentencing] Commission intended its guidelines and policy statements to 'equalize punishments for white collar and blue collar crime,'" and courts have endeavored to implement that intention in sentencing. *United States v. Thurston*, 358 F.3d 51, 80 (1st Cir. 2004) (reversing the district court's downward departure where the white-collar defendant's good works, although "admirable," were insufficient to qualify as exceptional in light of, among other things, his status as a prominent corporate executive with the means to make financial contributions and engage in civic and charitable activities), *vacated on other grounds*, 125 S. Ct. 984 (2005); *see also United States v. Wright*, 363 F.3d 237, 248-49 (3d Cir. 2004) (upholding the district court's denial of a downward departure where the defendant minister's good works, although "profound," "substantial," and "sustained," were not so extraordinary as to justify a downward departure). As District Judge Marrero in the Southern District of New York observed:

> [W]hite collar offenders, because of their greater wealth and leadership in the
> community, enjoy much greater opportunities to participate and rise to

93

> prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence.

*United States v. Fishman*, 631 F. Supp.2d 399, 403 (S.D.N.Y. 2009). To permit departures primarily on the basis of such charitable activity would in effect be penalizing poorer defendants.

While Defendants' conduct in the community if genuine is nice, it should be analyzed in the context of these offenses. To the extent defendant Hills was able to give of his time and money, much of the money given was undoubtedly not his to give, but instead was facilitated by the free flow of benefits from Defendants Alqsous and Al-Madani. The same holds for Alqsous and Al-Madani, who effectively had extra days in the week to volunteer and extra income from their increased incentives and full-time pay to give to charity.

Nothing about these characteristics makes Defendants unique. If individuals with the resources and connections to make more contributions to the community than less fortunate people are given special accommodation in the criminal justice system, the message will be sent to the public that the severity of corruption sentences depends on social circumstances and financial means. Respectfully, in a justice system that is required to treat all similarly situated defendants equally, that would be an unfair and hypocritical result, and it would send the wrong message to the public, some of whom already believe that the "haves" are treated far better by the justice system than the "have nots." *See Emmenegger*, 329 F. Supp. 2d at 427 ("To permit such an offender to avoid meaningful incarceration, while jailing thieves and other non-violent offenders of lower social status, would trivialize the seriousness of white-collar offenses."). Accordingly, Defendants' character references and citations of "good deeds" should be measured against their long-running, multi-year and multi-faceted criminal conduct, and their numerous

94

bad deeds upon discovery including extensively obstructing justice by, among other things, lying to an FBI agent, accessing confidential and privileged information from the OSDB, using that information to needlessly threaten innocent and unaffiliated individuals and threatening witnesses with deportation.

Additionally, the government anticipates that Defendants will claim to have provided value to MetroHealth, either by being extremely productive and producing receipts (when they actually worked) in excess of the harm they caused, or by effectively leading parts of the hospital, in excess of their harms, thus negating their sentence. This Court should not reward Defendants for the times they were being good doctors – that is what the good doctors do. *Cf. Ganim*, 256 Fed. App'x at 402-03 ("[t]here is no exception for corruption for the good mayors"). What defendants did for the good of MetroHealth is not a factor that this Court should consider very important in determining an appropriate sentence because that is what good dentists and public servants do. They use their personal abilities and talents to the public's benefit. They try hard to serve the public, and they care about others instead of just themselves.

2.      Defendant Edward Hills

The evidence at trial demonstrated Edward Hills' unrelenting drive to misuse his public position to his benefit. The trial testimony and evidence was rife with Hills' willingness to spend other people's money for his own pleasure, and to repay and reward Alqsous and Al-Madani with MetroHealth funds. This is so despite the fact that he earned over $750,000 in his last year at MetroHealth, and average over $400,000 a year in salary for multiple years prior. Alqsous' own sentiments after the Red Steakhouse reflect Hills unflinching motivation to squeeze his supposed friends and comrades for every cent.

Hills use of his role and stature at MetroHealth to obtain things of value not just for himself, but for his mistresses, the mother of his child and his live-in girlfriend further

95

demonstrates his willingness to put his out personal interests before the public's. The testimony established that time and again, Hills would use his position to obtain cash (for the MacBook), airfare (for himself and Kennedy), hotels, prescription medications and other items from Alqsous, Al-Madani and Elrawy with the implicit promise to act favorably in return. Perhaps most telling is the fact that Hills instructed Elrawy to pay for car repairs for the mother of his child, even though this was ostensibly his own, very personal obligation. That rather than ensure that the needs of his minor son were met, he simply shrugged them off to Elrawy, speaks volumes as to Hills' character.

Moreover, Hills did not simply secure these things of value with promises to act favorably alone. He also spoke in veiled tones regarding his power and connection to the OSDB, and especially to Lili Reitz with whom he boasted of a sexual relationship. That he wielded and misused these connections is not in doubt. The evidence established that in this realm he again placed his interests over the general publics. For example, Hills used his past connections as both a shield and as a sword in numerous schemes. First, even though he was no longer a member of the OSDB, he misused and abused his relationship with Reitz to obtain clearly privileged and confidential information from the OSDB to help OHE obtain a steady stream of referrals. Second, during the criminal investigation he further engaged Reitz to obtain confidential OSDB records to first misidentify and then correctly identify individuals that called into an anonymous complaint line.

This conduct is extremely egregious but perhaps unsurprising. Hills was the former Secretary of the OSDB and the individual who for several years was responsible for investigating misconduct by dentists in the state of Ohio. He served on the dental board for almost 10 years. He was in the perfect position to know the value of keeping the anonymous tip line and other

96

dental board information confidential. Instead, he treated his past relationship as a lifetime pass to access this sensitive information when it served to his advantage. Moreover, his complete lack of remorse concerning Dr. DiFilippo, who was misidentified but still targeted by Hills' and Larry Zukerman's inappropriate correspondence, speaks to his overall lack of remorse in this case.

The government further urges the Court to look at the way in which Hills created and operated OHE. The testimony established that he conspired to create this business with the primary purpose of reaping maximum profit from minimal effort. He misused his connections and resources at OSDB to obtain access to a steady stream of clients, lying to other Board members in the process and surreptitiously adding OHE to the list of approved providers without the Board's knowledge and in a directly apparent conflict of interest. Moreover, attention should be given to the effort and care he directed to OHE's creation. Stacey Kime testified that Hills hired her to literally plagiarize dental books, a fact corroborated by Dr. Abadi and Kennedy. Before he began stealing from MetroHealth to operate OHE, he was already stealing from other textbook authors around the country. This behavior further demonstrates the brazen and careless attitude Hills demonstrated toward making a quick and easy buck, and militates against any hope that he will no recidivate in the future.

