# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:16-cr-329 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| EDWARD HILLS, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are the motions for new trial based on newly discovered evidence, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, filed by defendants Yazan Al-Madani ("Al-Madani") (Doc. No. 618) and Edward Hills ("Hills") (Doc. No. 620). Also before the Court is the combined motion of defendant Sari Alqsous ("Alqsous") for leave to file a motion for new trial and motion for new trial (Doc. No. 622), as well as Al-Madani's motion for reconsideration of the Court's decision denying him leave to supplement his motion for a new trial (Doc. No. 652). Plaintiff United States of America (the "government") opposes the motions for new trial (Doc. No. 644 (Consolidated Response)) and opposes Al-Madani's request for reconsideration (Doc. No. 645). Al-Madani and Alqsous filed replies in support of their respective Rule 33 motions.[1] (Doc. No. 647 (Alqsous Reply); Doc. No. 653 (Al-Madani Reply).)

## I.  BACKGROUND

The facts surrounding the events charged in the Indictment (and ultimately determined by

---

[1] Alqsous also filed without leave a supplement to his reply (Doc. No. 662), and Al-Madani filed a supplement in support of his motion for reconsideration (Doc. No. 658).

the jury) have been the subject of numerous opinions and decisions by this Court and the Sixth Circuit, including the Sixth Circuit's recent decision on direct appeal. *See United States v. Hills*, 27 F.4th 1155 (6th Cir. 2022). The Court assumes familiarity with these prior decisions and will only supply enough background to provide context for the pending motions.

On July 27, 2018, after a five-week jury trial, Hills, Alqsous, and Al-Madani were each found guilty of sixteen or more federal fraud and fraud-related counts. A fourth defendant, Tariq Sayegh ("Sayegh"), was found guilty of five counts. The charges related to defendants' employment as dentists at MetroHealth Hospital, a public hospital located in Cleveland, Ohio that received federal and state funding. The crimes for which defendants were found guilty included: RICO conspiracy, conspiracy to commit mail and wire fraud and honest services mail and wire fraud, Hobbs Act conspiracy, bribery concerning programs receiving federal funds, solicitation or receipt of healthcare kickbacks, and obstruction of justice. Hills was also convicted of multiple counts of filing false tax returns.

The government's case against defendants was organized into seven distinct but related fraudulent schemes. *See Hills*, 27 F.4th at 1170. Two of the charged schemes are especially relevant to the present motions. The "dental resident bribery" scheme, which spanned the years 2008 to 2014, involved the soliciting and receiving of bribes from dentists applying to the dental residency program at MetroHealth. Al-Madani, Alqsous, and Sayegh—all foreign-born and trained dentists—targeted foreign-born residency candidates with whom they had personal or family connections for the purpose of extracting cash payments in exchange for promises of assistance in getting into MetroHealth's residency program.[2] Four residency candidates—Ahmad

---

[2] Hills was not charged in the "dental resident bribery" scheme.

Alsaad, Yazan Karadsheh, Firas Yacoub, and Seim Salemeh—testified that they were asked to make "donations" of cash in exchange for assistance in getting admitted to MetroHealth's residency program. All three defendants were convicted of conspiring to commit bribery concerning a program receiving federal funds (Count 3) and conspiring to commit honest services mail and wire fraud (Count 4). These defendants were also convicted of one or more substantive counts of federal-program bribery tied to the bribes associated with each individual residency candidate: one count against Alqsous and Sayegh (Count 5 [Seim Salameh]) and two counts against Al-Madani and Sayegh (Counts 6 [Firas Yacoub] and 7 [Yazan Karadsheh]). (Doc. No. 338 (Alqsous Jury Verdicts); Doc. No. 339 (Al-Madani); Doc. No. 340 (Sayegh Jury Verdicts).) Alqsous was acquitted of the substantive bribery counts relating to the candidacies of Yacoub of Karadsheh. (Doc. No. 338, at 6[3] and 7.)

The "stream of benefits bribery" scheme, which took place between 2009 and 2014, involved Hills soliciting and receiving bribes (in cash and other things of value) from Alqsous, Al-Madani, and an unindicted co-conspirator, Dr. Hussein Elrawy ("Dr. Elrawy" or "Elrawy"), in exchange for favorable treatment with respect to their employment at MetroHealth. This favorable treatment included bonuses, accommodations for their preferred candidates for the residency program (such as those who had paid bribes), and the right to work flexible schedules. The jury found Hills, Alqsous, and Al-Mandani each guilty of conspiracy to commit Hobbs Act bribery (Count 2).