Finally, the evidence established that Hills was completely willing to manipulate others for his own benefit, and potentially to their detriment. In addition to showing that he purposely obtained and retained attorney-client privileged communications and other confidential information from the OSDB, the testimony established that during the criminal investigation Hills sought to control the narrative of others, including Joyce Kennedy and Sari Alqsous, by imposing his choice of attorney on them and attempting to prevent Ms. Kennedy from

mentioning the envelopes of cash he obtained from Alqsous and Al-Madani. He further attempted to control the narrative of his misdeeds by venally suggesting to Alqsous, Al-Madani and Elrawy that their stream of bribes to him were actually reflective of some sort of "Middle-Eastern culture."

        3.    <u>Defendant Sari Alqsous</u>

Alqsous' misuse of his public position at MetroHealth is staggering and began before he even started his first day there. Indeed, he began his life in America engaging in bar fights with police officers, see Exhibit N (Alqsous Arrest Report), and later lied about them to keep and maintain his job at MetroHealth.

A little over three months after accepting his position at MetroHealth, he began soliciting bribes relative to his job. *See* GX 1010 (Alqsous acceptance of employment on July 20, 2008). That he was willing to corrupt MetroHealth before he even showed up for his first day on the job should inform the Court of his underlying motivations during his time at the hospital. This is not an actor with civic virtue in mind; rather he sought to put his hand in the till from day one and line his pockets at the public expense at every opportunity. Furthermore, the fact that just a few days after he first solicited Dr. Al-Saad for a bribe Alqsous deliberately lied to MetroHealth about his then-pending criminal matter (and there is no other explanation for his conduct when that case was still pending and he was still returning to Boston for court appearances) demonstrates his willingness to put his interests ahead of the public's. *Compare* GX 1009 (Alqsous' Boston court records) *with* GX 1010 (Alqsous July 2008 acceptance) and GX 1011 (Alqsous failure to disclose legal problems). This was no accident, it was intentional and simply the start of his eight-year long career of deception against MetroHealth. After Alqsous was caught lying about the prior arrest and forced to correct this omission, MetroHealth decided to retain his services and gave him a second chance. Rather than rise to the esteem in which the

Case: 1:16-cr-00329-SL  Doc #: 447  Filed: 02/05/19  99 of 125.  PageID #: 16361

hospital apparently held him, he threw this opportunity away and victimized the hospital over and over. Indeed, this was not even his only second chance to right his ship considering the Boston court's separate decision to grant him leniency. This Court should not repeat those mistakes in sentencing Alqsous.

The government also submits that Alqsous' criminal history is underrepresented as he committed and continued committing the underlying offenses while under the Boston sentence. While that prior adjudication did not result in a lasting criminal conviction, Alqsous was still under probation in the Boston courts for the bar fight and ostensibly promised to live a law-abiding life, not repeatedly seek bribes from Dr. Al-Saad. In fact, only eight days after entering his pre-trial probation agreement with the Boston courts on December 24, 2008, GX 1009 at 3, Alqsous obtained another bribe payment from Dr. Al-Saad. GX 1105 ($4,973 wire on January 2, 2009). Thus, his criminal history score is underrepresented by the Guidelines calculation and the Court should take his prior bad conduct, and his subsequent disavowed promise to the Boston courts to not commit new crimes, into account in pronouncing sentence.

Moreover, as discussed *infra*, Alqsous' conduct was not the result of some momentary lack of judgment or weakness. It was the product of repeated attempts to sell and buy favor in exchange for things of value. Over the course of years he feted Hills with bribes and kickbacks in return for official acts in his favor. These were not isolated incidents but rather part of a concerted and continued effort to maintain a mutually beneficial relationship with Hills. Indeed, as the below evidence, among other items, shows, he willfully and happily committed these acts precisely because they benefited him – at the expense of the taxpayers and the public:

GX 4300-S:                                        GX 4436-S:



Finally, Defendant Alqsous persisted in presenting a series of false narratives throughout trial that this Court should consider under the § 3553(a) factors. The government notes that these

issues were not simply singular misapprehensions of minor facts, but that they constitute repeated and materially relevant misstatements that Defendant Alqsous was fully aware of and adopted during the course of the trial. First, Alqsous claimed throughout trial that he had no involvement with Buckeye Family Dental until after Hills' March 14, 2014, referral order. *See* (R. 392, PageID 9771) (Alqsous Opening Statement claiming Buckeye owned by Al-Madani and Dr. Manal Sunna). This claim was stressed and advanced numerous times over yet Alqsous, knowing full well that it was not true, did not advise his counsel to abandon this specious argument. *See* (R. 399, PageID 12019) (cross-examination of Vilma Trimarchi emphasizing lack of knowledge of when Alqsous purchased BFD); (R. 402, PageID 12684-85, 12697-98) (cross-examination of Amy Anderson emphasizing no knowledge of Alqsous purchase); (R. 403, PageID 12970) (cross-examination of SA Spielmaker suggesting purchase in 2014). Instead, knowing that he claimed over $50,000 in losses from his partnership in Buckeye Family Dental for tax year 2013 alone, GX 5030, he allowed counsel to persist in this clearly misleading argument.[29]

Second, the government submits that because he was an attending dentist heavily interested in who was accepted into the MetroHealth dental residency program (and whom he could solicit for bribes) Alqsous knew full well that MetroHealth only intended to admit three residents to the program in 2014. Nevertheless, he permitted his counsel to pursue a fool's

---

[29]     The government does not suggest or imply that trial counsel for Alqsous were aware of this factual issue or that they would have knowingly pursued such argument in bad faith. The government notes that during testimony concerning both GX 4715 and 5030, trial counsel for Alqsous appeared unaware and unprepared for either the fact that MetroHealth had contracted for three spots with National Matching Service or that their own client had claimed over $52,000 in losses from BFD on his 2013 tax return. However, the one person in the courtroom who did know both of these incontrovertible facts was Defendant Alqsous.

errand in pressing forward on the demonstrably incorrect claim that the hospital always had four openings for residents that year. *Compare* Alqsous NL (document purporting to demonstrate that MetroHealth would have four resident positions for 2014-15) with GX 4715 (document showing MetroHealth only contracted with National Matching service for three spots for 2014-15 residencies prior to Hills' intervention).

Defendant's repeated pattern of behavior should tell the Court all it needs to know about him. He not only lied to MetroHealth about his prior arrest, but when given a second chance he continued to victimize the hospital for eight years. When given another second chance by the Boston courts, he promptly went back to soliciting and accepting bribes from Dr. Al-Saad and others. And here, he knew that he owned Buckeye Family Dental in 2013 yet tried to mislead the jury otherwise. Defendant Alqsous has run out of second chances and the Court should impose a severe sentence on him in accordance with § 3553(a).