At the close of the government's case, defendants moved for judgment of acquittal under

---

[3] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

Fed. R. Crim. P. 29(c), and the Court heard extensive argument over a two-day period before denying the motions. Following the jury's verdicts, each defendant timely renewed his Rule 29(c) motion. The Court denied these motions, as well as Alqsous' motion for a new trial, and proceeded to sentencing. (Doc. No. 421.) Hills received an aggregate prison sentence of 188 months, Alsqsous received 151 months, Al-Madani received 121 months, and Sayegh was sentenced to a term of imprisonment of 60 months.

All four defendants took direct appeals, though Sayegh eventually dismissed his appeal.[4] On appeal, Hills, Alqsous, and Al-Madani challenged the sufficiency of the evidence, alleged deficiencies in the Indictment and the Court's jury instructions, and alleged errors in sentencing. Alqsous also attacked the Court's denial of his suppression motion. While their appeals were pending, Hills, Alqsous, and Al-Madani filed the present Rule 33 motions for new trial. The Court deferred ruling on these motions pending the outcome of the direct appeals in the Sixth Circuit. (Doc. No. 624 (Order).)

On March 3, 2022, the Sixth Circuit issued its decision denying the direct appeals. *Hills, supra*. In so ruling, the Sixth Circuit rejected each argument raised by Hills, Alqsous, and Al-Madani, and affirmed the Court's judgments against them. With respect to the schemes at issue in the present motions—the "dental resident bribery" scheme and the "stream of benefits bribery" scheme—the Sixth Court found that the evidence was amply sufficient to support the jury's verdicts. *Hills*, 27 F.4th at 1175–76, 1180–82. Following the ruling on direct appeal, the Court instructed the government to file a response to the pending motions for new trial based on newly discovered evidence. (Order [non-document], 4/1/2022). These motions are now fully briefed, and

---

[4] Sayegh was released from prison on October 26, 2021. (https://www.bop.gov/inmateloc/).

4

the Court is ready to issue its rulings.

## II.  MOTION TO FILE UNTIMELY RULE 33 MOTION

Before the Court can reach the merits of the Rule 33 motions, it must address one preliminary matter: Alqsous' motion for leave to file an untimely Rule 33 motion (Doc. No. 622). Fed. R. Crim. P. 33(b)(1) provides that "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." The three-year deadline can be extended based upon a showing of "excusable neglect." *United States v. Munoz*, 605 F.3d 359, 367 (6th Cir. 2010). The Sixth Circuit has identified a non-exhaustive list of factors to be balanced in determining whether a party has demonstrated "excusable neglect," including "(1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith." *Id*. at 368 (quotation marks and citation omitted).

On July 26, 2021, Al-Madani filed his motion for a new trial on the basis of newly discovered evidence, with copies of the proposed newly discovered evidence attached thereto as exhibits. On July 27, 2021, exactly three years from the date of the jury's guilty verdicts, Hills filed his motion for a new trial. Eight days later, on August 4, 2021, Alqsous filed his combined motion for leave and motion for a new trial. Alqsous argues that this delay should be excused because the documents upon which he bases his motion—the exhibits attached to Al-Madani's motion—were only made available to Alqsous upon the filing of Al-Madani's motion. (Doc. No. 622, at 14–15.) Until Al-Madani filed his motion, Alqsous was unaware of any basis for a Rule 33 motion premised on newly discovered evidence. Upon learning of such basis, he promptly sought

leave to file a motion beyond the 3-year deadline. (*Id*. at 15.)

The government has indicated that it does not contest the timeliness of Alqsous' motion. (Doc. No. 644, at 3.) It candidly acknowledges that the eight-day delay in filing the afore-mentioned motion will not prejudice it, require it to respond to additional claims beyond what has been raised by Al-Madani and Hills, or otherwise negatively impact these judicial proceedings. In sum, it does not object to the Court making a finding of excusable neglect. (*Id*.)

The Court agrees that Alqsous has demonstrated the requisite excusable neglect, in that the delay was only eight days, and the government will not be prejudiced by the delay. Additionally, given that the Court stayed its consideration of any motions for new trial until the direct appeals were resolved, the delay did not disrupt this Court's judicial proceedings. Finally, there is no evidence that Alqsous acted in bad faith. Accordingly, Alqsous' motion for leave to file a motion for a new trial outside of the time-period specified in Rule 33 for motions based on newly discovered evidence is granted.

## III.   MOTIONS FOR NEW TRIAL

At issue in these motions are three documents submitted by Al-Madani: (1) a screenshot of Facebook messages in 2010 between Sayegh and Firas Yacoub; (2) a summary of an alleged conversations in 2018 between Al-Madani and Sayegh; and (3) an unsigned employment contract between MetroHealth and Dr. Loiy Alshami ("Dr. Alshami" or "Alshami"). Al-Madani relies on all three documents, Alqsous relies on items 2 and 3, and Hills restricts his motion to item 3.