4. Defendant Yazan Al-Madani

The Government notes the following facts that the Court should consider in evaluating Al-Madani's history and characteristics.

First, like Alqsous, Al-Madani began abusing his position at MetroHealth not long after he started work there. Al-Madani's residency started in July 2007. *See* GX 300 (Al-Madani HR File). In September 2008, Al-Madani obtained a fast-track teaching license from the OSDB by having Hills push his application through without the standard waiting period for a background check. *See* GX 3005 (Al-Madani license file showing handwritten note about "working for Dr. Hills"); (R. 398, PageID 11671) (testimony of Melinda Franks that background checks for license applicants normally took weeks). Not long after, Al-Madani began working at Noble Dental and defrauding MetroHealth out of countless hospital shifts. Al-Madani's relatively

quick assimilation into the RICO schemes reflects a complete lack of concern with his role as a MetroHealth physician tasked with treating patients who could not afford to go elsewhere.

Second, Al-Madani's choice to issue a veiled threat to Yazan Karadsheh about cooperating shows a willingness to engage in gross and manipulative conduct. In Al-Madani's eyes, Karadsheh was a loose end who could be bullied into not talking to the hospital or the FBI. This shows that Al-Madani was willing to do practically whatever was necessary to conceal his criminal activity.

Third, Al-Madani's actions throughout the course of the RICO conspiracy show that the primary motivating factor in his professional life was greed, not patient care. On multiple occasions, Al-Madani exchanged text messages with Alqsous about whether the incentives were on par with what they expected. *See* GX 5049-S; GX 5015-S (Al-Madani: "F**k this my incentive is $ 439?"). Al-Madani also bragged to Alqsous about how they were sending MetroHealth patients to their private clinic. *See* GX 5050 (Alqsous: "Man schedule 2 cases for 13 thousand each I brought them for implants" . . . Al-Madani: "One more on the way [winking emoji]").

D.    UNWARRANTED SENTENCING DISPARITIES

1.    The Guidelines are an important factor to consider throughout the entire sentencing process.

Although the Sentencing Guidelines are now advisory, they nonetheless serve an important function in sentencing. Indeed, the post-Booker federal sentencing scheme "aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review." *Peugh v. United States*, 133 S.Ct. 2072, 2083 (2013).

Before varying from the guideline range, courts must be careful to recognize the

important function that the Guidelines play. For example, in *Kimbrough v. United States*, 552 U.S. 85, 107 (2007), the Supreme Court acknowledges that the work of the Sentencing Commission creates a familiar harbor—i.e., an informed heartland—which generally provides for equality of treatment, consistency in outcome, and a semblance of sentencing reliability for litigants and society.

Carrying out its charge, the Commission fills an important institutional role. It has the capacity courts lack to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* at 109-110. Reference to the Guidelines is a required starting point simply because they create a norm where sentences are neither too harsh nor too lenient—where all defendants at least start out being treated equally and with a better understanding of the possible consequences, rather than with "the luck of the draw" of unbridled subjectivity between different sentencing courts. *Gall v. United States*, 552 U.S. 38, 49 (2007); see also *Rita v. United States*, 551 U.S. 338, 351 (2007) ("An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general."); *United States v. Bistline*, 665 F.3d 758, 761 (6th Cir. 2012) ("Although the Sentencing Guidelines are now only advisory, they still 'should be the starting point and the initial benchmark' for choosing a defendant's sentence."). Not only do the district courts consider the Guidelines at the beginning of the sentencing, but they are to "remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n. 6 (emphasis added).

The Court cannot, without explanation, ignore a sentencing factor or "shrug off" the Sentencing Commission's statements of policy. *United States v. Bragg*, 582 F.3d 965, 970 (9th Cir. 2009). If a district court contemplates a non-Guidelines sentence, it "must consider the

extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50; see also *Pepper v. United States*, 131 S. Ct. 1229, 1254 (2011) (Breyer, J., concurring in part and concurring in the judgment) ("[T]he law permits the court to disregard the Guidelines only where it is 'reasonable' for a court to do so." (citing Booker, 543 U.S. at 261-262)). And while the Guidelines no longer mandate a particular sentence, "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range 'fails to properly reflect § 3553(a) considerations' even in a mine-run case." *Kimbrough*, 552 U.S. at 109.

Most sentencing proceedings should begin and end within the guideline range. The guidelines create a "heartland" where the "mine run of cases" ought to be found. See *Rita*, 551 U.S. at 351; *Gall*, 552 U.S. at 46. That is, while this Court must consider the personal characteristics of the defendant in every case, in most cases the guideline range takes that into account. Without some adherence to that principle, there would be no "heartland" where one could expect to find the "mine run of cases."

The guidelines incorporate important societal goals that rarely receive any real attention at sentencing. A sentence within the heartland of the guideline range provides certainty and fairness while avoiding unwarranted sentencing disparities among similarly situated defendants. See, Héctor L. Ramos-Vega, *Federal Sentencing Then, Federal Sentencing Now: The United States Sentencing Commission's Ill-Advised Efforts to Fix Something That Is not Broken*, 59 Fed. Law. 4, 4 (2012). That is why a sentence within the guideline range is almost always reasonable, and a district court that sentences within that range will rarely, if ever, receive a rebuke from the circuit court for sentencing a defendant too harshly, or too leniently. See, e.g., *United States v. Lebowitz*, 676 F.3d 1000, 1013 (11th Cir. 2012) ("Although we do not automatically presume a sentence

within the guidelines range is reasonable, we ordinarily expect such a sentence to be reasonable.").

(Citations omitted.).

2. <u>A Sentence Within the Advisory Guidelines is Designed to Avoid Disparities</u>

On the issue of unwarranted disparity, the U.S. Supreme Court has held it is instructive to

consider the § 3553(a)(6) factor in its inverse: the "need to avoid unwarranted *similarities* among

other[s] not similarly situated." *Gall*, 552 U.S. at 55, 128 S.Ct. 586. As the Sixth and Seventh

Circuits have adequately stated:

> The point of the guidelines is to decrease sentencing disparities, an objective
> *furthered* by a within-guidelines sentence, as opposed to a sentence that varies
> above or below the advisory guidelines range. The very thing Swafford
> presumably wants—a below-guidelines sentence—is more likely to create
> disparities than eliminate them. There is nothing wrong, to be sure, with a below-
> guidelines sentence. It is just that a request for one should not turn on §
> 3553(a)(6). *See United States v. Shrake,* 515 F.3d 743, 748 (7th Cir.2008).