### A.  Standard of Review

"Motions for a new trial based upon newly discovered evidence are disfavored and should be granted with caution." *United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000) (citing *United*

*States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)). The decision to grant a Rule 33 motion for a new trial lies within the Court's sound discretion. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994); *see United States v. Ricketts*, 111 F. App'x 812, 814 (6th Cir. 2004) (A "trial court's decision not to grant a new trial [on the basis of newly discovered evidence] will be affirmed unless it is a clear abuse of discretion." (citing *Seago*, 930 F.2d at 488)). "The defendant bears the burden of proving that a new trial should be granted." *Davis*, 15 F.3d at 531.

To qualify for a new trial based on newly discovered evidence, the defendant must satisfy the following four-part test: (1) the evidence was discovered after trial; (2) it could not have been discovered earlier with due diligence; (3) it is material and not merely cumulative or impeaching; and (4) it would likely produce an acquittal if the case were retried. *Turns*, 198 F.3d at 586–87 (citing *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982)).

### B.  Facebook Posts

Exhibit 1 to Al-Madani's motion includes a screenshot of Facebook messages of a conversation in December 2010 between Sayegh and Firas Yacoub, one of the resident applicants targeted in the dental resident bribery scheme, in which the two appear to exchange contact information. (Doc. No. 618-1.) According to Al-Madani, this piece of evidence represents a significant revelation because it demonstrates Al-Madani did not supply Sayegh with Yacoub's phone number.

The government called Yacoub, a Jordanian dentist who applied for the residency program at MetroHealth during the 2010-2011 application cycle, as a witness at trial. Yacoub testified that Al-Madani was "a relative to one of my close friends." (Doc. No. 394 (Trial Transcript), at 130–31.) After applying, Yacoub visited Cleveland in November 2010 and interviewed for a spot in the

program. Al-Madani was one of the dentists on his interview panel. During his stay, Yacoub also socialized with Al-Madani and Alqsous and, to a lesser extent, Sayegh. (*Id*. at 133–34.) When he returned to Jordan in 2010, he received a phone call from Sayegh, during which Sayegh told Yacoub that MetroHealth "is a very tough competitive program [and] if [he was] willing to give like a [$20,000] donation to like a group of people that are associated with the hospital, they can help support [his] application." (*Id*. at 135–36.) Yacoub indicated he was surprised to get a phone call from Sayegh because he did not know him well and he did not believe he had given out his Jordanian phone number while he was in Cleveland. (*Id*. at 135–36.) Yacoub ultimately agreed to pay the money to Sayegh in installments and was accepted into the program. (*Id*. at 138–44.)

In the government's closing argument, the government's attorney reviewed the evidence relating to the dental resident bribery scheme and reminded the jury that Yacoub was surprised to receive a phone call from Sayegh because he did not socialize much with Sayegh and he did not share his phone number with anyone. (Doc. No. 413 (Trial Transcript), at 15.) The government's attorney did not suggest that it was Al-Madani who supplied Sayegh with Yacoub's phone number. Nevertheless, he emphasized that Al-Madani was "[t]he only link, the only reason that [Yacoub was] being asked [by Sayegh for a bribe] is because Yazan Al-Madani identified him as a Middle Eastern dentist, as someone that, for the group, they could try to exploit and get money from." (*Id*.; Doc. No. 414 (Trial Transcript), at 27.) The government's argument, Al-Madani posits, permitted the jury to infer that Al-Madani had given Sayegh Yacoub's phone number. Al-Madani believes that this inference, now purportedly refuted by the 2010 Facebook messages, destroys Al-Madani's one and only connection to the dental resident bribery scheme. (Doc. No. 618, at 2.)

Even if the Court assumes that the first three prongs of the test are met, there are two

8

problems with Al-Madani's argument that prevent him from satisfying the fourth and final prong. First, without even mentioning the implication that Al-Madani supplied Sayegh with Yacoub's phone number, the Sixth Circuit found that there was "[a]mple evidence" tying Al-Madani to this scheme. *Hills*, 27 F.4th at 1180. As previously noted, Al-Madani had a family/friend connection with Yacoub. Both Yacoub and Karadsheh testified that Al-Madani served on their interview panels and that Al-Madani socialized with them during the interview process. Also, before the official announcement, Al-Madani used Facebook Messenger to let Karadsheh know he had been accepted. And, in 2014, after the investigation had started at MetroHealth, it was Al-Madani who called Karadsheh and warned him not to talk with anybody because Karadsheh could get deported. *Id.* at 1180–81.