*United States v. Swafford*, 639 F.3d 265, 270 (6th Cir.2011) (Emphasis added); *see also United*

*States v. Shrake*, 515 F.3d 743, 748–49 (7th Cir.2008) ("Sentencing disparities are at their ebb

when the Guidelines are followed, for the ranges are themselves designed to treat similar

offenders similarly … The more out-of-range sentences that judges impose … the more disparity

there will be.") (citations and quotations omitted).

3. <u>Examples of Recent Public Corruption Sentences</u>

In this case, a sentence that is in line with the recommended sentence in the properly

calculated guidelines range will avoid any unwarranted sentencing disparities. The facts and

circumstances of this case are severe and not commonly found in cases under § 2C1.1. Data

from the U.S. Sentencing Commission shows that in 2017, § 2C1.1 was applied to 207 cases. Of

those 207 cases, only 14 (or 6.7%) involved a loss amount in excess of $1.5 million, and only 7

cases (3.4%) involved losses in excess of $3.5 million.[30]  Therefore, the great bulk, and thus any medians, are lower level bribery offenses that are often caught early.  Case law in both the Sixth Circuit, and across the country, indicates that public corruption schemes have been treated seriously by the courts.  Federal courts have recognized that extensive schemes like the one run by Defendants deserve significant sentences.  Below are examples of recent sentences imposed for public corruption offenses involving bribery and kickbacks.

> a.  **James C. Dimora and Frank P. Russo**, Nos. 10-CR-387 and 10-CR-384 (N.D. Ohio). In 2011, former Cuyahoga county commissioner Jimmy Dimora was convicted of racketeering and bribery-related crimes for accepting items of value in return for helping contractors obtain county contracts, grants and loans, and helping others secure county employment and salary raises. He was sentenced to 336 months (28 years) in prison based on his receipt of $451,000 in personal benefits. In a related case, former Cuyahoga county auditor Frank Russo--who pleaded guilty to accepting more than $1 million in return for $21.4 million in county real estate appraisal contracts, as well as other bribery schemes involving jobs and salary increases--received a prison sentence of 262 months (almost 22 years).

> b.  **Mark Ciavarella and Michael Conahan**, No. 09-CR-00272 (M.D. Pa.), *aff'd United States v. Ciavarella*, 716 F.3d 705 (3rd Cir. 2013). In 2009, Ciavarella and Conahan, both judges with the Luzerne county court of common pleas, were charged with racketeering for accepting a total of $2.8 million from the owners of several juvenile detention centers in return for the judges' support in the construction and operation of the facilities, as well as for the judges' failure to disclose their conflicts of interest when placing juvenile offenders at the facilities. Ciaveralla was convicted at trial and sentenced to 336 months (28 years) in prison. Conahan pleaded guilty and was sentenced to 210 months (17.5 years) in prison.

> c.  **Russell Cletus Maricle**, (E.D. Ky.), *rev'd on other grounds by United States v. Adams, et al.*, No. 11-5308, 722 F.3d 788, (6th Cir. 2013). In 2011, Maricle, an elected state circuit court judge, was convicted of racketeering for participating in a vote-buying scheme in Clay County, Kentucky. He was sentenced to 320 months (26 years) in prison. His conviction was overturned by the Sixth Circuit for reasons unrelated to his sentence.

> d.  **Donald W. Hill**, No. 3-07-CR-289-M (N.D. Tex.), *aff'd United States v. Reagan, et al.*, No. 10-10211, 725 F.3d 471 (5th Cir. 2013). In 2009, Hill, a Dallas city

---

[30]    *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2017/Use_of_SOC_Guideline_Based.pdf at 25 (Last Accessed February 4, 2019).

councilman, was convicted of bribery and extortion for helping provide public financing, zoning clearance, and political support to affordable housing developers in exchange for the developers' employment of Hill's associates and appointees as consultants. The evidence at sentencing showed that Hill's associates received about $270,000 in fees and other benefits through the scheme, and that losses totaled about $4.8 million, but there was little evidence that Hill himself received money from the scheme. Despite his lack of personal enrichment, Hill was sentenced to 216 months (18 years) in prison.

e.    **Jonathan Bolar**, No. 09-CR-00138 (E.D. La.), *aff'd United States v. Bolar*, No. 10-30879, 483 F. App'x 876, 2012 WL 1994728 (5th Cir. June 5, 2012). In 2010, Bolar, a Gretna, Louisiana city councilman, was convicted of extortion for pressuring people to hire his construction firm or give him campaign donations in return for his support in various land use matters. Although Bolar extorted a total of only $122,000, the trial court applied an upward variance from the Guidelines range of 121 to 151 months because of Bolar's "pervasive extortion," as well as his obstructive conduct. The resulting 204-month (17-year) sentence was affirmed by the Fifth Circuit.

f.    **Larry P. Langford**, No. 08-CR-00245 (N.D. Ala.), *aff'd United States v. Langford*, 647 F.3d 1309 (11th Cir. 2011). Langford, the president of the Jefferson County, Alabama commission and later the mayor of Birmingham, was convicted in 2009 of accepting bribes for steering county bond work to an investment banking firm in exchange for $240,000 in cash, clothing, and jewelry. Langford was sentenced to 180 months (15 years) in prison based on a net benefit to the investment banking firm of $5.5 million. It has been noted, that the corrupted bond deals helped contribute to Jefferson County's $4 billion bankruptcy filing in 2011, the largest municipal bankruptcy in U.S. history before the recent $18 billion filing by the city of Detroit.

A significant sentence will avoid unwarranted sentence disparities. The Sixth Circuit has explained that the need to avoid unwanted sentence disparities is a factor which "concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct--not disparities between codefendants." *United States v. Carson*, 560 F.3d 566, 586 (6th Cir. 2009) (quoting *United States v. Conestar*, 514 F.3d 508, 521 (6th Cir. 2008)). The Sixth Circuit recognizes that a number of factors could cause disparate sentences between co-defendants, including "differences in . . . the offenses of conviction." *Id.* (quoting *Conestar*, 514 F.3d at 522)). The above cases demonstrate that while sentences for violations or conspiracy to violate 18 U.S.C. § 666 may differ slightly depending on the size of the bribe, sentencing within the appropriate Guideline sentencing range, as dictated by U.S.S.G. § 2C1.1 and U.S.S.G. §

108

2B1.1, is substantively reasonable under the circumstances.  Here, the long length and extreme scope of the conspiracy as well as the extent of Defendants participation in the conspiracy indicate that the recommended, properly calculated Guidelines sentences months would avoid any unwarranted sentencing disparities.