Second, given Al-Madani's well established connection to the conspiracy, the government was permitted to rely on *Pinkerton* liability to convict Al-Madani of the underlying substantive counts. "*Pinkerton* liability is a way of holding members of a conspiracy liable for acts committed by other members*." United States v. Hamm*, 952 F.3d 728, 744 (6th Cir. 2020) (quotation marks and citation omitted). Under this doctrine, a member of a conspiracy is liable for the substantive offenses committed by his co-conspirators, "even if he did not participate in them, as long as: (1) the offenses are 'done in furtherance of the conspiracy,' (2) they 'fall within the scope of the unlawful project,' and (3) they are reasonably foreseeable 'consequence[s] of the unlawful agreement.'" *United States v. Sadler*, 24 F.4th 515, 544–45 (6th Cir. 2022) (quoting *Hamm*, 952 F.3d at 744 (further quotation marks and citation omitted)).

Here, the jury was properly instructed on the *Pinkerton* theory of liability (and Al-Madani does not suggest otherwise) and the evidence easily established all three elements. The extraction

of a bribe from Yacoub—a Jordanian dental resident applicant during the relevant application cycle—would have advanced the conspiracy to exploit foreign-born dental applicants for profit in a way that was within the scope of the conspiracy. These facts, plus the family/friend connection Al-Madani shared with Yacoub, made it reasonably foreseeable that Yacoub would be targeted for a bribe. Even if Sayegh acted alone and never discussed his plans to ask Yacoub for a bribe, *Pinkerton* liability would have been sufficient to convict Al-Madani of Count 6. *See Hamm*, 952 F.3d at 744 (under *Pinkerton* liability, the "crimes themselves do not have to have been agreed upon, intended or even discussed" by the defendant for him to be liable (quotation marks and citation omitted)). The fact that Sayegh may have acquired Yacoub's phone number directly from him would not have severed Al-Madani's connection to the conspiracy or meant that *Pinkerton* liability was no longer available to convict Al-Madani of the substantive offenses. Moreover, regardless of how Sayegh acquired Yacoub's phone number, there is nothing about the screenshot of the 2010 messages that dispels the reasonable inference, suggested by the government in its close, that it was Al-Madani who first identified Yacoub to the members of the conspiracy as a possible mark for the dental resident bribery scheme. Accordingly, the Court cannot find that this evidence would likely cause a different result in a retrial.[5] Al-Madani, therefore, is not entitled to a new trial based on the screenshot of the Facebook messages.

### C.  Sayegh's Post-Trial Change of Heart

Exhibit 2 to Al-Madani's motion is an unsigned four-paragraph document that purports to

---

[5] To the extent Al-Madani would use the Facebook messages to impeach Yacoub at a retrial, this would not provide an appropriate basis for granting a motion for a new trial under the third prong of the test. *See Ricketts*, 111 F. App'x at 814 (the third prong of the Rule 33 test for a new trial grounded in newly discovered evidence requires both that the proposed evidence be material and not merely cumulative or *for purposes of impeachment* (citing *Barlow*, 693 F.2d at 966)).

be a summary of a series of conversations in late November and early December 2018 between Al-Madani and Sayegh from the detention facility in which they were held pending sentencing. (Doc. No. 618-2.) In addition to advising Al-Madani that he communicated with Yacoub via Facebook Messenger, Sayegh is alleged to have advised Al-Madani that Sayegh paid bribe money (presumably from the proceeds from the dental resident bribery scheme) to Dr. Matthew Kirlough and Dr. Elrawy. (*Id*. at 1.) Al-Madani suggests that this information is critical as it shows Sayegh's substantial role in the dental resident bribery scheme and implicitly shows Al-Madani's lack of involvement. (Doc. No. 618, at 3–4.)

Alqsous believes that these conversations are significant because they paint Elrawy, a former resident and then attending dentist at MetroHealth and an unindicted co-conspirator, in a bad light. He insists that Elrawy was the "government's tool to purportedly show the jury the inside of how the alleged conspiracies worked." (Doc. No. 622, at 5–6.) These alleged conversations, Alqsous contends, show that Elrawy was actually "the person the defense thought him to be." (*Id*.) According to Alqsous, "[h]ad the jury heard the confession of Tariq Sayegh, they would have understood Hussein Elrawy to be something quite different than the whistleblower the government portrayed him as." (*Id*. at 6.)

The Court finds this first item of "newly discovered evidence" to be inherently incredible and unlikely to produce a different result in a retrial. As a general matter, courts have repeatedly held that a co-defendant's or witness' post-trial willingness to provide exculpatory information to be suspect and unworthy of garnering a new trial. *See United States v. Pierce*, 62 F.3d 818, 825 (6th Cir. 1995) ("[t]he remedy of a new trial seems particularly inappropriate when, as here, the newly discovered evidence lacks credibility, conflicts directly with believable testimony, and is

11

offered by a witness who could easily construct a set of facts to leave Pierce out of the conspiracy" (quotation marks and citations omitted)); *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991) ("recanting affidavits and witness are viewed with extreme suspicion" (citations omitted)); *see also United States v. Vergara*, 714 F.2d 21, 23 (5th Cir. 1983) (holding that the district court may deny the defendant a new trial, without an evidentiary hearing, if it determines that a previously silent accomplice's postconviction willingness to exculpate his codefendant is not credible).