## VI.    OTHER MISCELLANEOUS FACTORS

### A.    METROHEALTH IS A VICTIM AND RESTITUTION SHOULD BE MADE TO THE HOSPITAL

#### 1.    Applicable Law

When sentencing a Defendant convicted of any offense committed by fraud or deceit, the Mandatory Victims Restitution Act (the "MVRA") requires the court to order that a defendant make restitution to the victim of that offense. 18 U.S.C. §§ 3663A(a)(1); 3663A(c)(1)(A)(ii).  The MVRA requires those convicted of offenses against property under Title 18 to pay restitution for victims' losses. *United States v. Elson*, 577 F.3d 713, 721 (6th Cir. 2009).  Criminal restitution rests with one foot in the world of criminal procedure and sentencing and the other in civil procedure and remedy, though because it is part of the sentencing process it is fundamentally "penal" in nature. *Kelly v. Robinson,* 479 U.S. 36 (1986).  Restitution thus also constitutes punishment. *United States v. Schulte*, 264 F.3d 656 (6th Cir. 2001) see also *United States v. Bearden*, 274 F.3d 1031, 1041 (6th Cir. 2001) (restitution is "punitive rather than compensatory in nature").

"'[A] criminal sentence is a package of sanctions that the district court utilizes to effectuate its sentencing intent.'" Pepper v. United States, 562 U.S. 476, (2011) (quoting United States v. Stinson, 97 F.3d 466, 469 (11th Cir. 1996) (per curiam)).  "Although the guidelines mandate imposition of restitution where allowable under the statutes, the restitution statutes function independently from the guidelines and do not rely on the guidelines for their validity." *United States v. Sosebee*, 419 F.3d 451, 462 (6th Cir. 2005). "Restitution under the MVRA is a criminal penalty

and a component of the defendant's sentence." *United States v. Adams*, 363 F.3d 363 (5th Cir. 2004) (quoting *United States v. Chaney*, 964 F.2d 437, 451 (5th. Cir. 1992)).

The MVRA specifically states that the amount of restitution should be equal to the "amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A) (when a court is ordering restitution, the amount of restitution should be equal to the "amount of each victim's losses as determined by the court." *Sosebee*, 419 F.3d at 462 (18 U.S.C. § 3664(f)(1)(A) (emphasis in original)).

The MVRA defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). Under the MVRA, a victim is any person harmed " 'as a result of the commission of an offense ... including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.' " *United States v. Elson*, 577 F.3d 713, 730 (6th Cir. 2009) (quoting 18 U.S.C. § 3663A(a)(2)). The MVRA "does not require a victim to have a subjective belief that he or she has been harmed. Rather, it is left to the court to make that determination." *United States v. Teadt*, 653 F. App'x 421, 428 (6th Cir. 2016). A district court has an independent obligation to calculate restitution. See 18 U.S.C. § 3446(a). A district court has wide latitude to determine the amount of a victim's losses. See 18 U.S.C. § 3664(f)(1)(A).

The MVRA provides that in the case of an offense resulting in loss of property to a victim, the order of restitution shall require the defendant to pay an amount equal to the greater of (i) the value of the property on the date of the loss or (ii) the value of the property on the date of sentencing.  18 U.S.C. § 3663A(b)(1)(B)(i)(I) and (II).  The value of any property returned to the victim may be credited in the amount of the value of that property as of the date it is returned. 18 U.S.C. § 3663A(b)(1)(B)(ii).

In those cases where the offense of conviction includes a scheme, a conspiracy or a pattern of criminal activity, the courts will order restitution for all losses attributable to the scheme, conspiracy or pattern of criminal conduct. *US v. Davis*, 170 F.3d 617, 626 (6th Cir. 1999). " '[T]he court can order restitution for damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction.' " *United States v. Sawyer*, 825 F.3d 287, 295 (6th Cir. 2016) (quoting *Elson*, 577 F.3d at 723). Where one of the offenses of conviction is a title 18 conspiracy offense, § 371, but the underlying offense is a non-title 18 offense for which restitution would not otherwise be eligible, the courts have held that a full sentence of discretionary restitution is authorized under § 3663(c) because § 371 is an offense "under this title" (i.e., title 18). See, e.g., *United States v. Helmsley*, 941 F.2d 71, 101 (2d Cir. 1991). Under the MVRA, "'if someone is convicted of a conspiracy, the court can order restitution for damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction.'" *United States v. Bussell*, 504 F.3d 956, 966 (9th Cir. 2007) (quoting *United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir. 1996)). However, the court must exclude injuries caused by offenses that are not part of the conspiracy of which the defendant has been convicted. *United States v. Elson*, 577 F.3d 713, 722-723 (6th Cir.2009). Additionally, where a fraudulent scheme is an element of the conviction, the court may award restitution for actions pursuant to that scheme, but the restitution for the underlying scheme to defraud is limited to the specific scope of the indictment. See *United States v. Morrison*, 685 F.Supp. 2d 339, 348 (E.D.N.Y 2010) (RICO conspiracy case holding that restitution is limited to loss directly and proximately caused by the course of conduct under the count for which defendant was convicted).

2.     MetroHealth is a Victim

Here, MetroHealth suffered tangible losses for the amount of salary it overpaid Defendants Alqsous and Al-Madani, and Dr. Elrawy. The hospital also sustained losses from unnecessary upward incentive adjustments to Alqsous, Al-Madani and Elrawy for work that was already subsumed within the incentive calculation (i.e., working extra days, which would have been considered due to additional productivity). Additionally, the hospital lost the value of the salary it paid for dentists who worked at NDC under the agreement between Hills and Dr. Wang, and by proxy at least the value of services NDC paid Hills.

Defendant Alqsous in his objections to the initial PSR, and in a further showing of his lack of remorse, attempts to equate MetroHealth to large financial institutions that knowingly engaged in bad lending practices prior to 2008. In this process he accuses the hospital of being "reckless," and notes in support that the hospital was previously the victim of corruption by Thomas Greco, John Carroll and the East/West Contracting Company. He then claims, without support, that the hospital was aware of problems with the dental department because of a KPMG audit, although Defendant has not produced any actual evidence of the audit and the government is not aware of its existence. Finally, he notes that Patricia Forkapa made general complaints about the dental department in 2010. At best, what Alqsous describes, and what is supported by the Forkapa complaint and the phantom KPMG audit, is mere negligence on the part of the hospital, not reckless or equally culpable behavior.