Assuming Sayegh is now willing to admit his involvement in the dental resident bribery scheme in a second trial—which, itself, is a matter of pure speculation—such admissions are suspect because Sayegh has already been convicted for his role in the scheme and double jeopardy has attached. *See Allen v. Yukins*, 366 F.3d 396, 405 (6th Cir. 2004) ("postconviction statements by codefendants are inherently suspect because codefendants may try to assume full responsibility for the crime without any adverse consequences"). The ease with which Al-Madani claims Sayegh subsequently spun a scenario in which he admitted his own involvement (after he had been convicted) without implicating Al-Madani is especially dubious.

Of course, the evidence submitted by Al-Madani does not even establish Sayegh's willingness to testify at a new trial as it is not an affidavit supplied by Sayegh attesting to that fact. It is not even an affidavit from Al-Madani detailing his conversations with Sayegh and recounting Sayegh's expressed desire to testify, which at least might expose Al-Madani to the penalties for perjury. Instead, the document is an unsigned and undated summary prepared by one of Al-Madani's former attorneys, Richard Drucker, sometime after these conversations purportedly took place, and that still does not indicate whether Sayegh would be willing to testify at a new trial.

Moreover, Attorney Drucker was not privy to the alleged conversations between Al-Madani and Sayegh, so he was forced to rely on Al-Madani's representations regarding the details of these discussions. Further, it is worth noting that the only reason the Court has any confidence that this summary was prepared by Attorney Drucker is because another one of Al-Madani's trial attorneys—Patrick Haney—identified it as the summary of a statement Attorney Drucker took from Al-Madani. (Doc. No. 618-4 (Declaration of Patrick Haney) ¶ 3.) Of course, Attorney Haney's identification of the summary in no way speaks to its accuracy or reliability, any more than Attorney Drucker's summary ensures the accuracy of the underlying conversations. For these reasons alone, the evidence is so unreliable that it cannot serve as the basis for a new trial for either Al-Madani or Alqsous.

But assuming that Sayegh was willing to take the stand (or could be compelled to do so), and further assuming that he admits his role in the dental resident bribery scheme, this testimony would be unlikely to result in an acquittal for either Al-Madani or Alqsous in a retrial. Beginning with Al-Madani, the summary does not exonerate him. While Sayegh appears to have admitted his own involvement in the scheme, he does not suggest that Al-Madani was not involved. Rather, the suggestion that Al-Madani was unaware of the details regarding the bribes from resident candidates comes from Al-Madani's own unsworn and self-serving statements to that effect. (*See* Doc. No. 618-2, at 1–2.) Further, as discussed above, any action taken by Sayegh to advance this scheme would not help Al-Madani. As previously discussed, credible trial evidence established Al-Madani's own participation in the underlying conspiracy, and he was therefore liable for the substantive offenses, at a minimum, under a theory of *Pinkerton* liability. There is nothing in the summary that would change either result on a retrial.

Turning to Alqsous' motion, the fact that Alqsous wishes to use Sayegh's testimony to impeach Elrawy means Alqsous cannot satisfy the third prong of the relevant Rule 33 test. *See Ricketts*, 111 F. App'x at 814 (the third prong of the Rule 33 test for a new trial grounded in newly discovered evidence requires both that the proposed evidence be material and not merely cumulative or for purposes of impeachment (citing *Barlow*, 693 F.2d at 966)). It also fails to satisfy the third prong because any attempt at impeachment would have been merely cumulative. Alqsous is correct that Elrawy testified that he was involved in many of the schemes that were charged in the Indictment. While the government may have called Elrawy to provide "an insider's" view of the crimes at issue in this case, Elrawy was an insider because he actively participated in those crimes. At trial, Elrawy testified as to how he, Alqsous, and Al-Madani would provide things of value to Hills and Hills' girlfriend, in exchange for work incentives provided by Hills ("stream of benefits" scheme). (*See, e.g.*, Doc. No. 405 (Trial Transcript), at 29–30; 31–38; 50–51.) Elrawy also testified to how he, Alqsous, and Al-Madani received patient referrals to their private clinics from Hills ("patient referral kickback" scheme), and how Hills arranged for MetroHealth residents to work in their private clinics ("free labor" scheme). Additionally, he testified to his involvement in the "oral health enrichment" scheme. The jury was already well aware that Elrawy was not a model citizen; any further evidence regarding Elrawy's involvement in the crimes charged in this case would have been merely cumulative, providing another reason why the third prong of the test is not satisfied.[6]

Alqsous also overstates the government's reliance on Elrawy's testimony. In his closing

---

[6] Notwithstanding Alqsous' suggestion to the contrary, the government did not attempt to place Elrawy on a morality pedestal. Rather, at the start of his testimony on direct, the government introduced a letter from MetroHealth indicating that Elrawy's employment was terminated in 2015 because Elrawy violated many of the hospital's rules and policies, including its ethical rules. (*Id.* at 21–22.)