Also missing from his analysis is the fact that Defendant Hills, who inconveniently is a co-conspirator to Defendant Alqsous, was also the Chief Operating Officer of the MetroHealth system. Defendant Alqsous relies on *United States v. Litos*, 847 F.3d 906, in support of his position that MetroHealth was somehow culpable in this offense conduct. In that case Bank of America, which had entered into a $16 billion settlement with the Department of Justice over

112

charges of mortgage fraud related to the 2008 recession, issued numerous questionable loans to borrowers that ultimately failed. *Id.* at 907. The Seventh Circuit then went on to determine that the bank had acted recklessly for failing to investigate seriously questionable, but unconcealed claims related to the fraudulent loan applications. *Id.* at 908. In particular, the *Litos* court took exception to the bank approving approximately 25 mortgages to five individuals in the span of a few months without any investigation. *Id.*

Putting aside the fact that MetroHealth has not been accused of, much less engaged in a settlement with the Department of Justice, the facts and rationale behind the *Litos* are readily distinguishable from this situation. In a mortgage fraud case where a borrower obtains numerous mortgages from a reckless bank there is a dividing distinction between those two parties. The borrower is not a bank employee but is an outside entity seeking the bank's funds. If there is truly reckless conduct by the bank, as a separate and distinct entity, that facilitates or enables the specific conduct (i.e., bank failing to verify that a borrower had stated assets and income numerous times over a short period of time), that conduct occurs as a separate internal system out of the borrower's control. Here, Defendants Hills, Alqsous, Al-Madani and Sayegh were the bank and they corrupted it within. There was no dividing line. MetroHealth cannot be held to be reckless when the Defendants were the ones who corrupted the very institution itself. Indeed, in this case it is telling that MetroHealth was neither ever suspected of committing fraud relative to this scheme, nor did the hospital enter into any settlement agreement for any fine amount with the Department of Justice. There simply is no indicia of bad behavior by MetroHealth itself, as opposed to the demonstrated ill intent and conduct of its fiduciaries Edward Hills, Sari Alqsous, Yazan Al-Madani and Tariq Sayegh. Rather, this case lends itself more to a bank embezzlement

analysis rather than a mortgage fraud one, in which the victim institution was perhaps only reckless in giving its trust to the Defendants.

Moreover, this analysis may work for a private bank that could care less about the risk to its funds because they would soon be securitized. *Litos*, 847 F.3d at 910 (7th Cir. 2017). In that case, the bank could be deliberately indifferent to the risks to its loans because that risk would soon be transferred to a third entity, Fannie Mae. *Id*. That argument fails here in the context of a public safety net hospital funded by taxpayers. Here the victims include the people of Cuyahoga County and the public trust in general. There is a very real and meaningful difference between the shareholders of a financial institution whose funds were stolen by a third party, and the general public as trustees of a public hospital that was defrauded from within. *See United States v. Bryant*, 655 F.3d 232, 253-54 (3d Cir. 2011) (affirming award of restitution in honest services fraud case involving the University of Medicine and Dentistry of New Jersey School where there was loss to the public and government institution; also rejecting objections to restitution based on claims that high-level officials were knowing participants in scheme where defendants were those participants and acted to hide pertinent facts from others).

3.  MetroHealth Should Further Be Awarded Restitution for Attorney's Fees Resulting from Defendants' Criminal Conduct

Attorneys' fees can constitute direct damages recoverable under the MVRA when they are foreseeable as a result of a fraud. *United States v. Bogart*, 490 F. Supp. 2d 885, 895 (S.D. Ohio 2007), *aff'd*, 576 F.3d 565 (6th Cir. 2009), and *aff'd sub nom. United States v. Elson*, 577 F.3d 713 (6th Cir. 2009). Indeed, in the Thomas Greco matter, initially handled by then-District Judge O'Malley, restitution for foreseeable attorney's fees related to the criminal investigation were in fact ordered against Greco. *See United States v. Thomas Greco, Jr.*, Case No. 1:09-CR-506 (JRA) (R. 179: Amended Judgment). Accordingly, in addition to monetary restitution owed

114

as a result of actual harm caused to MetroHealth by the defendants' various schemes, the Court should also determine that additional harm in the form of foreseeable attorneys' fees arising from investigating the defendants' criminal conduct are also subject to restitution.  As of this filing, the government does not have an exact figure from MetroHealth, but has requested that counsel for the hospital provide the same to all parties and the Court as soon as possible,

4.  <u>For Counts 31-33, restitution should be made payable by Defendant Edward R. Hills to the victim, the Internal Revenue Service, in the amount of $80,426.</u>

Section 3563(b) of Title 18 authorizes district courts to order a defendant to pay restitution as a discretionary condition of probation.  The supervised release statute, 18 U.S.C. § 3583(d), authorizes district courts to impose as a condition of supervised release, "any condition set forth as a discretionary condition of probation in section 3563(b)."  The text of § 3563(b) provides that a district court may order the defendant to "make restitution to a victim of the offense under § 3556 (but not subject to the limitation of § 3663(a) or § 3663A(c)(1)(A)."  This language makes clear that restitution ordered as a condition of probation or supervised release is available for offenses not covered by §§ 3663(a) and 3663A(c)(1)(A).  Section 3556 authorizes a district court to "order restitution in accordance with section 3663," which in turn provides that a court "may order . . . that the defendant make restitution to any victim of such offense." Although § 3663 by its own terms limits restitution to certain (non-Title 26) offenses, § 3563(b) expressly provides that § 3663's limitation in scope does not apply to restitution as a condition of probation (or, accordingly, as a condition of supervised release).  *See United States v. Perry*, 714 F.3d 570, 577 (8th Cir. 2013); *United States v. Butler*, 297 F.3d 505, 518 (6th Cir. 2002); *United States v. Bok*, 156 F.3d 157, 167 (2d Cir. 1998); *United States v. Daniel*, 956 F.2d 540, 543-44 (6th Cir. 1992); *United States v. Comer*, 93 F.3d 1271, 1278 (6th Cir. 1996).

A court's authority to order restitution for Title 26 offenses as a condition of probation or supervised release is explicitly recognized in the Sentencing Guidelines, which prescribe the use of that authority. *See* U.S.S.G. § 5E1.1(a)(2); *Gall v. United States*, 21 F.3d 107, 109-10 (6th Cir. 1994). Generally, under § 5E1.1(a)(2), when a defendant has been found guilty after a trial of a tax crime under Title 26 and a court finds that the government has suffered a loss, the defendant should be ordered to make restitution as a condition of supervised release. *See* U.S.S.G. § 5E1.1(a)(2).

The United States, including the Internal Revenue Service, an agency of the United States, is a victim for the purpose of Title 26 of the United States Code. *See United States v. Perry*, 714 F.3d 570, 577 (8th Cir. 2013) (defendant, charged under 26 U.S.C. § 7201, was ordered to "pay restitution to the IRS, as the victim of his tax evasion offense"). Courts have consistently affirmed restitution orders to government agencies and hold such agencies eligible as victims. *See United States v. Senty-Haugen*, 449 F.3d 862, 865 & n.3 (8th Cir. 2006). The wide language of Title 18 as defining a victim as any person allows courts to order restitution payments to be made to the United States and its agencies.