14

argument, the government's attorney told the jury that "[t]his case doesn't rest only on Hussein Elrawy." (Doc. No. 414 (Trial Transcript), at 12.) He stressed that the information provided by Elrawy was corroborated by other witnesses, including Joyce Kennedy, and by Alqsous himself. (*Id*. at 12–13.) The government's attorney referred to Alqsous' own text messages, and those of his co-defendants, as the "best evidence" in this corruption case because it described the thought process of the defendants while they executed the various schemes charged in the Indictment. (*Id*. at 13.)

As was the case with Al-Madani, testimony from Sayegh that he paid some of the bribe money from the dental resident bribery scheme to Elrawy also would not have helped Alqsous. As the Sixth Circuit determined on direct appeal, "[a]mple evidence" established Alqsous' own involvement in the dental resident bribery scheme. *Hills*, 27 F.4th at 1180. At trial, the jury heard testimony from Dr. Alsaad, who knew Alqsous from their days in dental school in Jordan. He testified that Alqsous told him that he could ensure his acceptance into the program in return for a "donation" of $20,000. Alsaad stated that he made several payments to Alqsous before making the final payment to Sayegh. (*Id*.) In doing so, Dr. Alsaad testified to his own incriminating illegal activity without any promise of immunity from the government. Additionally, Dr. Issa Salemeh, a physician in Cleveland who was interested in getting his sister Seim Salemeh into the MetroHealth dental residency program, testified that Alqsous told him that he would have to pay $25,000 to Alqsous' "boss" to guarantee a spot in the program for Seim. *Id*. at 1181. The Sixth Circuit concluded from this and other evidence that "[t]here can be no doubt" that the evidence was sufficient to establish that Alqsous and Al-Madani conspired to commit the substantive offenses of federal-program bribery and honest services mail or wire fraud, and that the same evidence

supported the underlying substantive offense for which Alqsous was convicted. *Id*. at 1181–82. Given the substantial evidence of Alqsous' own involvement in soliciting and securing bribes from dental residency candidates, testimony from his co-defendant that Elrawy received some of the bribe money would not diminish Alqsous' considerable involvement and would not, therefore, likely change the outcome on a retrial.

### D.  Dr. Alshami Employment Contract

The final document is an unsigned employment agreement between MetroHealth and Dr. Loiy Alshami, effective July 1, 2015. (Doc. No. 618-3.) The agreement makes no reference to the number of days per week Dr. Alshami was expected to work but indicates that he was to be designated as a full-time employee (otherwise known as a "1.0 FTE"). Al-Mandani represents that he obtained this document via a request for public records he made *after* the trial in this case was concluded. (Doc. No. 618, at 5; *see* Doc. No. 618-4 ¶ 4.)

At trial, Dr. Alshami testified that while working at MetroHealth as a full-time dentist, he also worked at a private dental clinic, Angel Dental. (Doc. No. 402 (Trial Transcript), at 42, 84.) He explained that he worked Monday, Tuesday, Thursday, and Friday for MetroHealth, and worked Wednesday and Saturday at Angel Dental. (*Id*. at 84.) He also testified that, prior to working at Angel Dental, he obtained permission from MetroHealth to work a second job. (*Id*. at 83–4.) A second witness, Dr. Alfred F. Connors, then former Chief Quality Officer and Interim Chief Clinical Officer, testified that full-time employees (or those designated as 1.0 FTE) were required to work at MetroHealth five days a week. (Doc. No. 403 (Trial Transcript), at 304–05.)[7]

---

[7] Dr. Connors explained that dentists are salaried—and not hourly—employees, who were expected to work more than 40 hours per week. As salaried professionals, the expectation at MetroHealth was actually that a dentist would put in between 55 and 60 hours per week. (*Id*. at 303.)

He further testified that, if an employee was designated as "0.8 FTE," he was considered part-time and would be working four days per week or 80 percent of a full-time position. (*Id*. at 305.) Additionally, he noted that any employee who wished to alter his status or schedule would need to seek approval from MetroHealth. (*Id*. at 306.)