In this case, the victim, the Internal Revenue Service of the United States, was directly harmed as a result of the Defendant Edward R. Hills' actions. As a direct and proximate result of Defendant's affirmative conduct, the Internal Revenue Service suffered financial loss. This loss would not have occurred if not for the Defendant Edward R. Hills' actions. Accordingly, Defendant Hills should be ordered to make restitution to the IRS for approximately **$80,426** in tax losses.

116

B.     FINES SHOULD BE IMPOSED

    1.    Applicable Law

Section 5E1.2(a) of the Sentencing Guidelines provide that the court shall impose a fine in all cases, "except where the defendant establishes that he is unable to pay *and is not likely to become able to pay any fine*." U.S.S.G. § 5E1.2(a) (emphasis added). *See also United States v. Hickey*, 917 F.2d 901, 907 (6th Cir. 1990); 18 U.S.C. § 3572(A)(1) (referencing earning capacity).

In determining whether and to what extent to impose a fine generally and in addition to the § 3553(a) factors, the court considers: defendant's income; *earning capacity*; financial resources; the burden on the defendant and his dependents; pecuniary loss inflicted on others as a result of the offense; whether restitution is ordered; the need to deprive the defendant of illegal gains; and the need to promote respect for the law, provide just punishment, and adequate deterrence. *United States v. Tosca*, 18 F.3d 1352, 1354 (6th Cir. 1994) (emphasis added).

Negative net worth at the time of sentencing is not a finding of indigency. *United States v. Kelley*, 861 F.3d 790, 801-802 (8th Cir. 2017). If "at some point" a defendant would be able to pay a fine in the future, "[t]his ability to earn money in the future preclude[s] a finding of indigence." *Id.* (Analyzing indigence and future earning capacity in considering imposition of $5,000 special assessment under 18 U.S.C. § 3014). The Fifth Circuit Court of Appeals has similarly held that the district court did not improperly consider a defendant's "future earnings" to determine the defendant's non-indigence. *United States v. Rodgers*, 711 F. App'x 229, 229-230 (5th Cir. 2018).

2.      The Inmate Financial Responsibility Program Provides a Future Ability to Pay

A defendant's future ability to pay through the BOP Inmate Financial Responsibility Program can preclude a finding of indigence.  As the Tenth Circuit explained, "nothing in the statute [18 U.S.C. § 3014] precludes an examination of future ability to pay as part of a holistic assessment of the indigency determination."  *United States v. Janatsch*, 722 F. App'x 806, 810-11 (10th Cir. 2018).  On the contrary, as the Court in that case noted, "[the defendant]'s going to have plenty of time to pay that off while incarcerated."  *Id.* at 806, 810-11.

In the Sixth Circuit, a defendant's current assets are not the sole factor for determining whether a fine should be imposed.  "Rather, the defendant has the burden of establishing that he or she is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine."  *Tosca*, 18 F.3d at 1354 citing  *United States v. Perez*, 871 F.2d 45, 48 (6th Cir. 1989) and *United States v. Blanchard*, 9 F.3d 22 (6th Cir. 1993).  The court went on to explain that even though Tosca had no assets or present earnings, "he can make installment payments from prisoner pay earned under the Inmate Financial Responsibility Program.  The Program requires that when an inmate has a financial obligation the Bureau of Prisons staff must help the inmate develop a financial plan to meet the obligation."  *Tosca*, 18 F.3d at 1355.

The BOP's Program Statement 5380.08, Financial Responsibility Program, Inmate, dated August 15, 2005 provides that one of the objectives of the Inmate Financial Responsibility Program ("IFRP") is for all sentenced inmates with financial obligations to develop, with BOP staff assistance, a financial plan to meet those financial obligations.  Program Statement 5380.08 at page 2.  On page 5 of Program Statement 5380.08, an inmate's financial plan should include the following obligations, ordinarily to be paid in the following order of priority:

1. Special Assessments imposed under 18 U.S.C. § 3013;

2. Court-ordered restitution;

3. Fines and court costs;

4. State or local court obligations (including child support); and

5. Other federal government obligations (costs of incarceration followed by a non-exclusive list of civil debts).

A court could presumably change this order of priority in a criminal judgment.

In this case, Defendants will have a lengthy repayment period for paying a fine because the obligation to pay it will not expire for 20 years from the date he is released from BOP custody. Under 18 U.S.C. § 3613(b), a defendant's obligation to pay any fine imposed terminates the later of 20 years from the date of the criminal judgment or 20 years after release from imprisonment. In the event of the defendant's death, his estate will be held responsible for any unpaid balance of restitution.

### 3.    The Court Should Impose Fines on All Defendants

The Court should impose fines as contemplated within the properly calculated Guidelines. Defendants are all highly-trained and skilled dentists with the potential ability to regain their licenses in the future. For example, Dr. Charles Akin was a dentist convicted of Mail and Wire Fraud and sentenced to prison, but was given the opportunity (but failed) to regain his license through Defendant Hills' business OHE. Defendants are all relatively young, with the exception of Defendant Hills. They will be able to seek additional income upon release from incarceration. Finally, the appropriateness of a fine is further supported by the unavailability of asset forfeiture in this case relating to otherwise fungible proceeds of the offense. *See* 18 U.S.C. § 3572(a)(5) (one factor relevant to determination of a fine is "the need to deprive the defendant of illegally obtained gains from the offense").

To the extent that any of the schemes in which defendants participated resulted in no readily demonstrable *actual* loss to MetroHealth or others (such as lost productivity), or in which the Court may not issue an order of restitution, but still resulted in a gain to Defendants, they must be disgorged of the profits of their illegal conduct. For example, the Court may agree with the government that the intended loss from the part-time and secondary employment aspects of the Hobbs Act Conspiracy covers both their lost salary and the lost productivity for MetroHealth. However, the Court may determine that lost productivity is not appropriate for restitution purposes. This decision, while correct, would overlook the fact that Defendants still profited from their enterprise not just from stealing their salary from MetroHealth, but also by earning revenue in their own private clinics while paid by the hospital. Similarly, even though the amount of intended or actual loss resulting from the Oral Health Enrichment and Noble Dental Rent-A-Dentist schemes may be difficult to determine, the amount of restitution due to the hospital is even more difficult to ascertain. Nevertheless, the evidence did establish the defendants profited from illicit schemes and accordingly they must be disgorged of those gains.