In its close, the government highlighted the testimony of Dr. Connors, noting that full-time employees were expected to work five days a week at MetroHealth. (Doc. No. 414, at 19.) The government's attorney argued that Alqsous, Al-Madani, and Elrawy were the only full-time dentists who were permitted by Hills to work "flextime," meaning that they could work fewer than five days a week at MetroHealth so that they could also work at their private clinics. (*Id*.) This flextime arrangement, counsel maintained, was an incentive provided solely to these defendants in exchange for the stream of benefits they sent to Hills. In so arguing that this "flextime" arrangement was fraudulent, counsel distinguished the schedules worked by individuals, such as Alshami, by noting that "[n]one of those people were 1.0 FTEs." (*Id*.)

All three defendants now argue that Dr. Alshami's 2015 employment agreement directly refutes Dr. Connor's testimony that 1.0 FTE employees were required to work five days a week at MetroHealth and would have undercut the government's case that their flextime arrangements were fraudulent. (Doc. No. 618, at 5; Doc. No. 620, at 3; Doc. No. 622, at 10–11.) Hills also argues that it would have had a profound impact on sentencing. (Doc. No. 620, at 3.) Because defendants cannot meet three of the four prongs of the test, this post-trial document does not entitle them to a new trial.

As a preliminary matter, the Court finds that this evidence cannot satisfy the second prong of the test because defendants failed to exercise due diligence in obtaining it. Al-Madani concedes

17

that he obtained this document via a public records request made *after* trial. (*See* Doc. No. 618, at 5.) While the government argues that this concession is fatal to Al-Madani's motion, Al-Madani claims that he also attempted to obtain this document via a Rule 17(c) subpoena to MetroHealth but was not permitted to do so. (*Id*. at 5.) This representation, while technically correct, is deceptively misleading.

On March 19, 2019—eight months *after* the jury returned its verdicts—Al-Madani filed a motion for a Rule 17(c) subpoena seeking records from MetroHealth for use in sentencing. (*See* Doc. No. 475.) The proposed subpoena sought, among other things, the employment contract of Dr. Alshami from 2015. (*Id*. at 4.) The Court denied his request for a Rule 17(c) on April 26, 2019. (Doc. No. 501.) *See United States v. Hills*, No. 1:16-cr-329, 2019 WL 1873220 (N.D. Ohio Apr. 26, 2019). In so ruling, the Court relied in part upon a finding that Al-Madani failed to exercise due diligence in attempting to acquire the information, noting that "[i]ssues relating to the FTE status of defendants and their respective work schedules have been known to Al-Madani since before trial."[8] *Id*. at *3.

Hills actually claims that he attempted to obtain a copy of Dr. Alshami's employment contract *before* trial. (Doc. No. 620, at 2.) He provides no record citation in support of this claim. During the course of this case, Hills and his co-defendants filed numerous pretrial motions seeking Rule 17(c) subpoenas. (*See, e.g*., 98, 114, 118; *see also* Doc. No. 270 (Motion to Quash Hills' Rule 17(c) Subpoena to MetroHealth).) These motions were the subject of many pretrial hearings and

---

[8] Al-Madani claims that it was not clear what the government's theory was until Dr. Connors took the stand, but this argument is without merit. Defendants were put on notice as early as the filing of the Indictment on October 19, 2016, that it was the government's position that their use of a flextime schedule was fraudulent. (*See* Doc. No. 1 (Indictment) ¶ 176 [noting that Hills allowed Alqsous, Al-Madani, and Elrawy "to retain their full-time salaries as Attending Dentists without requiring them to work a full-time schedule at MetroHealth, thus allowing them to work partial weeks and to operate private clinics while paid full-time wages by MetroHealth"].)

conferences, and, although not all were successful, defendants were permitted to use the Court's subpoena power to obtain many documents prior to trial.[9] (*See, e.g.*, Doc. No. 185 (Stipulated Order).) The Court has reviewed these pretrial requests and finds that none sought the document now under consideration.[10]

Notwithstanding defendants' numerous pretrial attempts to subpoena records, there is no evidence that defendants made any attempt to acquire Dr. Alshami's employment contract prior to trial. Under these circumstances, defendants have failed to show that this document "could not have been discovered earlier with due diligence." *United States v. Jones*, 399 F.3d 640, 648 (6th Cir. 2005) (citation omitted). For this reason, alone, this newly discovered evidence entitles them to no relief.