### C.   COLLATERAL CONSEQUENCES SHOULD NOT BE CONSIDERED

The Court should be sympathetic toward those who will be adversely affected by Defendants' incarceration, most notably those family members and loved ones who had no role or knowledge of their conduct. However, their incarceration is a natural and foreseeable result of the kind of conduct in which they engaged. Defendants cannot escape an otherwise just sentence by propping up their families to invoke undue sympathy. *See United States v. Musgrave*, 761 F.3d 602, 608–09 (6th Cir. 2014) (rejecting sentencing court's rationale that the defendant "had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life" and describing those circumstances as "[i]mpermissible considerations" in the context of sentencing). "[I]t is

120

impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see Morgan*, 635 Fed. App'x at 446 ("None of these collateral consequences are properly included in [the] sentence. They impermissibly favor criminals ... with privileged backgrounds.")

Not only would such a basis ignore the purpose of the guidelines to bring balance to sentencing white-collar and "blue-collar" defendants, it would ignore the mental calculus that separates those camps. As this Court is certainly aware, many "blue-collar" defendants, while still culpable of criminal offenses, may lack the luxury of credentials that a white-collar defendant enjoys, such as high-paying jobs, advanced education and higher social status, and the multitude of options they open. It is perhaps telling that white-collar crimes not only require and advanced level of planning and circumspection, they also require the defendants to ignore their already beneficial postures in life, such as their families, loved ones, and high-paying careers. These are not options that a many drug dealers in high-crime neighborhoods necessarily have, but they were ones that the Defendants, by their own calculated decisions, chose to abandon.

D.    DEFENDANTS' CONDUCT IS NEITHER ABERRANT NOR DESERVING OF A ROLE REDUCTION

Defendants Alqsous and Al-Madani, although convicted of participating in six or more schemes during an eight-year long RICO conspiracy and a total of 16 and 18 related felony convictions, respectively, claim that they are "minimal" participants in this matter. The Court should consider, and reject, this argument in the context of the overarching breadth of this public corruption case.

This Court has undoubtedly encountered defendants who have committed a single – yet significant – error in judgment and who might otherwise deserve a break at sentencing.

121

Defendants  do not fall  into that category.  Contrary to the well-intentioned  sentiments  expressed by their family  and friends,  none of whom knew about the double life  the defendants  led, their crimes  do not represent a "one-off"  where they experienced  a momentary  lapse in judgment. Instead, Defendants  committed  their crimes  over the course of almost eight  years during  which they had ample  opportunity  to reflect  on what they were doing over and over again.  However, instead of ceasing their misconduct  after one incident  (for example, Alqsous  successfully soliciting  a bribe  from Dr. Al-Saad  or Edward Hills  obtaining  a $3,700 briefcase  from his subordinates),  the defendants  escalated their criminal behavior  and continued  with impunity  until they were caught.  None of the conduct for which  Defendants  Alqsous  and Al-Madani  were convicted  were isolated  incidents  reflecting  temporary  moments  of bad judgment.  Instead, they demonstrated  a calculated  and continued  effort,  in some cases spanning  years, to undermine  the integrity  of MetroHealth  to their personal  benefit  and designed  to maximize  their  public offices and access to individuals  in power.

    Moreover, Defendants  Alqsous  and Al-Madani,  in addition  to the RICO conspiracy charged  in Count 1, were convicted  of 15 and 17 additional  counts  related  to the underlying schemes  in that conspiracy.  This is not a situation  where a defendant  charged in a large-scale, multi-faceted  racketeering  conspiracy  played a small role in only one scheme  for only a few months.  Instead, Defendants  Alqsous  and Al-Madani  were found  guilty  beyond a reasonable doubt of conduct  relevant  to each scheme  in the RICO conspiracy.  Al-Madani  and Alqsous further  played indispensable  roles in these schemes,  each providing  multiple  things  of value to Hills  in the Hobbs  conspiracy;  soliciting  bribes  from Dr. Al-Saad  and Salameh,  or providing valuable  information  about Dr. Yacoub  and Dr. Karadsheh  in the Resident  Bribery  Scheme; threatening  Dr. Karadsheh  to protect  and conceal  the corrupt  enterprise;  providing  the keystone

clinical remediation aspect of OHE; operating and soliciting patient referrals for BFD, and further creating forms for tracking patient referrals; providing undeclared labor to Dr. Wang at NDC; obstructing justice by agreeing to keep secrets from their fiancés/spouses and lying to agents; and allowing procedures to be marked educational for Anthony Jordan. Nothing about their conduct was minimal. Rather, it was essential.

## VII. CONCLUSION

> *The exposure and punishment of public corruption is an honor to a nation, not a disgrace. The shame lies in toleration, not in correction.... If we fail to do all that in us lies to stamp out corruption we cannot escape our share of responsibility for the guilt. The first requisite of successful self-government is unflinching enforcement of the law and the cutting out of corruption.*

Roosevelt, Third Address, *supra*.

The harm Defendants caused to MetroHealth and the public trust are astounding. They took advantage of and corrupted a public hospital whose mission for over 170 years has been to provide much-needed care to those who cannot afford it. Society and the citizens of Cuyahoga County and the Northern District of Ohio expect and demand better from their public servants. Defendants Hills, Alqsous and Al-Madani deliberately engaged in a systematic conspiracy over eight-years in the making to corrupt the good works of MetroHealth into pure profit for themselves. Defendant Sayegh likewise corrupted the very institution that gave him an opportunity for a well-paying career in the United States and tarnished MetroHealth's and the Dental Department's legacy.

Defendants should now be held to account for the full measure of their selfish, greedy and venal conduct. Accordingly, the government requests that the Court sentence the Defendants to lengthy sentences to the fullest extent permissible under the Guidelines and 18 U.S.C. § 3553(a), and reserves the opportunity to request a variance or departure for the reasons stated above.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:     /s/ *Om M. Kakani*
        Om M. Kakani (NY: 4337705)
        /s/ *Michael L. Collyer*
        Michael L. Collyer (OH: 0061719)
        /s/ *James P. Lewis*
        James P. Lewis (MD: 1412170148)
        Assistant United States Attorney
        United States Court House
        801 West Superior Avenue, Suite 400
        Cleveland, OH 44113
        (216) 622-3756/3744/3958
        (216) 685-2378 (facsimile)
        Om.Kakani@usdoj.gov
        Michael.Collyer@usdoj.gov
        James.Lewis@usdoj.gov

<u>CERTIFICATE  OF SERVICE</u>

I hereby  certify  that  on this  5th day of February  2019 a copy of the foregoing  document was filed  electronically.   Notice of this  filing  will  be sent to all  parties  by operation  of the Court's electronic  filing  system.   All  other parties  will  be served by regular  U.S. Mail.   Parties  may access this  filing  through  the Court's system.

/s/ Om Kakani
_____
Om Kakani
Assistant  U.S. Attorney