Defendants are also unable to meet the third (relevance) and fourth prong (likely to produce a different result on retrial) of the test. In rejecting his post-trial request for a Rule 17(c) subpoena for employment records (including Dr. Alshami's 2015 contract with MetroHealth), the Court held:

> Whether MetroHealth permitted other dentists and physicians to work a flexible schedule is irrelevant to the question of Al-Madani's culpability for using flex-time to corruptly profit at the expense of the hospital.
>
> ***
>
> Such a consideration would be especially irrelevant given the fact that Al-Madani seeks documents relating to employment practices *after* co-defendant Edward Hills left the administration at MetroHealth. A focal point of the trial was the fact that Hills used his position and influence as a member of senior management of MetroHealth to benefit himself, his codefendants, including Al-Madani, and others.

---

[9] This was in addition to the voluminous discovery defendants received as part of the government's Rule 16 pretrial discovery disclosures.

[10] To the extent Hills is referring to his unsuccessful attempt to subpoena MetroHealth in 2018 to release certain documents, that subpoena did not seek any employment contracts. (*See* Doc. No. 270-1, at 3.)

19

How MetroHealth treated dentists and physicians after the conclusion of the corrupt racketeering scheme charged in the present case is simply irrelevant to any aspect of sentencing relating to Al-Madani and his co-defendants.

To the extent that any of the documents Al-Madani seeks are relevant, they would also be cumulative and, therefore, are not necessary to permit Al-Madani to adequately prepare for sentencing. There was considerable testimony at trial regarding the ability of doctors and dentists to work flexible schedules and engage in outside employment. Dr. Alshami testified as to his full-time position as an attending at trial, including his full disclosure to the Hospital before seeking secondary employment. Alfred Connors, former MetroHealth Chief Medical Officer, Hussein Elrawy, Firas Yacoub, and Stacey Kime were among the many witnesses who testified to the work schedules for dentists at MetroHealth. Al-Madani and his co-defendants were afforded liberal opportunity to explore the issue with these witnesses on cross-examination.

*Hills*, 2019 WL 1873220, at *2. Specifically, "[w]ith respect to the 2015 employment contract for

Alshami," the Court observed:

any comparison with Al-Madani's employment would be of limited value at sentencing. Alshami testified that he started working at Angel Dental *after* Hills left MetroHealth, and that he fully disclosed his employment status to MetroHealth—two facts that distinguish his situation from that of Al-Madani's. Indeed, it is likely that any employment contract from 2015, after the conclusion of the corrupt racketeering scheme, would not inform the Court as to any issues relative to sentencing.

*Id*. at *2 n.4.

The Court's reasoning in 2019 still holds true today. The 2015 employment agreement

between MetroHealth and Dr. Alshami, entered into after Hills left MetroHealth, is not relevant to

the issues in this case. As such, it is not likely that its introduction would lead to a different result

in a retrial. Thus, even if defendants had exercised due diligence in attempting to acquire this piece

20

of "newly discovered evidence," it would not entitle them to relief under Rule 33.[11]

## IV.  CONCLUSION

For the foregoing reasons, defendants' motions for new trial based on newly discovered evidence (Doc. Nos. 618, 620, 622) are DENIED.

**IT IS SO ORDERED**.

Dated: January 30, 2023

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[11] The Court also denies Al-Madani's motion for reconsideration. (Doc. No. 652; *see* Doc. No. 643 (Motion to Amend).) On June 16, 2022, nearly a year after the deadline for filing a Rule 33 motion based on newly discovered evidence and days before the government's response brief was due, Al-Madani sought an order granting him a period of 60 days in which to supplement his Rule 33 motion with newly discovered evidence in the form of yet-to-be acquired affidavits from certain MetroHealth physicians whom he claims were permitted to work less than a full week, yet were classified as full-time employees. (*See* Doc. No. 643, at 1.) The Court denied the request. (Doc. No. 646.) Al-Madani now argues that reconsideration is necessary to prevent manifest injustice. While Al-Madani criticizes the government's argument that amendments are never permitted under Rule 33, the Court denied the request because Al-Madani failed to demonstrate excusable neglect. He now claims that the delay was the result of MetroHealth's interference by way of its legal department advising these physicians not to supply the affidavits. (Doc. No. 652, at 4.) In his supplement, he also offers evidence he believes shows that MetroHealth failed to provide a substantive response to his *2019* documents request. (*See* Doc. No. 658.) Even if all of this is true, it does not entitle Al-Madani to reconsideration. As was the case with Dr. Alshami's employment contract, there is no evidence that Al-Madani made any effort to obtain this information prior to trial. And, as with the purported confession of Sayegh, Al-Madani has not demonstrated that these physicians would now be willing to offer affidavits, or that they would be willing to testify at a retrial. Moreover, for all the reasons discussed herein, it is unlikely that any such testimony would be relevant, non-cumulative, or likely lead to a different result on retrial. Accordingly, Al-Madani has failed to demonstrate any justification for delaying these proceedings further while he attempts to gather "new evidence" that would not entitle him to a new trial. His motion for reconsideration (Doc. No. 652) is DENIED.